UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ALLEN HAMILTON,<br><br>    Petitioner,<br><br> vs.<br><br>ROBERT J. AYERS, Acting Warden<br>of San Quentin State Prison,*<br><br>    Respondent. | Case No. CIV. F-90-363-OWW-P<br><br><u>Death</u> <u>Penalty</u> <u>Case</u><br><br>Order Denying Petitioner's Pro Se Request for Reconsideration of May 5, 2005 Order, for Further Investigation, Evidentiary Hearing and New Counsel (Doc Nos. 334 & 335) |

  Petitioner Michael Allen Hamilton ("Hamilton") filed a motion for reconsideration of the May 5, 2005 order denying his pro se request for further evidentiary hearing and for new counsel, and filed an amendment to his motion for reconsideration with additional documents and argument.  In his motion for reconsideration, Hamilton again seeks investigation that he previously requested: testing of a similar gun and expert evaluation of the crime scene photos regarding gunshot residue and blowback, investigation and other discovery relating to the gun sale from K-Mart, obtaining records and other discovery

---

* Robert J. Ayers is substituted for his predecessor as Acting Warden of San Quentin State Prison, pursuant to Federal Rule of Civil Procedure 25(d).

relating to the condition of his truck tire, declarations/ depositions from percipient and expert witnesses regarding lividity, and declarations/depositions and other discovery of financial and phone records.  Hamilton's amendment seeks to take depositions, or testimony at an evidentiary hearing, of law enforcement officers involved in his trial, of persons involved with the possession and/or storage of the crime scene vehicle, and of all counsel, trial, appellate and federal, who have worked on his case.

<u>Hamilton's motion for reconsideration</u>

Hamilton asserts the denial of his October, 2004 pro se request for further evidentiary hearing and for new counsel is in direct conflict with the authorization to file supplemental evidence and conduct additional investigation granted at the 2003 evidentiary hearing.

Hamilton takes issue with the finding that his conclusion regarding blowback (that it must have been on the shooter) is inconsistent with the trial testimony of criminalist Steven O'Clair.  Hamilton asserts there is no evidence that O'Clair visited the crime scene or examined other evidence which contradicts his testimony.  Hamilton contends the testimony by the pathologist Dr. Morrison, as well as prosecution testimony of the shooting, supports his conclusion.  Hamilton also argues that Detective Salazar's description of the crime scene supports the presence of blowback evidence.  Hamilton contends that further investigation and evidentiary hearing is required.  Hamilton

1  states that he has not received any report by criminalist Charles
2  Morton, whom current counsel asserts she contacted about this
3  issue, and further that Mr. Morton was not provided with the
4  autopsy report, Dr. Morrison's testimony, or crime scene reports.
5      Hamilton takes issue with the finding that inconsistent
6  reports about the lividity present in Gwen's body do not support
7  his claim that he was not responsible for her death.  Hamilton
8  observes that reports from the autopsy do not mention any
9  lividity.  Hamilton asserts that Sgt. Byrd's estimate of time of
10 death based on the lividity he observed is consistent with the
11 timeline Hamilton and his family gave after Gwen's body was
12 discovered.  Hamilton asserts that the detective's test of the
13 flat tire also supports the timeline he and his family gave, and
14 is inconsistent with the statements and testimonies of Detective
15 Salazar and Sgt. Byrd.
16     Hamilton argues with the conclusion that there is no
17 evidence the phone records, if they do exist, would prove his
18 ineffective assistance of counsel claim.  Hamilton asserts he
19 gave prior federal counsel Sam Palmer a letter from Hamilton's
20 son stating the phone records and other financial records might
21 have been turned over to Detective Salazar.  Even without the
22 phone records, Hamilton argues that had he been permitted to
23 investigate, as authorized at the evidentiary hearing, he may
24 have been able to obtain the needed declarations from recipients
25 of phone calls about Gwen's last pregnancy.
26     Hamilton takes issue with the finding that despite any

1  inconsistencies, Lillian Bardsley's testimony still implicated
2  him in the purchase of the shotgun.  Hamilton points to numerous
3  uncertainties in Ms. Bardsley's identification of him (failure to
4  pick him out of a photo line-up, description not matching his
5  physical characteristics), and her in-court identification of
6  Sharon (not Brenda) Burns and Gilbert Garay.  Hamilton argues
7  that if Ms. Bardsley was mistaken (in her identification of
8  Sharon Burns), then all her testimony must be stricken as
9  unreliable.  Hamilton denies he purchased the gun, and seeks to
10 investigate (as he asserts was "authorized" at the evidentiary
11 hearing) the security tape from the store and a list of all other
12 shotgun sales the same day to compare to Ms. Bardsley's
13 description.

14     Hamilton argues that if he is allowed to investigate the
15 fact that he was not the shooter, the testimony of both co-
16 defendants would be undermined and must then be stricken as
17 unreliable and unsupported.  Hamilton asserts that he has
18 presented potentially meritorious evidence which has not been
19 fully investigated and warrants further investigation.  Hamilton
20 contends he has been denied a full and fair hearing, adequate
21 investigation, and the right to cross-examine witnesses.
22 <u>Hamilton's amendment to his motion for reconsideration</u>
23     Hamilton submits two main categories of additional evidence
24 to support his motion:
25 1.   Crime Scene Vehicle
26     Detectives Salazar and Millard photographed and surveyed the

truck for fingerprints before Gwen's body was removed.  Then they were instructed by Sgt. Byrd to finish processing the vehicle.  It was stored at Wallace Towing in Porterville.  Exs. 1, 2, 42, 43, 49 and 54.  Detectives Salazar and Millard went to Wallace towing later that morning (November 3, 1981) to complete the processing, taking photos, lifting latent prints and conducting an air pressure test on the right front tire.  Exs. 1 and 50.  Detectives Salazar and Diaz returned to Wallace Towing on November 6, 1981, and obtained additional evidence.  Exs. 6 and 8.

On November 9, Detective Salazar received a call from Arnold Wiebe Leasing regarding obtaining possession of the truck, for which they had a repossession order.  Ex. 10.  On November 10, Detective Diaz, pursuant to a call from Kern County Deputy Sheriff Johnson, contacted Debbie Douglas and took her statement.  Ex. 44.  On November 12, Detective Salazar contacted Ms. Douglas (aka Howard) regarding her statement and took her to view the crime scene vehicle on November 16.  The vehicle had been turned over to the legal owner, Arnold Wiebe Leasing.  Exs. 15 and 17.

Hamilton was in custody from November 3 to November 5, and re-arrested on November 17, 1981.  Exs. 7, 18A and 38A.  On February 5, 1982, the prosecutor sent a letter to defense counsel informing him that on February 12 the District Attorney's Office would be authorizing the return of the vehicle to its owner, Arnold Wiebe Leasing, and any further inspection of the vehicle should be arranged immediately.  Ex. 56.

**Argument**

Hamilton asserts that any collection of evidence after the vehicle was stored at Wallace Towing was contaminated, and that none of the evidence from the vehicle, either before or after storage, was turned over to the defense.  He claims the defense had no opportunity to determine whether evidence from the vehicle could have led to a suspect other than Hamilton.  Hamilton also argues that the vehicle was transferred to Arnold Wiebe Leasing before November 16, 1981, at a time he was out of custody, not in February of 1982 when notice of the release was sent to trial counsel by the prosecutor.

2.   Hamilton's Statement and the News Release

The first law enforcement interview of Hamilton was tape recorded and conducted by Sgt. Byrd and Detective Montejano between 2:30 and 3:30 am on November 3, 1981.  Exs. 38 and 42. Following the interview, Detective Montejano prepared a news release and called it in to the Tulare Co. Sheriff's Office in Visalia, concluding his investigation at 4:20 am.  Exs. 38 and 40.

Sgt. Lovelady was assigned to interview and conduct a polygraph examination of Hamilton on November 3, 1981, and was briefed by Detectives Salazar and Montejano prior to the exam. Ex. 51.  Detective Montejano assisted Sgt. Lovelady in setting up the polygraph and explaining the exam to Hamilton.  Ex. 38.  Sgt. Lovelady gave Hamilton *Miranda* warnings prior to the exam.  In response to a question, Hamilton stated that one of the

1  detectives told him Gwen had been stabbed to death, and that he
2  only saw a bloody wound at the base of her throat and upper
3  chest, but could not tell what caused the wound.  Ex. 51.
4  Detective Montejano waited outside while the exam was conducted.
5  Exs. 38 and 51.
6       The exam concluded at 12:15 pm, and Sgt. Lovelady said the
7  test was negative and untruthful in certain areas.  Hamilton
8  maintained his innocence, and Sgt. Lovelady contacted Sgt. Byrd.
9  Detective Montejano lodged Hamilton in the jail about 1:25 pm.
10 Ex. 38.  Sgt. Lovelady stated Hamilton flunked the exam in two
11 areas: that Gwen had been killed with a gun (a fact neither he
12 nor anyone else had been notified of at that time) and that the
13 weapon used was a shotgun (a fact no one but the investigating
14 officers and supervisory personnel knew about at that time).
15 Hamilton was again given *Miranda* warnings and was re-interviewed
16 by Sgt. Byrd and Detective Montejano about the results of the
17 exam.  Hamilton stated he knew who killed Gwen, that it was a
18 Canadian, that he had a female with him, and as soon as she got
19 away Hamilton would tell the officers the details.  Ex. 42.
20      During this interview, Hamilton asked to speak to a public
21 defender.  David Liebowitz arrived, and spoke with Hamilton
22 privately.  Hamilton stated Mr. Liebowitz could not answer his
23 question at the time, but would recontact him that evening about
24 6:00 pm.  Hamilton was advised not to have further conversation
25 with law enforcement, and was taken back to the jail where he was
26 booked.  Ex. 38.

1       Sgt. Byrd states that about 11:00 am on November 3, he was
2  requested by Lt. Sgt. McCoy to obtain some photographs of
3  Hamilton, to place on the news in order to attempt to locate the
4  person in the green mustang who Hamilton claimed had given him a
5  ride.  Hamilton was at the Porterville substation, so Sgt. Byrd
6  went there with Detective Salazar and photographed Hamilton with
7  a Polaroid camera.  Hamilton said he wanted to talk to them, and
8  wanted his attorney present.  Hamilton said if he was allowed to
9  talk to a female, he could clear this whole matter up, that the
10 suspect involved was a Canadian on his way back to Canada with
11 the female, and if she could get away then Hamilton could clear
12 up the whole matter.  Mr. Liebowitz was contacted, came over and
13 talked to Hamilton for a short time, then advised them not to
14 talk to Hamilton, but that he would talk to him again at 6:00 pm.
15 Ex. 42 and 43.
16      Detective Montejano's supplemental report on November 3, at
17 12:15 pm, states he had custody of Hamilton and contacted Sgt.
18 Byrd about where Hamilton should go.  He placed Hamilton in
19 Detective Sgt. McCoy's office for a couple of minutes while
20 searching for Sgt. Byrd, but kept him within eye contact.  He
21 observed Hamilton reading a news release that was on McCoy's
22 desk.  At about 12:45 pm, Montejano made contact with Sgt. Byrd,
23 who instructed that Hamilton should be booked at the Tulare
24 County jail, and would be re-interviewed later.  Montejano took
25 Hamilton downstairs and booked him.  Exs. 39 and 40.
26      On November 4 at 1:00 pm, Detective Salazar and Sgt. Byrd

90dp363.ODenyRecond.wpd                 8

1  contacted Hamilton at the Porterville substation to take a color
2  photo.  Hamilton stated he wanted to talk and that he wanted his
3  attorney present, that he could take them to a woman who could
4  clear this up.  Hamilton said he didn't shoot his wife, but he
5  knew who did and mentioned something about "he's on his way to
6  Canada, is a citizen of Canada, and may kill someone else."  Sgt.
7  Byrd told Hamilton they couldn't talk to him without his
8  attorney.  Hamilton continued, saying he flunked the polygraph
9  because he had read the news release that said Gwen had been
10 shot, but he knew it was a shotgun anyhow.  (Detective Salazar
11 notes that there had not been a written news release at that time
12 saying the victim had been shot, only verbal reports.)  Detective
13 Salazar called the Public Defender's office and left a message
14 for Mr. Liebowitz to call the Porterville substation.  Ex. 3.
15      Sgt. McCoy states he was contacted by Sgt. Byrd on November
16 4 at 2:30 pm regarding Hamilton's assertion that he had found out
17 about the shooting of his wife from a news release on McCoy's
18 desk.  Sgt. Byrd related Detective Montejano's account that
19 Hamilton was in McCoy's office and read the news release after he
20 was given the polygraph.  Sgt. McCoy retrieved the news release,
21 marked it for further identification, and noted that it was
22 prepared by Sgt. Byrd during the time Hamilton was taking the
23 polygraph.  Ex. 46.
24      Sgt. Byrd states that he received another call from Hamilton
25 on November 4 that he wished to talk, and contacted his attorney.
26 After Hamilton spoke to his attorney, they were advised he did

1  not wish to talk at this time.  Ex. 42.  The next day, Sgt. Byrd
2  states Hamilton again requested to talk, his attorney was
3  contacted, and he was again advised Hamilton did not wish to make
4  a statement at that time.  Ex. 42.
5       On November 5, at 3:00 pm, Detective Salazar reported that
6  Hamilton was released, and he drove him to his mother and
7  stepfather's house in Porterville.  While on the way, Hamilton
8  was asked if he knew who killed his wife.  Hamilton said he had
9  to contact somebody first and would tell them in a couple of
10 days.  Detective Salazar gave Hamilton his home phone number and
11 asked him to call when he was ready to disclose a suspect.
12 Ex. 6.
13 <u>Argument</u>
14      Hamilton disputes that he was at the Porterville substation
15 on November 3 at 11:00 am (when Sgt. Byrd reported he and
16 Detective Salazar went there to take his picture, Ex. 42),
17 asserting that he was in Visalia taking the polygraph exam that
18 morning.  See Exs. 38 and 51.  Hamilton points out that Sgt.
19 Byrd's own report contradicts when Hamilton's statement (that if
20 he could talk to a female, he could clear the matter up, and that
21 the female was with a Canadian suspect) was made – stating that
22 it was made after they took Hamilton's picture in Porterville,
23 and then stating it was made after Hamilton took the polygraph
24 exam in Visalia.  Hamilton observes that Detective Salazar also
25 relates the story about taking Hamilton's picture in Porterville,
26 but reports it occurred on November 4 at 1:00 pm, instead of

1  November 3 at 11:00 am.  Exs. 3 and 42.

2      Hamilton contends that Sgt. McCoy's report that the news
3  release was prepared by Sgt. Byrd while Hamilton was taking the
4  polygraph exam, Ex. 46, was an attempt to support the above
5  (allegedly discredited) reports in Exs. 3 and 42.  Detective
6  Montejano's testimony contradicts Sgt. McCoy's report, stating
7  the news release was made by him and Lt. Gray.  RT 7:1700-01.
8  Sgt. Byrd's testimony also states there were two news releases
9  and Detective Montejano prepared them both.

10     Hamilton argues that Sgt. McCoy's report raises serious
11 questions about who actually authored the news release, and why
12 the officers went to such lengths to show that Hamilton had not
13 seen it prior to the polygraph exam.  Hamilton asserts their
14 efforts were made in an attempt to give the jury the impression
15 that Hamilton knew more about the crime than he had stated.
16 Hamilton contends that there is a chain of custody question about
17 the news release because, although Sgt. McCoy dated and initialed
18 it on November 4, he did not turn it in as possible evidence
19 until six days later.

20 <u>Closing Argument</u>

21     Hamilton asserts the officers willfully collaborated to
22 falsify reports in order to fortify the case against him.
23 Hamilton contends trial counsel was ineffective for failing to
24 present this evidence in support of his innocence.  Hamilton
25 argues that all appellate counsel have also failed to present
26 this evidence.

Hamilton observes that he has been attempting to obtain a stay of proceedings and new counsel since December, 2000, on the basis that both federal habeas counsel have failed to support the guilt phase claims. Hamilton contends this Court's direction to supplement the record, given at the in camera portion of the 2003 evidentiary hearing, included the authorization of additional investigation. Hamilton presents the exhibits in support of his motion for reconsideration so that he may be granted a full and fair review of all the issues relating to the guilt phase.

Hamilton asserts that the prosecutor 1) prevented access to evidence collected from or related to the crime scene vehicle, 2) prevented examination by forensic experts of the crime scene vehicle, 3) prevented confrontation/cross-examination of prosecution witnesses, 4) allowed release of the crime scene vehicle prior to the conclusion of the trial.

## Requested Relief

Hamilton requests reconsideration of his guilt phase claims in light of the submitted evidence and argument, and that full investigation of these matters be allowed. Pending resolution of the issue of appointment of new counsel, Hamilton requests that independent counsel be appointed to represent him in the matter of further investigation and/or evidentiary hearing, and additionally because Ms. Hart will be a witness in the IAC claim against her. Hamilton contends that Ms. Hart has known of all his claims and done little to nothing to assist him in present these matters in support of his petition, despite adequate

opportunity to do so, and so Hamilton asserts he has lost confidence in Ms. Hart.

If further investigation is granted, Hamilton requests funding for the following depositions, or alternatively, testimony at an evidentiary hearing:

1. Prosecutor O'Hara, Tulare Co. Sheriff's investigator, Sargents Byrd, Lovelady, McCoy, and Remillard, Detectives Salazar, Montejano, Brian Johnson, Diaz, and Millard, Deputy Levario, and Debbie Douglas Howard;
2. Larry Utsler and any other employees/agents of Arnold Wiebe Leasing who participated in the receipt, transfer and/or repossession of the crime scene vehicle;
3. The proprietor and any other employees/agents of Wallace Towing in Porterville responsible for storage of the crime scene vehicle;
4. Trial counsel Liebowitz, appellate counsel Betty L. Dawson, John Grele, Gary Sowards, Samuel Palmer (and his associates Clayton McReynolds and George Dechant), and Katherine Hart.

Hamilton argues this investigation/hearing would be fair and equal treatment in light of the same consideration afforded the State in re-opening the evidentiary hearing in 2004.

<u>Conclusion</u>

Hamilton's requests for investigation exceed the scope of the Court's supplemental authorization to expand the record given at the 2003 evidentiary hearing. None of the evidence or arguments presented by Hamilton justifies starting the

1 investigation over in this case.

2   Hamilton is represented by competent, experienced capital
3 counsel, and has been capably represented during his appeal.  Pro
4 se filings are not proper when a petitioner is represented by
5 counsel.  Hamilton's counsel filed the claims which, in her
6 judgment, she believed should have been raised, and the court has
7 or will rule on those claims.  This filing is an attempt by
8 Hamilton to make an end-run around his counsel.

9   Hamilton's case has been pending in this court for 16 years.
10 Over $650,000 has been spent in these habeas proceedings to
11 investigate and prepare Hamilton's federal petition, and over
12 $3,800 of additional investigation was performed after Hamilton's
13 return from state exhaustion.  Any evidence not presented during
14 the federal proceedings is either unavailable, would not help, or
15 is detrimental to Hamilton.  Hamilton has not presented any
16 evidence, nor shown any justification for additional
17 investigation.  The issues Hamilton now raises are not new, but
18 have been previously raised, but now Hamilton wants to start
19 over.  Two bites at the apple is enough.

20   The evidence that Hamilton points to, regarding the lack of
21 or inconsistent reports about, blowback, lividity of the victim,
22 tire pressure, phone calls about Gwen's last pregnancy, and the
23 identity of the purchaser of the shotgun, does not require
24 additional investigation.  None of the questions Hamilton raises
25 about the evidence from the crime scene vehicle or of any
26 inconsistencies in the law enforcement reports regarding his oral

statement and the news release undermine the verdict.

Hamilton's request for reconsideration of the May 5, 2005 order is DENIED. Hamilton's request for additional investigation and discovery, for evidentiary hearing, and for new federal habeas counsel, is DENIED.

**IT IS SO ORDERED.**

**Dated:     June 28, 2006                        /s/ Oliver W. Wanger**
**b64h1h                                  UNITED STATES DISTRICT JUDGE**