1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   EASTERN DISTRICT OF CALIFORNIA

8

9  MICHAEL ALLEN HAMILTON,           ) Case No. CIV. F-90-363-OWW-P
                                     )
10                    Petitioner,    )
                                     ) Death Penalty Case
11     vs.                           )
                                     ) Final Memorandum Decision
12  ROBERT L. AYERS, JR., Acting Warden ) and Order Denying Petition
   of San Quentin State Prison,*     ) for Writ of Habeas Corpus
13                                   ) and Granting in Part
                      Respondent.    ) Certificate of Appealability
14  _____ )

15

16         Petitioner Michael Allen Hamilton ("Hamilton") first

17  appeared in federal court June 12, 1990, requesting a stay of

18  execution and appointment of counsel.  Hamilton filed his

19  petition for writ of habeas corpus under 28 U.S.C. § 2254

20  December 3, 1991, and amended his petition January 11, 1993.

21  Hamilton was ordered to exhaust state remedies March 18, 1993,

22  and his second state habeas petition was filed in July, 1994.

23  After informal briefing, the California Supreme Court issued an

24  order to show cause ("OSC") on July 17, 1996, addressing issues

25  _____
    * Robert Ayers is substituted for his predecessor as Acting
26  Warden of San Quentin State Prison, pursuant to Federal Rule of
   Civil Procedure 25(d).

1   of juror bias and misconduct.  The matter was referred to the

2   trial court, a referee was appointed, and an evidentiary hearing

3   was held November 4 and 5, 1997.  The California Supreme Court

4   discharged the OSC and denied the petition May 6, 1999, holding

5   the evidence did not show the juror's failure to fully disclose

6   her pretrial knowledge and opinions about the case resulted in

7   the seating of a biased juror since her omissions were

8   inadvertent, and her contemplation of her deceased uncle did not

9   bear on her ability to be fair and was not a pretrial event which

10  she was required to disclose in voir dire.  *In re Hamilton*, 20

11  Cal. 4th 273 (1999).  The remainder of Hamilton's claims in his

12  second state habeas petition were summarily denied.

13      Hamilton filed his fully exhausted petition with supporting

14  points and authorities April 14, 2000.  Respondent Robert Ayers

15  ("the State") filed an answer with supporting points and

16  authorities July 19, 2000, and Hamilton's traverse was filed

17  November 20, 2000.  Hamilton filed his motion for evidentiary

18  hearing December 5, 2000, and the State's opposition to an

19  evidentiary hearing was filed January 2, 2001.  The State was

20  granted leave to file a supplemental opposition to Hamilton's

21  motion for evidentiary hearing January 15, 2002, and Hamilton's

22  response to the supplemental opposition was filed March 1, 2002.

23      Hamilton's motion for evidentiary hearing was granted in

24  part on Claim 2b, addressing the issue of whether trial counsel's

25  performance was deficient for failing to present mitigating

26  evidence.  Claims 8, 10, 12, 14, 15, 21, and subclaims a, g, h,

1   *i*, o, u, w, aj, ak, ao, and as, of Claim 2, were denied an

2   evidentiary hearing and denied on the merits.[1]  *See* Memorandum

3   and Order Granting in Part and Denying in Part Motion for

4   Evidentiary Hearing, dated November 12, 2002.

5        An evidentiary hearing was held December 3 and 4, 2003, at

6   which testimony was received from *Strickland* expert Phillip

7   Cherney, trial counsel David M. Liebowitz, defense investigator

8   Danny Wells, and Hamilton.  Following the hearing, Hamilton was

9   allowed to supplement the record, and did so with documents filed

10  January 26, 2004.  Hamilton filed his post-hearing brief March

11  16, 2004, and the State filed their post-hearing brief on March

12  29, 2004.

13       The State objected to a copy of a letter by Hamilton about

14  his background dated September 20, 1982, first submitted with the

15  supplemental records filed January 26, 2004.  *See* Ex. 133D.  The

16  State argued the late submission, fourteen years after the

17  ineffective assistance of counsel claim was raised and after the

18  completion of habeas discovery and the evidentiary hearing,

19  raises serious questions about its authenticity and reliability.

20  The State submitted a declaration from trial counsel stating he

21  was certain he never saw this document.  The State contended

22  these issues must be resolved before any weight could be given to

23  ───────────────────

24       [1] The analysis of the claims denied evidentiary hearing is
    repeated here for continuity.  The language of the original order
25  inadvertently referred to the standard of review under the
    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").
26  The merits of those claims have been reconsidered under the
    standard in effect prior to the enactment of the AEDPA and the
    result is not altered.

1  this document.  The State's motion to reopen the evidentiary
2  hearing was granted and a hearing addressing the limited issue of
3  the credibility of Exhibit 133D was held September 9, 2004.
4  Hamilton filed his supplemental brief October 26, 2004, and the
5  State filed its supplemental brief November 2, 2004.

6  I.   PROCEDURAL HISTORY

7       Hamilton was convicted of the November 2, 1981 shooting of
8  his wife and their unborn child.  The jury found Hamilton
9  personally used a firearm in the murders.  Two special
10 circumstances, financial gain and multiple murder, were found
11 true as to Hamilton's wife, and the special circumstance of
12 multiple murder was found true as to the fetus.  Hamilton was
13 sentenced to death on December 16, 1982.  On direct appeal the
14 California Supreme Court set aside one of the multiple murder
15 special circumstances and otherwise affirmed the judgment in
16 full.  *People v. Hamilton,* 48 Cal. 3d 1142 (1989).  Hamilton's
17 first state habeas corpus petition, filed March 14, 1989, was
18 summarily denied August 31, 1989, and certiorari was denied March
19 19, 1990.

20 II.  FACTS

21      In 1981, Hamilton, his wife Gwendolyn (Gwen) who was
22 pregnant, and their four children, ages six, four, three and one,
23 lived in Bakersfield.  RT 7:1725, 1740; RT 9:2039-40.  In March
24 of that year, the Hamiltons purchased life insurance policies,
25 $175,000 on Hamilton and $100,000 on Gwen, paying the initial
26 premium for coverage until June.  RT 7:1715-17.  When they did

*ORePetnHam*                          **4**

1  not pay the second quarterly payment on time, the agent

2  personally collected the payment from Hamilton, extending the

3  policy into September.  *Id.* at 1717, 1722.  When the third

4  premium was not received, the agent again visited the Hamiltons

5  on October 17, collecting payment for two months from Gwen,

6  extending the policies into November.  *Id.*

7       In September, Hamilton began an extramarital relationship

8  with Brenda Burns.  RT 8:1798-99.  In October, he called his

9  sister Carolyn Hamilton to ask if she knew anyone who would do

10 something illegal for money.  *Id.* at 1852-53.  Later he told

11 Carolyn he wanted someone to kill Gwen and offered her $20,000

12 from the insurance on Gwen's life if she would help find someone

13 to do the killing.  *Id.* at 1855, 1857-60.  Hamilton told both

14 Carolyn and his brother-in-law Lyle Palmer that he had a

15 girlfriend, but if he left or divorced Gwen he wouldn't have his

16 kids.  *Id.* at 1857; RT 7:1744-45.  Brenda's sister Sharon Burns

17 also testified that Hamilton told her he didn't like the way Gwen

18 was in bed, sexually, and he wanted to divorce her so he could

19 live with Brenda.  RT 8:1842.

20      Carolyn first asked another sister, Victoria (Vicki)

21 Hamilton, who agreed to kill Gwen for $10,000 of the insurance

22 money.  RT 8:1861; RT 9:2045.  However, Vicki moved to Texas a

23 few days later.  RT 8:1959-68.  Carolyn then approached Gilbert

24 Garay, a prior acquaintance she met when both worked as security

25 guards for Porterville Private Patrol.  *Id.* at 1856, 1865-67,

26 1972-77.  Gilbert agreed to kill Gwen for $10,000.  *Id.* at 1867,

1  1974-75.

2      On October 31, Hamilton and Brenda Burns went to K-Mart in

3  Bakersfield and purchased a single-shot 12-gauge shotgun.  RT

4  8:1776, 1801.  Hamilton said he left his identification in the

5  car, so Brenda purchased the gun and shells with money furnished

6  by Hamilton.  *Id.* at 1776; 1802-03, 1805-06.

7      That evening Hamilton, Gwen, and their children drove to

8  Porterville to take their kids trick-or-treating with Carolyn's

9  son.  RT 8:1868.  While accompanying the children trick-or-

10  treating, Hamilton, Carolyn and Gilbert discussed plans for the

11  murder.  *Id.* at 1869-70.  Hamilton told Carolyn he would start to

12  drive his family home, but then stop on Highway 65 claiming one

13  tire was flat, so that Carolyn and Gilbert could drive by and

14  shoot Gwen.  *Id.* at 1869-70, 1982.  Carolyn and Gilbert left in

15  Carolyn's truck a few minutes after Hamilton.  *Id.* at 1981.  As

16  planned, Carolyn and Gilbert found Hamilton crouched down by the

17  tire with Gwen standing beside him holding a flashlight.  *Id.* at

18  1872-73.  Although Carolyn drove by three to four times, Gilbert

19  never pulled the trigger, so they eventually returned to

20  Porterville.  *Id.* at 1874, 1984-85.

21      Hamilton phoned Carolyn about an hour later to ask what

22  happened.  RT 8:1875.  Carolyn made excuses and Hamilton said

23  they would come back to Porterville the next day.  *Id.* at 1875-

24  76.  The next day Hamilton phoned Carolyn to say he would pretend

25  to have lost his wallet while changing the tire.  *Id.* at 1876-77,

26  1987.  Hamilton and Gwen would stop at the same place on the

1  pretext of looking for his wallet.  *Id.* at 1877, 1987.  Carolyn
2  and Gilbert would follow them and shoot Gwen as previously
3  planned.  *Id.*

4      That evening, Hamilton and his family again visited Carolyn,
5  his mother and stepfather, Jacqueline (Jackie) and Sam Piper, in
6  Porterville.  RT 8:1877, 1988.  Carolyn and Gilbert followed
7  Hamilton about a half-hour after he left, and found him and Gwen
8  at the same place, looking for the "lost" wallet.  *Id.* at 1878-
9  79, 1989.  Carolyn and Gilbert drove by several times, but again
10 Gilbert did not shoot.  *Id.* at 1879-80, 1990-91.  Hamilton was
11 mad when he called Carolyn about an hour later, and she made more
12 excuses.  *Id.* at 1881.

13     The following day Hamilton called Carolyn with a new plan.
14 RT 8:1882.  As part of this plan, Carolyn called Gwen and told
15 her that Hamilton's wallet had been found.  *Id.* at 1993.
16 Hamilton and Gwen for the first time left their children with
17 Gwen's sister, who also lived in Bakersfield, and drove a white
18 pickup truck to Porterville.  RT 7:1726-28.  When they arrived,
19 Hamilton surreptitiously gave Carolyn his wallet, so she could
20 return it to him in front of the family.  RT 8:1884.  Hamilton
21 and Carolyn went to pick up Gilbert, and Carolyn and Gilbert told
22 Hamilton they weren't going to shoot Gwen.  *Id.* at 1886-87,
23 1993.  Hamilton said he would do it.  *Id.* at 1888.  Hamilton said
24 he would be hitchhiking, and instructed Carolyn and Gilbert to
25 pick him up and take him back to his pickup.  *Id.* at 1995.
26     This time everything went according to the new plan.

1   Carolyn gave Hamilton an icepick, which he used to jab a hole in

2   one of his pickup's tires.  *Id.* at 1888-89.  Hamilton stopped the

3   pickup along the highway because one tire was going flat.   RT

4   7:1696.  He left Gwen in the truck and walked along the highway,

5   ostensibly to find a place where he could phone for help.  *Id.*

6   Carolyn and Gilbert picked him up in Carolyn's truck and drove

7   him to a phone booth, where Hamilton called his mother and asked

8   her to come help him.  RT 8:1892, 1998; RT 7:1613.  Mrs. Piper

9   said she could not come until Carolyn returned with the truck.

10  *Id.* at 1614.  Carolyn and Gilbert then drove Hamilton back to

11  where Gwen was waiting in the pickup.  RT 8:1892, 1998.  Hamilton

12  took the shotgun, walked over to the pickup, and shot Gwen.  *Id.*

13  1894, 2001.  He returned to the truck and demanded another shell.

14  *Id.* at 1894, 2003.  After reloading, he went back and shot Gwen

15  again.  *Id.* at 1896, 2003-04.

16       Gilbert drove back to the phone booth where they left

17  Hamilton.  RT 8:1897-98, 2006.  Carolyn returned home with the

18  truck after she dropped Gilbert off at a friend's house.  *Id.* at

19  1899-1900.  Carolyn called Hamilton back at the phone booth and

20  said their mother and stepfather were on the way.  *Id.* at 1900;

21  RT 7:1615.  The Pipers drove Carolyn's truck to pick up Hamilton

22  at the phone booth, and then to where Hamilton "discovered" that

23  Gwen had been killed.  *Id.* at 1615-16.

24       An autopsy revealed the cause of Gwen's death was shotgun

25  wounds to the throat and chest, fired at close range.  RT 7:1677-

26  81.  The fetus was viable and died from anoxia caused by Gwen's

ORePetnHam                          **8**

1  death.  *Id.* at 1682-84; RT 8:1929-30.

2      Hamilton first told the police that Gwen had been killed
3  while he was hitch-hiking to the phone booth.  RT 7:1695-98.  The
4  next day, however, he said that she was killed by a Canadian whom
5  he refused to identify.  *Id.* at 1699.  Eventually Vicki told the
6  police of the plan to kill Gwen.  RT 9:2052-53.  With Vicki's
7  consent, the police taped two phone calls between her and
8  Carolyn.  *Id.* at 2054.  Carolyn and Gilbert each confessed when
9  they were arrested, and were each charged with two counts of
10 first degree murder with special circumstances.  RT 8:1904, 2011-
11 12.  Both Carolyn and Gilbert agreed to plead guilty to second
12 degree murder with a dangerous-weapon enhancement, and be
13 sentenced to 16 years to life, in return for their testimony
14 against Hamilton at trial.  *Id.* at 1904, 2013.  Carolyn and
15 Gilbert both testified at trial, identifying Hamilton as Gwen's
16 killer.  *Id.* at 1894-96, 2000-04.

17     At trial, the defense attempted to show that Gilbert might
18 have been the actual killer.  Lilly Bardsley, the clerk from K-
19 Mart who testified for the prosecution that she sold the shotgun
20 to Brenda and Hamilton, was recalled by the defense and testified
21 instead that she sold the gun to Brenda's sister Sharon, who was
22 accompanied by both Hamilton and Gilbert.  RT 9:2145-51, 2157-68.
23 Sharon, also recalled by the prosecution in rebuttal, denied
24 purchasing the shotgun.  *Id.* at 2177-80.  The ATF form filled out
25 at the time the gun was purchased was signed with Brenda's name,
26 and the prosecutor presented expert testimony that the signature

1  was in Brenda's, not Sharon's, handwriting.  *Id.* at 2211-24.

2  Vicki testified that when she first talked to Carolyn after the

3  murder, she assumed Gilbert was the shooter.  *Id.* at 2050.

4  Another defense witness testified that prior to Gwen's murder,

5  Hamilton told her he suspected Vicki and her boyfriend, Stephen

6  Fitzherbert (who was Canadian), were planning to kill him.

7  Hamilton stated, "Well, you know my family, if they want anything

8  bad enough, they'll kill for it."  RT 9:2138-41.  Hamilton did

9  not testify.

10     The jury found Hamilton guilty as charged, and found true

11  the charged special circumstances of intentional murder for

12  financial gain, and two counts of multiple murder.  RT 10:2347-

13  58.  The penalty trial was brief.  The prosecutor presented

14  documentary evidence that ten years previously Hamilton was

15  convicted of grand theft.  *Id.* at 2373-74.  Defense counsel

16  called Hamilton's mother, who testified that as a child Hamilton

17  had been removed from the family home because of abusive conduct

18  by his father, and placed in a series of foster homes.  *Id.* at

19  2382-84.  Hamilton requested permission to read a statement

20  telling the penalty jury he was not guilty, but for unspecified

21  reasons beyond his control he was not permitted to testify or

22  present exonerating evidence, and asking the jury to "return with

23  the penalty described by law for the crime that you have me

24  guilty of."  *Id.* at 2374-81.  Defense counsel objected, and the

25  court refused to permit Hamilton to read the statement.  *Id.*

26  After approximately four hours, the jury returned a verdict

1  imposing the death penalty.  *Id.* at 2419-20.

2  III. APPLICABILITY OF THE AEDPA; STANDARD OF REVIEW

3       On April 24, 1996, Congress passed the Antiterrorism and

4  Effective Death Penalty Act of 1996 ("AEDPA"), amending Chapter

5  153 (28 U.S.C. §§ 2241-2255), which governs federal habeas corpus

6  proceedings.  The United States Supreme Court held the provisions

7  of the AEDPA apply only to cases filed <u>after</u> its effective date.

8  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Under previous Ninth

9  Circuit authority, a capital habeas corpus case was pending or

10 filed when an application for appointment of counsel and a

11 request for a stay of execution was filed.  *Calderon v. U.S.*

12 *Dist. Court (Kelly V)*, 163 F.3d 530, 540 (9th Cir. 1998) (en

13 banc).  However, *Woodford v. Garceau*, 538 U.S. 202 (2003),

14 overturned *Kelly V*, holding that only an application for habeas

15 relief which seeks adjudication on the merits of a petitioner's

16 claims qualifies a case as "pending" under amended § 2254(d).

17 *Id.* at 207.

18      The holding of *Garceau* does not affect the previous rulings

19 that Hamilton is not subject to the limitations of the AEDPA.

20 Hamilton's initial federal habeas petition, which sought

21 adjudication on the merits of his claims, was filed on December

22 3, 1991.  Hamilton's case was pending at the time the AEDPA was

23 enacted and is not subject to the amendments to Chapter 153.

24      Constitutional violations are categorized as either trial

25 error or structural error.  *Arizona v. Fulminante,* 499 U.S. 279,

26 306-10 (1991).  Trial errors "occur during the presentation of

ORePetnHam                        11

1  the case to the jury," and are amenable to harmless-error

2  analysis because they can "be quantitatively assessed in the

3  context of other evidence presented" to determine the effect on

4  the trial.  *Fulminante,* 499 U.S. at 307-308.  Structural errors

5  are "defects in the constitution of the trial mechanism, which

6  defy analysis by 'harmless-error' standards," *id.* at 309, and

7  require "automatic reversal of the conviction because they infect

8  the entire trial process."  *Brecht v. Abrahamson*, 507 U.S. 619,

9  629-30 (1993).

10      The limited scope of federal habeas review does not warrant

11  relief unless trial errors had a "substantial and injurious

12  effect or influence in determining the jury's verdict" and

13  deprived Hamilton of a fair trial in violation of his right to

14  due process.  *Brecht*, 507 U.S. at 623.  In the rare case where a

15  court is in "grave doubt" or "virtual equipoise" about the

16  harmlessness of the error, the error should not be treated as

17  harmless.  *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).  Mixed

18  questions of fact and law require de novo review.  *Dickson v.*

19  *Sullivan*, 849 F.2d 403, 405 (9th Cir. 1988).  State court

20  findings of historical fact are entitled to a presumption of

21  correctness under 28 U.S.C. § 2254(d) (effective until April 23,

22  1996), and are reviewed for clear error.  *Jeffries v. Blodgett*,

23  5 F. 3d 1180, 1187 (9th Cir. 1993).

24  IV.  PRE-TRIAL CLAIMS

25  1.   CLAIM 21: COMPETENCE TO STAND TRIAL

26      Hamilton contends he was incompetent to stand trial and that

no inquiry was made by the court, the prosecutor, or defense counsel, into his mental state even though they were on notice of his possibly disordered or impaired mentality.  Competence to stand trial is a fundamental right which implicates due process. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996).  The test for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam); *Godinez v. Moran*, 509 U.S. 389, 396 (1993).

Cases finding sufficient evidence of incompetency have entailed either extremely erratic and irrational behavior during trial or a lengthy history of acute psychosis and psychiatric treatment.  *Compare Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985) (no real and substantial doubt of competency because five attempted suicides were too distant from the crime, no mental impairment from repeated head injuries and alcoholism, and diagnosis as a sociopath does not affect competency); *and De Kaplany v. Enomoto*, 540 F.2d 975, 983-85 (9th Cir. 1976) (no bona fide doubt of competency despite two emotional and inappropriate outbursts at trial, expert testimony of severe disturbance and paranoid schizophrenia, and a bizarre and gruesome crime); *with Tillery v. Eyeman*, 492 F.2d 1056, 1057-58 (9th Cir. 1974) (incompetence found where the defendant displayed erratic and irrational behavior during trial, such as screaming throughout

the night, laughing at the jury, gesturing to the bailiff,
disrobing in the courtroom and butting his head through a glass
window); *Moore v. United States*, 464 F.2d 663, 665 (9th Cir.
1972) (incompetence shown by the defendant's lengthy history of
acute psychosis, repeat hospitalization for acute mental illness
and hallucinations, and evidence of psychiatric treatment); and
*Odle v. Woodford*, 238 F.3d 1084, 1088 (9th Cir. 2001) (competency
hearing required where section of Odle's brain was removed and
had history of psychotic episodes, despite calm appearance in
court).

On collateral review, the determination of competence is
reviewed as of the time of trial. *De Kaplany*, 540 F.2d at 979-80
(evidence before the state trial judge reviewed to determine if
there should have been a bona fide doubt as to competence).  A
claim of trial court error requires a showing that a reasonable
judge would have had a bona fide doubt as to the defendant's
competence to stand trial. *Amaya-Ruiz v. Stewart*, 121 F.3d 486,
489 (9th Cir. 1997); *cf. Torres v. Prunty*, 223 F.3d 1103, 1109
(9th Cir. 2000) (trial court's finding of no bona fide doubt was
not supported by the record).  A bona fide doubt arises if there
is substantial evidence of incompetence, which includes
irrational behavior, demeanor at trial, and any prior medical
opinion on competence. *Amaya-Ruiz, id.*; *Drope v. Missouri*, 420
U.S. 162, 180 (1975).

Hamilton contends he had a previous psychiatric history
including an admission to a psychiatric ward, was psychiatrically

1  and neuropsychologically impaired during the commission of the

2  crime and pre-trial detention, and suffered from major mental

3  illnesses, all of which required professional intervention and

4  medications while awaiting trial, including treatment for: (1)

5  major depression; (2) suicidal tendencies with at least one

6  attempted suicide while awaiting trial; (3) post-traumatic stress

7  disorder; and (4) psychosis.  Hamilton contends he was

8  administered medications for depression, agitation, anxiety and

9  emotional instability which were not supported by reliable

10  medical or judicial determinations and were contra-indicated for

11  a patient with hyperthyroidism and emotional instability.

12      Hamilton presents in support of this claim the opinion of

13  George Woods, M.D., who asserts that Hamilton's mental state

14  deteriorated during his incarceration before trial.  Dr. Woods

15  relates that Hamilton was observed by medical staff to be

16  anxious, depressed, experienced sleep disturbances and

17  nightmares, and was suicidal, that a psychologist noted his

18  difficulty in concentration, blunted affect (feeling, emotion),

19  exhaustion, sadness and tearfulness, that he was medicated with

20  Etrafon (an antipsychotic drug), Tofranil (an antidepressant) and

21  Benadryl, medications which could have been contra-indicated

22  given his medical history, that he was observed by court staff

23  and jurors to be emotionally constricted, remarkably

24  expressionless, lacking emotion and seemingly detached, while at

25  other times emotionally labile (unstable), weepy and suddenly

26  uncontrollable, and that his emotional responses intensified and

1  he began shouting and crying during a conversation with counsel

2  after his dosage of Etrafon was increased.  Dr. Woods concludes

3  these reports point to a pharmaceutically-induced or aggravated

4  state of confusion, agitation and inattention that likely

5  affected Hamilton's ability to make decisions, testify

6  relevantly, and respond appropriately to courtroom proceedings

7  and developments, and made it extremely unlikely he would have

8  been able to weigh and consider such issues as the advantages and

9  disadvantages about testifying and to reach a rational decision

10 about testifying.  Dr. Woods also concludes that Hamilton's

11 family history of genetic disorders, childhood physical and

12 psychological abuse and atmosphere of sexual abuse, burdened him

13 with extreme mental and emotional impairments, including serious

14 psychiatric disorders, that compromised his ability to fully

15 appreciate the nature and consequences of his acts or to conform

16 his conduct to the requirements of the law.  See Ex. 48.

17     No medical records are presented in support of this claim.

18 Hamilton instead offers the opinion of Dr. Woods, concluding that

19 contemporaneous observations of Hamilton's emotional state during

20 his trial indicate Hamilton's preexisting mental condition was

21 exacerbated by the drugs he was given, rendering it extremely

22 unlikely Hamilton was able to make rational decisions.  No

23 declaration regarding Hamilton's competency is submitted from

24 trial counsel.

25     Further, Hamilton has not cited, and the record does not

26 show, one instance of Hamilton acting irrationally during the

1    pretrial, trial or sentencing proceedings.  To the contrary, on

2    the three occasions when the trial court conversed with Hamilton

3    regarding his request to be moved to an alternate cell, his

4    *Marsden*[2] motion, and his request to read a statement to the jury,

5    Hamilton responded appropriately and intelligently, indicating an

6    understanding of the court's explanations.  See RT May 17, 1982;

7    RT June 22, 1982; RT 10:2374-81.  Even Hamilton's proclamation of

8    his innocence prior to sentencing indicates his ability to

9    control his emotions and communicate, despite facing an extremely

10   stressful event.  See RT December 16, 1982.

11        Finally and very importantly, Hamilton has not shown that he

12   was unable to understand the nature of the proceedings against

13   him or to assist counsel.  To the contrary, Hamilton's discourses

14   with the trial court indicate he was fully aware of what was

15   occurring and was able to communicate his thoughts and opinions

16   to counsel.

17        Hamilton filed supplemental records on January 26, 2004,

18   which included Tulare County Jail Medical Records from December

19   1981 through March 1982, as well as medical records from Kings

20   View Clinic of a mental health evaluation on April 8, 1982, and

21   medication orders for May through October, 1982.  The jail

22   records show that Hamilton was receiving medication for

23   depression in March, 1982, and that it had been discontinued for

24   an unknown reason.  *See* Ex. 140.  The Kings View diagnosis

25   attributed Hamilton's blunted affect (feelings, emotions) and

26

        [2] *People v. Marsden*, 2 Cal. 3d 118 (1970).

1  depressed mood to being incarcerated and charged with murder.

2  *See* Ex. 134.   The supplemental evidence does not support

3  Hamilton's claim that he was incompetent.

4       When the record is viewed as a whole, the evidence presented

5  by Dr. Woods does not raise a "bona fide doubt" as to Hamilton's

6  competence to stand trial.   Based on the evidence presented,

7  defense counsel was not ineffective for failing to raise the

8  issue of Hamilton's competence.   The record fairly supports the

9  California Supreme Court's summary denial of this claim.   Claim

10 21 is denied on the merits.

11 2.   CLAIMS 1 & 2ab:   CHANGE OF VENUE; INEFFECTIVE ASSISTANCE OF

12      COUNSEL

13       Hamilton contends the trial court erred by twice denying his

14 request to change venue.   Hamilton also argues trial counsel

15 provided ineffective assistance by failing to pursue the

16 interlocutory appeal of the trial court's denial of his change of

17 venue motion.   Hamilton asserts the publicity before and during

18 his trial in Tulare County was so pervasive it was not possible

19 to impanel an impartial jury.   Hamilton alleges the media

20 coverage included grave inaccuracies, extra-judicial proof of

21 guilt, references to inadmissable evidence, and opinions by court

22 officers and state agents about his guilt and the appropriateness

23 of the death penalty.

24       The California Supreme Court reviewed this claim on direct

25 appeal, examining (1) the nature and extent of pretrial

26 publicity, (2) the county's population, (3) the nature and

ORePetnHam                          **18**

1  gravity of the offense, (4) the status of the victim and of the

2  accused in the community, (5) the existence of political

3  overtones in the case, and the actual jury voir dire.  The Court

4  denied this claim, finding the trial court's denial of Hamilton's

5  change of venue motion did not result in a reasonable likelihood

6  of an unfair trial.  *Hamilton,* 48 Cal. 3d at 1156-57.

7      Hamilton claims approximately 83% of the potential jurors

8  (126 of 147) and of the impaneled jurors (10 of 12) had been

9  exposed to the extensive media coverage of the murder.  Hamilton

10  maintains the selection of the jury and the conduct of the trial

11  resulted in the prejudicial exposure to inaccurate, exaggerated,

12  inflammatory publicity and extrajudicial information about his

13  guilt or innocence.  Hamilton alleges several jurors read a great

14  deal about the case before being called for jury duty, several

15  had extrajudicial information about fetal viability which they

16  shared with other jurors, and one juror thought she saw

17  Hamilton's sister near her house during trial.

18      A criminal defendant is entitled to an impartial jury.

19  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Where prejudicial

20  publicity makes seating an impartial jury impossible, a motion

21  for change of venue must be granted.  *Harris v. Pulley*, 885 F.2d

22  1354, 1360 (9th Cir. 1988); *Gallegos v. McDaniel*, 124 F.3d 1065,

23  1070 (9th Cir. 1997).  Prejudice of the venire may be presumed or

24  actual.  On habeas review, the district court must make an

25  independent review of the record to determine if prejudice

26  existed which denied the petitioner a fair trial.  *Jeffries v.*

1  *Blodgett*, 5 F.3d 1180, 1189 (9th Cir. 1993).

2  <u>Presumed Prejudice</u>

3          "Prejudice is presumed when the record demonstrates that

4  the community where the trial was held was saturated with

5  prejudicial and inflammatory media publicity about the crime."

6  *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996).

7  Prejudice is rarely presumed "because 'saturation' defines

8  conditions found only in extreme situations." *Jeffries*, 5 F.3d

9  at 1189.  Prejudice is not established where the nature of the

10 news coverage was factual and not inflammatory, and the bulk of

11 the publicity occurred months before jury selection began.  *Id.*

12         The evidence presented does not undermine the California

13 Supreme Court's finding that the publicity in this case was not

14 inflammatory nor very extensive for a crime of this magnitude.

15 *Hamilton*, 48 Cal. 3d at 1157; Ex. 60.  The submitted evidence

16 includes news articles from three area newspapers.  Six of the

17 articles were published in first five days following the murder

18 (through November 7, 1981) and another nine articles in the next

19 twenty-five days (through December 3, 1981).  Until the start of

20 jury selection on October 6, 1982, ten articles were published:

21 three in February, two in March, one in April, two each in June

22 and September.  The submitted evidence supports the state court's

23 finding that the majority of news articles appeared immediately

24 following the crime and almost a year before the trial, that the

25 publicity was not persistent and pervasive, and that it did not

26 create a reasonable likelihood Hamilton would be deprived of a

1    fair trial.  *Id.* at 1157-58.  Prejudice cannot be presumed in

2    this case.

3    <u>Actual Prejudice</u>

4         To establish actual prejudice, the defendant must

5    demonstrate that the jurors exhibited "actual partiality or

6    hostility that could not be laid aside."  *Harris*, 885 F.2d at

7    1363.  A defendant is entitled to an impartial jury, but that

8    does not mean a jury completely ignorant of the facts.  *United*

9    *States v. Flores-Elias*, 650 F.2d 1149 (9th Cir. 1981).  "The

10   relevant question is . . . whether the jurors . . . had such

11   fixed opinions that they could not judge impartially the guilt of

12   the defendant."  *Patton v. Yount*, 467 U.S. 1025, 1035 (1984).  A

13   key factor in evaluating the reliability of jurors' assurances of

14   impartiality is the percentage of veniremen who "will admit to

15   disqualifying prejudice."  *Murphy v. Florida*, 421 U.S. 794, 803

16   (1975).  Prejudice was not been established where 25 per cent of

17   the venire were excused because they indicated an opinion about

18   the defendant's guilt.  *Id.*; *contra, Irvin v. Dowd*, 366 U.S. 717,

19   727 (1961) (90 per cent of venire held some opinion as to guilt,

20   over 60 per cent were excused for cause as having a fixed opinion

21   of defendant's guilt).

22        Here about 20 per cent, 30 of the 152 persons in the venire,

23   were excused because they had formed a bias from the publicity

24   about the case.  Many of the potential jurors who had heard about

25   the case but were not excused for cause had only heard Hamilton's

26   version of the events (he had car trouble, he left to get help

and returned to find his wife murdered).  Actual prejudice is not established in this case.  Counsel was not deficient in failing to pursue a meritless appeal of venue.  The record fairly supports the California Supreme Court's denial of this claim. Claim 1 and Claim 2ab are denied on the merits.

3.   CLAIM 5:  IMPAIRED RIGHT TO TRIAL BY JURY[3]

     a.   *WITHERSPOON* ERROR

     Hamilton contends that jurors were excused who did not meet the *Witherspoon* standard, as they were excused without being informed of their duty to subordinate their views and follow the law.  *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Wainwright v. Witt*, 469 U.S. 412, 420 (1985).

     Hamilton does not indicate which excusals of potential jurors he objects to, and no argument is presented in support of this claim.  The excusal of Mr. Skidmore was raised and rejected in Hamilton's direct appeal.  The California Supreme Court found Mr. Skidmore's excusal complied with *Witherspoon* and *Witt*, because he made it unmistakably clear that, regardless of the evidence, he would not vote for the death penalty unless he was an eyewitness to the murder.  *Hamilton*, 48 Cal. 3d at 1165-66.

     Hamilton further asserts that the trial court erred in not

---

[3] Hamilton raises three challenges to the jury composition for which he provides no supporting evidence, factual explanation, or argument: subclaim b. that the manner of voir dire was inherently unfair; subclaim c. that jurors were from outside the geographic area of the crime; and subclaim d. that the jury was subjected to unfair and discriminatory remarks by court officers and the prosecution.  These subclaims are denied on the merits as they fail to state a prima facie claim for relief and are unsupported by any facts.

1  excusing two "pro-death" jurors, Wendell Webb and Geneva

2  Gholston.  Although Hamilton raises this claim in his petition,

3  the claim is not included in his supporting argument.[4]

4      A prospective juror is required to be excused under

5  *Witherspoon* and *Witt* if his or her views on capital punishment

6  would prevent or substantially impair the performance of the

7  juror's duties.  The inquiry on review is whether the finding is

8  fairly supported by the record.  *Hendricks v. Vasquez*, 974 F.2d

9  1099 (9th Cir. 1992).  A trial judge's factual finding about

10 juror bias is entitled to a presumption of correctness under

11 (former) 28 U.S.C. § 2254(d).  *Witt*, 469 U.S. at 429; *Hendricks,*

12 at 1103.  Even assuming for the sake of argument the trial judge

13 incorrectly denied an excusal for cause, the question is whether

14 the jury which actually was impaneled was impartial.  *Ross v.*

15 *Oklahoma,* 487 U.S. 81, 86 (1988).

16     Hamilton has presented no evidence to overturn the

17 presumption of correctness given the trial court's findings

18 regarding juror bias.  Further, review of the pertinent portions

19 _____

20     [4] Wendell Webb stated "I am personally in favor of the death
   sentence."  On further questioning, he said his main concern was
21 that he didn't "believe that if someone takes a life they should
   ever walk the streets again. . . . But as I said, my personal
22 belief is now that eventually someone would walk the streets
   again."  Voir Dire RT 2:392-93.  After questioning by the
23 prosecutor, Webb indicated that he could follow the law and weigh
   the evidence presented during the penalty phase.  *Id.* at 394.
24     Geneva Gholston stated that her personal beliefs were not so
   opposed to the death penalty that she could never vote for death,
25 and that she would weigh both alternatives of life without parole
   as well as death during the penalty phase.  Voir Dire RT 4:1094-95.
26 The claim as to Gholston appears to be based on information raised
   in Hamilton's state exhaustion petition.  See Claim 6d.

of the trial transcript, including the voir dire of jurors Webb

and Gholston, fails to indicate the impaneled jury was not

impartial.   Defense counsel was not ineffective for failing to

object to the jury's composition.   The record fairly supports the

California Supreme Court's denial of this claim.   Claim 5a is

denied on the merits.

  e.   FAIR CROSS-SECTION CLAIM

       Hamilton alleges that Hispanics and other minorities were

systematically excluded from his jury.   Hamilton contends 30% of

Tulare County was Hispanic in 1980-81.   (The 1980 census

indicates 73,290 Hispanics and 245,738 total population.)

Hamilton asserts that the Tulare County jury book for 1981

contained 14% Hispanic surnames (Appendix B: 1,461 of 10,495),

that his jury pool was 11% Hispanic (Appendix C: 20 of 160), and

that no Hispanics were seated on his jury.   Hamilton contends the

county erred by using voter registration and DMV records when

there was access to lists reflecting a more accurate cross-

section of the population.   Hamilton further asserts the county

was able to control the racial/ethnic composition of panels

through computerized data processing.

       The Sixth Amendment guarantees a criminal defendant an

impartial jury drawn from a fair cross-section of the community.

*Taylor v. Louisiana*, 419 U.S. 522, 530 (1985).   "In order to

establish a prima facie violation of the fair-cross-section

requirement, the defendant must show: (1) that the group alleged

to be excluded is a 'distinctive' group in the community; (2)

1  that the representation of this group in venires from which
2  juries are selected is not fair and reasonable in relation to the
3  number of such persons in the community; and (3) that this under-
4  representation is due to the systematic exclusion of the group in
5  the jury selection process." *Duren v. Missouri*, 439 U.S. 357,
6  364 (1979).

7        Proof of unconstitutional discrimination has not been
8  established by statistics showing a 10% or less absolute
9  disparity between the group representation on the jury venire and
10 in the community.  "We cannot say that purposeful discrimination
11 based on race alone is satisfactorily proved by showing that an
12 identifiable group in a community is under-represented by as much
13 as 10%."  *Swain v. Alabama*, 380 U.S. 202, 208-09 (1965),
14 *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79,
15 90-96 (1986).

16        The 1980 census showed that the *adult* population of
17 Hispanics in Tulare County was 24.85%.  *People v. Howard*, 1 Cal.
18 4th 1132 (1992); Appendix A (Total adult population - 165,565;
19 Hispanic adult population - 41,142 = 24.85% ).  The number of
20 people with Hispanic surnames in Hamilton's jury pool was 22.
21 (Appendix D omitted Jerry Rocha and Mary Rodarte.)  The
22 percentage of Hispanics on Hamilton's venire was 13.75% (22 of
23 160).  These figures represent a 11.1% absolute disparity between
24 the Hispanic representation on Hamilton's jury venire and in the
25 county's adult Hispanic population.

26        Although this percentage of under-representation is

1 slightly greater than the amount held inadequate to alone show

2 purposeful discrimination in *Swain*, Hamilton fails to address

3 other issues which would narrow the gap between adult population

4 and the jury pool, such as citizenship, prior felony conviction,

5 or the ability to speak and understand English.  *See* California

6 Code of Civil Procedure section 230 and *United States v. Torres-*

7 *Hernandez*, 447 F.3d 699, 701 (9th Cir. 2006) (holding a

8 determination of under-representation must rely on evidence that

9 most accurately reflects the jury-eligible population).

10       Hamilton provides no evidence to support his allegation

11 that the disparity is due to the systematic exclusion of

12 Hispanics in the jury selection process.  In fact, Hamilton's

13 allegation of computerized manipulation is undermined by the

14 declaration of Steve Konishi, court administrator for Tulare

15 County, stating that no procedures to monitor racial composition

16 exist, nor has the county ever been required to study racial

17 representation on jury panels.  See Appendix F.

18       Even assuming that Hamilton has presented sufficient

19 evidence to meet the second prong of *Duren*, there is no evidence

20 that the under-representation was caused by a systematic

21 exclusion of Hispanics from the jury selection process.  Based on

22 this evidence, defense counsel was not ineffective for failing to

23 object to the composition of the jury.  The record fairly

24 supports the California Supreme Court's summary denial of this

25 claim.  Claim 5e is denied on the merits.

26 /////

1        **f.**   *BATSON* CLAIM

2      Hamilton contends the prosecutor exercised peremptory

3 challenges to remove Hispanics or other minorities, as well as

4 persons with scruples against the death penalty, from the jury.

5 However, Hamilton has provided no evidence, factual explanation

6 or argument in support of this claim, instead he only lists page

7 citations for the voir dire of Hispanics on his jury venire. See

8 Appendix D.  This claim was not raised at trial.

9      The improper exercise by a prosecutor of a peremptory

10 challenge can deny a defendant the Equal Protection of the laws

11 under *Batson v. Kentucky*.  Although Hamilton was tried before the

12 Supreme Court decided *Batson*, both state and federal law grounds

13 existed under which he could have challenged the jury selection

14 process.  *People v. Wheeler*, 22 Cal. 3d 258, 272 (1978)

15 (prosecutor's use of peremptory challenges to remove prospective

16 jurors on basis of race violates state constitution); *Ford v.*

17 *Georgia*, 498 U.S. 411, 420 (1991) (defendant who was tried before

18 *Batson* and raised a contemporaneous objection to jury selection

19 based on *Swain v. Alabama* preserved a *Batson* claim for direct

20 appeal).  Under California law, a challenge to the composition of

21 the jury based on a prosecutor's improper exercise of peremptory

22 challenges must be made prior to the completion of jury

23 selection, that is, before the jury is sworn or alternates are

24 impaneled.  *Wheeler*, 22 Cal. 3d at 280-282; *People v. Ortega*, 156

25 Cal. App. 3d 63, 69-70 (1984).

26      To excuse procedural default, Hamilton must establish both

ORePetnHam

1  cause and actual prejudice.  *United States v. Frady*, 456 U.S.

2  152, 169 (1982).  An attorney's ignorance or inadvertent error

3  does not establish cause for procedural default unless the

4  attorney's performance is constitutionally defective.  *Murray v.*

5  *Carrier*, 477 U.S. 478, 488 (1986) (citing *Strickland v.*

6  *Washington*, 466 U.S. 668, 690 (1984)).  Thus, "the mere fact that

7  counsel failed to recognize the factual or legal basis for a

8  claim, or failed to raise the claim despite recognizing it, does

9  not constitute cause for procedural default."  *Carrier*, 477 U.S.

10  at 486-87.  Further, the establishment of a new federal claim

11  does not provide cause for a default if the alleged error also

12  violated established state law and no objection was made on state

13  law grounds.  *Dugger v. Adams*, 489 U.S. 401, 407-08 (1989).

14  Actual prejudice requires that Hamilton show "the errors at his

15  trial . . . worked to his actual and substantial disadvantage,

16  infecting his entire trial with errors of constitutional

17  dimension."  *Frady*, 456 U.S. at 170.

18       Hamilton's failure to raise this claim during trial, when it

19  could have been timely addressed, renders adequate review

20  difficult, since the opportunity for the prosecutor to provide a

21  basis for his peremptory challenges was lost.  For five of the

22  seven potential jurors with Hispanic surnames the prosecutor

23  excused, a non-racial basis for each excusal is apparent on the

24  face of the record.  Since this claim was not raised during

25  trial, when the prosecutor could have articulated non-racial

26  reasons for the challenges which are not apparent from the cold

1   record, and because Hamilton has shown no error resulting from

2   the prosecutor's exercise of peremptory challenges which worked

3   to his actual or substantial disadvantage, it cannot be assumed

4   that the other two challenges were improper.  Review of the

5   record establishes that, overall, an "inference of

6   discrimination" is not raised.  *Johnson v. California*, 545 U.S.

7   162, 168 (2005).  This evidence from the record that no

8   discriminatory exercise of challenges occurred means defense

9   counsel was not ineffective for failing to object to the jury

10  selection process.  The record fairly supports the California

11  Supreme Court's summary merits denial of this claim.  Claim 5f is

12  denied on the merits.

13  4.   CLAIM 6:   JUROR MISCONDUCT

14       d.   FAILURE TO DISCLOSE BIAS

15       Hamilton alleges Geneva Gholston failed to disclose that

16  prior to being summoned for jury duty she formed the opinion

17  Hamilton was guilty, that she was motived to serve to avenge

18  certain crimes, that she was guided by a dead uncle to impose

19  death, and that she had extrajudicial contact with and fear of

20  Hamilton's sister Vicki and her boyfriend Stephen Fitzherbert

21  (who she saw parked in the alley behind her house) which prompted

22  her to request police protection.  Hamilton asserts Ms.

23  Gholston's failure to disclose her bias violated his right to an

24  impartial jury and prevented trial counsel from examining her to

25  determine prejudice.

26       On state exhaustion, the California Supreme Court ordered an

1   evidentiary hearing on this claim.  The state trial court held,

2   based on factual findings by the referee, that even if Ms.

3   Gholston's voir dire answers understated her pretrial awareness

4   and impressions about the case, particularly with respect to

5   Hamilton's claim of a Canadian killer, her omissions did not lead

6   to the seating of a biased juror.  *In re Hamilton*, 20 Cal. 4th at

7   298.  The state court found that Ms. Gholston stated on voir dire

8   she was impartial, and *regardless of any pretrial impressions*,

9   she could and would judge the case solely on the evidence; that

10  she has since insisted at all stages her exposure to pretrial

11  information did not affect her fairness at trial; that the

12  referee, after watching Ms. Gholston testify, explicitly credited

13  her claim of impartiality.  The state supreme court found the

14  circumstantial evidence did not rebut the findings and there was

15  no basis to conclude Ms. Gholston's failure to disclose fully her

16  pretrial knowledge and opinions about Hamilton's case resulted in

17  the seating of a biased juror.  *Id.*, 20 Cal. 4th at 301.

18      The state court further held "the evidence provides no

19  convincing reason to credit [Ms.] Gholston's 1994 declaration

20  [which was prepared by a defense investigator], so lurid as to

21  raise doubts on its face, over her subsequent [contrary] and more

22  reasonable disclaimers both in writing and on the witness stand."

23  *Id.* at 304.  Like the referee, the state court accepted Ms.

24  Gholston's assurance that "the 1994 declaration does not

25  accurately set forth the 'Uncle Frank' episode, and that the true

26  experience is one which could have no bearing on her fairness as

1    a juror."  *Id.* at 304.  The Court also found no substantial
2    likelihood that the alleged alley incident with Vicki Hamilton
3    and Stephen Fitzherbert, as described by Ms. Gholston, caused her
4    to develop actual bias against Hamilton.  *Id.* at 306.

5        Hamilton does not seek to present any additional facts on
6    this claim, but disputes the conclusions reached by the state
7    referee, which were adopted by the California Supreme Court.
8    Hamilton contends the referee's findings were contrary to the
9    facts and that he has stated a claim for relief under federal
10   law.  Hamilton asserts Ms. Gholston's bias was entrenched; that
11   the opinion she formed about Hamilton's guilt during the
12   conversation with her neighbor was not superficial; that her fear
13   of Hamilton's sister affected her decision; that the "presence"
14   of her uncle contributed to her prejudgment of the case; that she
15   is not a competent witness of her own mental state; and that her
16   statements at the hearing and to investigators were demonstrative
17   of bias.  Hamilton contends Ms. Gholston was profoundly
18   influenced by both pretrial bias and bias which developed during
19   the trial such that he did not receive a fair trial.

20       The Sixth Amendment entitles a criminal defendant to a
21   verdict rendered by impartial, indifferent jurors.  To justify a
22   new trial based on a claim of juror bias, a petitioner must show
23   a dishonest answer was given on voir dire to a material question
24   and that the correct response would have provided a valid basis
25   for a challenge for cause.  *McDonough Power Equipment, Inc. v.*
26   *Greenwood*, 464 U.S. 548, 556 (1984) (plurality opinion); *Tinsley*

1  *v. Borg*, 895 F.2d 520, 524 (9th Cir. 1990).  A voir dire question

2  is material when the honest response would reflect bias,

3  prejudice or partiality against a party.  *Coughlin v. Tailhook*

4  *Ass'n.*, 112 F.3d 1052, 1061 (9th Cir. 1997) (finding a juror's

5  dishonest answers on voir dire were unrelated to material

6  questions as they did not result in any bias to the defendant);

7  *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (an

8  intentionally dishonest answer to a voir dire question is not

9  fatal unless it indicates a bias).  "Few voir dires are

10 impeccable, and most irregularities can be shrugged off as

11 immaterial to the fairness of the trial."  *Dyer*, 151 F.3d at 984.

12     State-court determinations of factual issues are presumed

13 correct unless an exception is present.  28 U.S.C. § 2254(d).

14 The exceptions to § 2254(d)'s presumption of correctness

15 essentially codified the standards requiring an evidentiary

16 hearing from *Townsend v. Sain*, 372 U.S. 293 (1963).  *Thompson v.*

17 *Keohane*, 516 U.S. 99, 108-09 (1995).  If a habeas petitioner has

18 had a full and fair hearing resulting in reliable findings, the

19 federal court ordinarily should accept the facts as found by the

20 state tribunal.  *Id.* at 109.  The determination of basic,

21 primary, or historical facts are subject to the presumption of

22 correctness, while the application of a legal standard, the

23 ultimate question, generally is not subject to § 2254(d).

24     Here, the credibility determination by the referee accepting

25 Ms. Gholston's testimony given at the evidentiary hearing is

26 exclusively a factual finding, subject to the presumption of

1   correctness.   The state court's conclusions that any failure to
2   fully disclose pretrial impressions was inadvertent, *In re*
3   *Hamilton*, 20 Cal. 4th at 301; that the "Uncle Frank" episode was
4   not accurately set forth in the 1994 declaration; that Ms.
5   Gholston experienced no direct encounter with her Uncle Frank's
6   spirit, *id.* at 302; and that although it was doubtful she saw
7   Hamilton's sister Vicki and her boyfriend Stephen near her house,
8   any failure to disclose this brief, ambiguous incident was
9   inadvertent, *id.* at 306; are all entitled to a presumption of
10  correctness.   Hamilton has presented no evidence nor persuasive
11  argument these presumptions of correctness should be set aside.

12      Whether the facts as found by the referee and state court
13  resulted in the seating of a biased juror is the ultimate legal
14  question, subject to de novo review.   In each instance, the state
15  court concluded after an evidentiary hearing that the undisclosed
16  incidents experienced by Ms. Gholston did not result in the
17  seating of a bias juror.   *In re Hamilton*, 20 Cal. 4th at 301-02,
18  306.   Hamilton has not shown, nor does review of the record
19  reveal, that Ms. Gholston was biased against him.   Any omissions
20  about her pretrial impressions did not impact her ability, or
21  stated intention, to be a fair and impartial juror.   There is no
22  evidence that any "feeling of the 'presence'" of her Uncle
23  Frank's spirit, nor any alleged contact with Vicki Hamilton and
24  Stephen Fitzherbert resulted in a bias against Hamilton.   Nothing
25  in the facts found by the state court indicates prejudice or
26  partiality against Hamilton.

ORePetnHam                          33

1    Based on this evidence, defense counsel was not ineffective
2  for failing to discover and impeach Ms. Gholston's alleged bias.
3  The record fairly supports the California Supreme Court's denial
4  of this claim.  Claim 6d is denied on the merits.
5  5.   FOURTH AMENDMENT ISSUES
6       a.   CLAIM 13:   ILLEGAL ARREST/PRE-TRIAL DETENTION
7       Hamilton contends that his arrest was without warrant or
8  probable cause, and made solely because he discovered the crime.
9  Hamilton asserts that law enforcement exploited his unlawful
10 detention, preying upon his lack of sleep and food to obtain a
11 statement in violation of his Fourth Amendment rights which was
12 used against him at trial.[5]  Hamilton argues this statement was
13 prejudicial, in part because the fact that Gwen had been shot had
14 not been made public, and that it was a product of his unlawful
15 detention.  Hamilton also contends his arrest was merely a
16 pretext for a warrantless search incident to arrest, allowing the
17 seizure of his clothing and Brenda Burns' address and phone
18 number from his wallet.  Hamilton also contends he is entitled to
19 habeas relief on this claim because trial counsel was ineffective
20 in failing to object to the admission of the above evidence,
21 resulting in his denial of a full and fair hearing on the claim
22 in state court.
23    The issue of probable cause to support Hamilton's arrest was
24
25         [5] Detective Byrd testified Hamilton stated "a guy who was a
26 Canadian citizen and a female subject were enroute back to Canada
   and that this person had done the shooting and he [Hamilton] knew
   that he [the Canadian] had used a shotgun to do it."  RT 7:1699.

1   properly litigated prior to trial during a hearing on a defense

2   motion to suppress.  RT 1538.5 Motion, Sept. 20 - 21, 1982.

3   Hamilton there argued that Brenda Burns' name and address were

4   improperly obtained from his wallet following his unlawful

5   arrest, and thus evidence of the shotgun and its purchase should

6   be excluded.  *Id.* at 25.  To make a determination whether the

7   seizure of Hamilton's wallet was proper, evidence was received

8   about the basis for Hamilton's arrest.  *Id.* at 47.  The trial

9   court found that there was probable cause to arrest Hamilton.

10  *Id.* at 76-77.  Further, the trial court determined that, even

11  assuming Hamilton's arrest was without probable cause, an

12  independent source for Ms. Burn's address existed.  *Id.* at 75-76.

13      The question of probable cause to support Hamilton's arrest

14  received a full and fair California Penal Code section 1538.5

15  hearing prior to trial.  The only evidence supporting the

16  contention that Ms. Burn's name and address were obtained from

17  Hamilton's wallet comes from her testimony of what the officers

18  told her.  This evidence was before the trial court and fully

19  considered in denying the motion to suppress.  A claim based on

20  the alleged violation of a Fourth Amendment right is not

21  cognizable on federal habeas corpus unless the petitioner shows

22  the state did not provide an opportunity for full and fair

23  litigation of the claim.  *Stone v. Powell*, 428 U.S. 465, 494

24  (1976); *Woolery v. Arave*, 8 F.3d 1325 (9th Cir. 1993).  Since

25  Hamilton was provided the full opportunity to fairly litigate

26  this claim in state court, it is not cognizable on federal habeas

1  corpus review.

2      Sixth Amendment claims of ineffective assistance of counsel
3  based on incompetent representation with respect to Fourth
4  Amendment issues are not barred from habeas review.  *Kimmelman v.*
5  *Morrison*, 477 U.S. 365 (1986).  However, the record establishes
6  defense counsel was not ineffective for failing to object to the
7  introduction of Hamilton's statement, since the issue of probable
8  cause to arrest had already been resolved by the 1538.5
9  suppression hearing and order.  Claim 13 is denied on the merits.

10         b.   CLAIMS 14 & 15:  *MIRANDA* VIOLATIONS AND COERCED
11              STATEMENT BY HAMILTON

12      Hamilton alleges in Claim 14 that he was denied sleep, food,
13 drink and cigarettes on the night of the murder; that when he was
14 finally allowed into a cell, he was forced to attempt sleep with
15 a radio and the intercom playing at high volume; that he was
16 badgered and berated by the police; that he was told Gilbert an
17 officer's brother and would not take the fall for the crime;
18 that gory pictures of Gwen's and the baby's autopsies were shoved
19 in his face; and that he was denied basic hygiene prior to making
20 statements.  Hamilton further asserts that on the third day he
21 was in custody (not the afternoon following the murder as
22 Detective Byrd testified), in response to a question about who
23 might have committed the crime, he suggested a Canadian (meaning
24 his sister Vicki's boyfriend Stephen Fitzherbert) might have had
25 a motive.  Hamilton also contends he was not given *Miranda*[6]

26 ─────────────────

     [6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

1   warnings again prior to this questioning.  Hamilton argues he

2   would not have made the statements he did in the absence of this

3   coercion.

4       Hamilton asserts in Claim 15 that he was interrogated and

5   made statements without a proper warning or waiver; that

6   interrogation and a request for a waiver occurred after he

7   requested counsel; and that he was interrogated, from which the

8   police obtained statements, after he was represented by counsel.

9       Some of the allegations in Claims 14 and 15 are contradicted

10  by Hamilton's own declaration of November 28, 2000.  Ex. A to

11  Motion for Evidentiary Hearing.  The petition alleges that

12  Hamilton was given no drink or cigarettes, which along with other

13  deprivations coerced him into making the statement that a

14  Canadian killed his wife.  However, Hamilton's declaration states

15  that after he called his Uncle Marvin to arrange for clothing for

16  his children, he was given coffee and cigarettes.  Ex. A, ¶ 21.

17  The petition alleges Hamilton made the statement about a Canadian

18  on November 5 or 6, just prior to his release.  However,

19  Hamilton's declaration states he made the statement about a

20  Canadian early on the morning of November 3.  *Id.* ¶¶ 22, 23.  The

21  petition alleges Hamilton was interrogated and made the statement

22  about a Canadian after he requested and was represented by

23  counsel.  However, Hamilton's declaration states he made the

24  statement about a Canadian on November 3, before and after the

25  polygraph examination, *id.* ¶¶ 22-24, and that he first asked to

26  speak to a lawyer when put in a holding cell after the polygraph

1    examination and subsequent interview.   *Id.* ¶ 30.

2         The allegations in the petition also are contradicted by

3    Lt. Byrd's testimony at trial, where he related Hamilton's

4    statement about a Canadian was made on November 3rd.   RT 7:1698-

5    99.   Further, there is no evidence the police had any suspicion

6    that Gilbert was involved in the murder before Vicki contacted

7    the detectives around November 19th, so Hamilton could not have

8    been coerced to make the statement about a Canadian by threats

9    about Gilbert's police connections.   Hamilton was only held for a

10   few days after the murder: he was taken from the scene late on

11   the second of November and first questioned about 2:30 a.m. on

12   the third of November.   RT 7:1670-76.   He was released on the

13   fifth of November.   Ex. 38A to Hamilton's Pro Se Motion filed

14   Jan. 13, 2006.   Hamilton's sister Vicki informed law enforcement

15   of the plan to kill Gwen about a week before Thanksgiving.   RT

16   9:2074.   Based on November 2nd being a Monday, RT 8:1882,

17   Thanksgiving was on November 26.   Gilbert was arrested on

18   November 30th.   *Id.* at 2011.

19        In addition, Hamilton made more than one statement on the

20   record which shows his ability to communicate with the trial

21   judge.   See RT May 17, 1982:7 *et seq.* (request move to another

22   cell due to inmate harassment); RT June 22, 1982:8 *et seq.*

23   *(Marsden*[7] motion); RT 10:2374-81 (November 18, 1982 request to

24   

25        [7] *People v. Marsden*, 2 Cal.3d 118 (1970) (defendant has
     constitutional right to state specific examples of allegedly
26   inadequate representation in support of a motion to substitute new
     counsel).

1  read statement to jury as part of closing argument at penalty);

2  RT December 16, 1982:1 (statement of innocence at sentencing).

3  No evidence has been presented showing Hamilton was prevented

4  during trial from asserting that his statement had been coerced.

5      There is no evidence beyond Hamilton's self-serving

6  statements to support these claims.  Based on the total lack of

7  evidence supporting these claims, Hamilton cannot establish

8  defense counsel was ineffective for failing to seek exclusion of

9  Hamilton's pre- and post-arrest statements.  The contradictions

10  between the allegations in the petition and Hamilton's own

11  declaration, prepared just seven months following the filing of

12  the amended petition, cast doubt on the credibility of both

13  Hamilton's declaration and the allegations in his petition.

14  Claims 14 and 15 are denied on the merits.

15  6.    CLAIM 9:   DENIAL OF MOTION TO RECUSE DA's OFFICE

16      Hamilton contends the trial court improperly denied his

17  motion to recuse the District Attorney's Office.  Hamilton

18  asserts that prior to his preliminary hearing, with the

19  assistance of a jail employee, he informed Mr. Richmond (the

20  district attorney who originally prosecuted his case) that he

21  wanted to speak with him.  Mr. Richmond instructed his chief

22  investigator Mr. Tucker to speak with Hamilton.  Mr. Tucker

23  obtained a statement from Hamilton, and Mr. Richmond notified

24  defense counsel of the contact the following day.  Deputy

25  district attorney Patrick O'Hara prosecuted the case against

26  Hamilton.  Defense counsel instituted disciplinary proceedings

1    against Mr. Richmond with the State Bar of California, which

2    Hamilton alleges created a direct conflict of interest between

3    defense counsel and the District Attorney's Office.[8]

4         At trial Hamilton's counsel sought the prosecutor's recusal

5    on two bases: the prosecutor's misconduct in communicating with

6    Hamilton without his counsel's consent, and the bias arising from

7    defense counsel's complaint against the prosecutor filed with the

8    State Bar.  The trial court denied recusal, relying on the fact

9    that Hamilton himself initiated the contact with the prosecutor,

10   questioning whether California Rule of Professional Conduct 7-

11   103, prohibiting contact with a party known to be represented by

12   counsel, applied to a public prosecutor, and questioning whether

13   prosecutorial bias or "ill will" against a defendant constitutes

14   a conflict of interest.  RT March 2, 1982:5-18.  Hamilton's

15   counsel appealed this denial, but the claim was rejected by the

16   Fifth District Court of Appeal and the California Supreme Court.

17        The California Supreme Court, on direct review, found that

18   Hamilton --

         presented no evidence of actual antagonism on the part
19       of the district attorney or any attorney from the
20       prosecutor's office.  He points to nothing in the
         conduct of the case which suggests bias against him.
21       Under these circumstances the possibility of hidden
         bias engendered by defense counsel's complaint to the
22       State Bar is insufficient to overturn the trial court's
         ruling.
23

24   *Hamilton,* 48 Cal. 3d at 1155-56.

25
     _____

26        [8]   The conversation between Hamilton and Mr. Tucker was not
     offered into evidence.  *Hamilton*, 48 Cal. 3d at 1155.

1      Hamilton asserts that California law does not exclude from

2 the requirements of Rule 7-103 claims by a represented party who

3 contacted the opposing attorney or claims where the opposing

4 counsel was a public official.  Hamilton also contends that the

5 potential for bias was grounds for recusal, and the context of

6 this error in a capital prosecution warrants reversal of his

7 conviction.  Hamilton cites *People v. Superior Court (Greer)*, 19

8 Cal. 3d 255 (1977) in support of his contention that the

9 prosecutor's potential for bias justifies recusal.  *Greer* states

10 that a conflict disqualifies a District Attorney if the conflict

11 either affects or appears to affect his ability to faithfully

12 perform the discretionary functions of his office.  However,

13 *Greer* was superceded by statue in 1980.  *See People v. Conner*, 34

14 Cal. 3d 141, 147-48 (1983).  The standard applicable at the time

15 of Hamilton's trial, from California Penal Code section 1424,

16 stated that a motion to recuse may not be granted unless evidence

17 shows a conflict of interest exists that would render it unlikely

18 the defendant would receive a fair trial.

19      Hamilton has presented no evidence showing the district

20 attorney had a conflict that affected Hamilton's ability to

21 receive a fair trial.  Hamilton contacted the prosecutor.  His

22 counsel made a complaint for misconduct against the prosecutor.

23 There is a total absence of evidence that Mr. O'Hara, Mr.

24 Richmond, or any other prosecutor bore Hamilton any animus,

25 arising out of what are expected and often strategically asserted

26 defense requests for sanctions against prosecutors in criminal

1  cases.  The record fairly supports the California Supreme Court's

2  denial of this claim.  Claim 9 is denied on the merits.

3  7.  CLAIM 12:  STATE INTERFERENCE WITH TRIAL PREPARATION

4       Hamilton asserts agents of the State of California,

5  including Tulare County Sheriff's Officers, incited jail inmates

6  against him and housed him with "problem" inmates resulting in

7  threats and assaults.  Hamilton states his complaints and legal

8  actions were ineffectual, and he could not sleep, eat,

9  concentrate or communicate effectively with counsel.  Hamilton

10 further contends his mental state and competence were adversely

11 affected by the improper administration of drugs.

12      The record reveals that on May 17, 1982, Hamilton requested

13 that he be moved to another cell because of harassment by other

14 inmates.  RT May 17, 1982:8-9.  Judge Conn stated he would make

15 an informal inquiry into the matter.  *Id.* at 10.  The record does

16 not contain the result of the judge's inquiry, however on June

17 22, defense counsel stated, in response to Hamilton's *Marsden*

18 motion, that he didn't have time to get involved in "certain

19 aspects of the jail," that Hamilton would have to "take a certain

20 amount of . . . c___ that they dish out in the way of words," and

21 that Judge Conn had investigated and did not perceive Hamilton's

22 treatment as different from other inmates.  RT June 22, 1982:16.

23      As noted above in Claim 21, neither medical records nor

24 declaration from trial counsel were presented to support

25 Hamilton's claim of incompetence.  Hamilton instead relied on the

26 opinion of Dr. Woods, which concludes that Hamilton's preexisting

1  mental condition was exacerbated by the drugs he was given,

2  rendering it extremely "unlikely" he was able to make rational

3  decisions.  Ex. 48:18.[9]  The record does not show any irrational

4  actions by Hamilton during trial, but reveals several occasions

5  where Hamilton responded appropriately and intelligently while

6  conversing with the trial court.  See RT May 17, 1982; RT June

7  22, 1982; RT 10:2374-81; RT December 16, 1982.

8       Finally and most importantly, Hamilton has not shown that he

9  was unable to understand the nature of the proceedings against

10 him or to assist counsel.  To the contrary, Hamilton's discourses

11 with the trial court demonstrate he was aware of what was

12 occurring and was able to communicate his thoughts and opinions

13 to counsel.

14      The record as a whole fails to support Hamilton's

15 allegations of state interference and of improper medication.

16 Based on this evidence, defense counsel was not ineffective for

17 failing to further raise Hamilton's assertions of state

18 interference or issues of improper medication affecting

19 Hamilton's competence.  The record fairly supports the California

20 Supreme Court's summary denial of this claim.  Claim 12 is denied

21 on the merits.

22 /////

23

24

---

25      [9] The report of Dr. Merikangas observes that Hamilton was
   medicated, but makes  no comment that it was an improper type or
26 dose, or that there was a resulting negative effect on Hamilton's
   mental state.  Ex. 61.

ORePetnHam                              **43**

1    **V.    TRIAL CLAIMS - GUILT PHASE**

2    **1.    CLAIMS INVOLVING CO-CONSPIRATORS**

3         **a.    CLAIM 10:    INSUFFICIENT EVIDENCE/FACTUAL INNOCENCE**

4         Hamilton asserts that instructions, court comments and

5    argument led the jury to believe the beyond a reasonable doubt

6    standard was not required to determine the viability of the

7    fetus, but instead implied that viability only needed to be

8    proved by a preponderance of the evidence.[10]   Hamilton contends

9    there was insufficient evidence of the fetus's viability, to

10   support the financial gain special circumstance, to support a

11   finding of first degree murder of either Gwen or the fetus, to

12   support a finding that he personally used a firearm, or to

13   establish the alleged aggravating factors.

14        Hamilton contends, in support of his claim that he did not

15   kill his wife and did not know of the plan to kill her, that

16   prior to the murder he agreed with his sister Carolyn and her

17   friend Gilbert to assist them in the robbery of an unnamed drug

18   dealer.  Ex. 62:1, Declaration of Michael Allen Hamilton, dated

19   November 28, 2000.  Hamilton asserts his role in the robbery was

20   to buy a shotgun and then after the robbery to fence the stolen

21   goods.  *Id.* at 1-2.  Hamilton contends that after he heard the

22   police had discovered the paperwork for the shotgun purchase, he

23   asked Carolyn to return the gun so he could turn it in.  *Id.* at

24   9-10.  Hamilton states that eventually Carolyn revealed she could

25   _____

26        [10] Fetal viability is a necessary finding for both the murder
     conviction and special circumstance finding.  *See* RT 10:2322 (jury
     instructions).

     ORePetnHam                        **44**

1  not return the gun because Gilbert had disposed of it.  *Id.* at

2  10.  When Hamilton replied he had to tell the police about the

3  gun to stay out of trouble, he asserts Carolyn begged him not to,

4  admitting Gilbert had shot Gwen and she had been with him,

5  driving the truck.  *Id.*

6      Hamilton asserts defense counsel was ineffective for failing

7  to investigate the timing discrepancy (a minimum of 15 minutes)

8  in Carolyn's and Gilbert's accounts between the total time (from

9  when Hamilton and Gwen left and Carolyn returned) and the time

10 required for all the activities they recounted, and for failing

11 to pursue testing to establish the lack of gunpowder residue,

12 blow-back and/or other physical evidence on Hamilton's clothes or

13 person from firing a shotgun.  Hamilton contends prosecutorial

14 misconduct occurred by failing to disclose secret benefits or

15 agreements conferred on witnesses and by the knowing use of

16 perjured testimony when his sister Vicki testified she received

17 no promises regarding the bad check charges.[11]  Hamilton points

18 to the following discrepancies in the evidence: the conclusion

19 that Gwen was relaxed and unalarmed despite a vehicle, occupied

20 by people she knew, repeatedly driving by on a lonely road three

21 nights in a row; that Vicki originally said Gilbert was the one

22 who shot Gwen; and differing testimony about the color of the

23 shotgun shells.  Hamilton also claims that investigation of the

24 driver of the Mustang who drove him to the telephone that night

25

26     [11]  See Claims 3b(1) & (2), 3c(9) below for analysis of
    prosecutorial misconduct claims.

1   was insufficient in light of his detailed description of the car,

2   that Gilbert had an opportunity to shower after the murder to get

3   rid of any evidence, and that extreme acrimony existed between

4   Hamilton and both his sisters, such that concerted action between

5   them was unlikely and which provided a motive for his sisters to

6   transfer blame for the murder to Hamilton.

7        In *Herrera v. Collins*, 506 U.S. 390 (1992), the United

8   States Supreme Court assumed for the sake of argument that a

9   "truly persuasive demonstration of 'actual innocence' . . . would

10  render the execution of a defendant unconstitutional . . . ."

11  *Id.* at 417.  However, the Court held that, due to the disruptive

12  effect entertaining a substantive claim of actual innocence would

13  have on the finality of capital cases, "the threshold showing for

14  such an assumed right would necessarily be extraordinarily high."

15  *Id.*  Alternatively, a claim of actual innocence may be a

16  procedural gateway to allow consideration of a constitutional

17  claim otherwise procedurally barred from federal review.  *Schlup*

18  *v. Delo*, 513 U.S. 298, 327 (1995).  Either claim of actual

19  innocence requires the presentation of new, reliable evidence,

20  such as exculpatory scientific evidence, trust-worthy eyewitness

21  accounts, or critical physical evidence.  *Id.* at 324.

22       The standard for a substantive actual innocence claim

23  requires the petitioner to show by clear and convincing evidence

24  that no reasonable juror would have found him guilty and/or

25  eligible for the death penalty.  *Sawyer v. Whitley*, 505 U.S. 333,

26  339, 350 (1992).  The standard for a procedural actual innocence

1  claim requires a finding that in light of the new evidence, it is
2  more likely than not that no reasonable juror would have
3  convicted the petitioner.  *Schlup*, 513 U.S. at 327.

4      Evaluating a request for evidentiary hearing on a claim of
5  actual innocence requires a court to assess the probative force
6  of the new evidence in light of the evidence of guilt presented
7  at trial.  *Schlup*, 513 U.S. at 331-32.  This test may consider
8  the timing of the submission and the affiants' likely credibility
9  when determining the probable reliability of the new evidence.
10  *Id.* at 332.

11      The California Supreme Court addressed the underlying basis
12  for Hamilton's insufficient evidence allegations on direct
13  appeal, finding that the evidence was sufficient to support the
14  jury's finding that the fetus was viable, that although the
15  evidence supporting the financial gain special circumstance was
16  relatively weak it was properly admitted and sufficient to
17  support the jury's true finding, and that although "other
18  aggravating evidence was not overwhelming, the capital crimes
19  themselves were exceptionally brutal."  *Hamilton,* 48 Cal. 3d at
20  1185; *see also id.* at 1172-73 (fetal viability), 1173-79
21  (financial gain special circumstance), 1185 (aggravating factor
22  evidence) and 1187 (evidence of first degree murder).  Hamilton
23  has not pointed to any evidence which, when considered in light
24  of the entire record, undermines the findings of the California
25  Supreme Court.  Further, the allegation the jury was mislead to
26  believe that fetal viability could be proved by only a

1  preponderance of the evidence is refuted by the record.  The jury

2  instructions expressly state "you must find *beyond a reasonable*

3  *doubt* that the fetus was viable."  RT 10:2322 (emphasis added).

4      Defense counsel argued the fact that no evidence of blood or

5  gunpowder was found on Hamilton.  The implication that the lack

6  of blood cleared Hamilton was undercut by the testimony of

7  criminalist Steve O'Clair stating the lack of blood or blood

8  stains on Hamilton's clothes or hands was not unusual as it is

9  possible to shoot someone without getting blood on the shooter.

10  RT 9:2033-35.  Defense counsel was not ineffective for failing to

11  further test for blood or gunpowder.

12      The allegation that Carolyn's and Gilbert's accounts of the

13  night of the murder lack credibility because of insufficient time

14  to accomplish all they testified to does not establish a claim of

15  actual innocence.  The time discrepancies are insignificant.

16  Contrary to Hamilton's allegations, Carolyn did testify she

17  looked at a clock when Hamilton and Gwen left at 8:45 p.m., RT

18  8:1912, neither Carolyn nor Gilbert testified Hamilton left at

19  the two-minute warning of the Monday Night Football game, no

20  source was provided to place the time of the two-minute warning

21  at 9:00 to 9:05 p.m., and Gilbert testified he drove past

22  Hamilton's truck twice, stopping the third time, but only one

23  time drove "a ways" down Terra Bella Road.[12]  RT 8:1999-2000.

24  The minimal time discrepancy of fifteen minutes is not sufficient

25

26      [12] Carolyn testified that after picking up Hamilton on November
2 and driving to Teapot Dome Road, they drove to Hamilton's pickup
and stopped.  RT 8:1890-93.

1  to support even a colorable claim in light of the conflict
2  between the record and the allegations in the petition.  Defense
3  counsel was not ineffective for failing to investigate the timing
4  issue.

5      The argument that Carolyn planned the murder and Gilbert was
6  the actual killer was presented as a defense at trial, RT
7  10:2273-83, but was rejected by the jury.  The allegation that
8  extreme acrimony between Hamilton and his sisters would have made
9  any conspiracy between them unlikely is contradicted by
10 Hamilton's own declaration, where he contends the purchase of the
11 shotgun and his repeated trips to Porterville were prompted by an
12 agreement with Carolyn to rob a drug dealer.  Ex. 62:1-2.

13     Beyond Hamilton's current assertions, no evidence shows his
14 innocence.  Even the proposed opinion of Mr. Morton, if rendered
15 as Hamilton contends, would not render it more likely than not
16 that no reasonable juror would have convicted Hamilton.  *See*
17 Claim 2a below.  The evidence presented at trial overwhelmingly
18 supports Hamilton's conviction.  The record fairly supports the
19 California Supreme Court's denial of this claim.  Claim 10 is
20 denied on the merits.

21     b.   CLAIM 8: LAW ENFORCEMENT CONFLICT REGARDING GILBERT

22     Hamilton contends that Detective Salazar's close friendship
23 with Gilbert and his family resulted in a conflict of interest
24 which affected the investigation and prosecution of this crime.
25 Hamilton asserts that the prosecutorial misconduct set forth in
26 Claim 3 (failure to disclose benefits to Vicki on bad check

1  charges, failure to disclose instructions to Gilbert not to

2  deviate from prior statement) was part of a plan to reduce

3  Gilbert's culpability for a capital offense and afford him

4  special, lenient treatment.  Hamilton argues this plan left

5  reasonable and obvious lines of investigation unexplored, coerced

6  witnesses to reduce Gilbert's involvement and to give false and

7  misleading testimony against Hamilton.

8      Hamilton presents a declaration from Gilbert, stating that

9  his plea agreement included a requirement that he testify

10 truthfully, and that the prosecutor reviewed the statement he

11 made to law enforcement to ensure there was nothing to add.

12 Gilbert declares that when Lilly Bardsley identified him as being

13 at K-Mart when the shotgun was purchased, the prosecutor

14 threatened to withdraw his deal and reinstate the death penalty

15 charges because that evidence made him more involved in the

16 planning of the crime than his confession had admitted.  Gilbert

17 states the prosecutor allowed his brother to obtain rebuttal

18 witnesses asserting he was with his child on Halloween afternoon,

19 and then he was allowed to testify.[13]  *See* Ex. 23.

20     A recent Ninth Circuit case found prosecutorial misconduct

21 justified the presumption of truthfulness of a declaration

22 recanting a co-conspirator's testimony, and establishing Smith's

23 actual innocence claim sufficient to excuse his procedural

24

25     [13] Gilbert is mistaken as to the sequence of events, as Lilly
   Bardsley's identification of him was presented during the defense
26 case, RT 9:2157-70, and Gilbert had already testified as part of
   the prosecution's case.  RT 8:1970-2023.

1    default.  *Smith v. Baldwin*, ___ F.3d ___, 2006 WL 3007751 (9th
2    Cir. Oct. 24, 2006).  Smith's co-conspirator signed two
3    declarations, one seven years after the crime and one twelve
4    years after the crime, recanting his testimony and declaring that
5    Smith was not the killer.  The government informed the co-
6    conspirator that if he persisted with a recantation of his trial
7    testimony on federal habeas, the plea agreement would be set
8    aside and he could be subject to capital murder charges for the
9    killing, but that if he reaffirmed his trial testimony
10   identifying Smith as the murderer, the state would not persue
11   perjury charges against him.  After conferring with counsel, the
12   co-conspirator invoked his Fifth Amendment rights and refused to
13   testify in the federal proceedings.

14        Although the holding of *Smith* appears to apply to this
15   claim, there are significant facts which distinguish *Smith* from
16   Hamilton's claim.  First, Gilbert's declaration does not in any
17   way clear Hamilton of responsibility for Gwen's death.  There is
18   sufficient evidence that Hamilton was the one who wanted Gwen
19   killed, and that he solicited Carolyn, and through her Gilbert,
20   to assist him.  Even assuming Gilbert was the actual shooter,
21   which is *not* supported by any statement in Gilbert's declaration,
22   Hamilton and Carolyn are still equally guilty of the murder.
23   Second, the State has made no current threat of further
24   prosecution, and has not in any way attempted to supress the
25   facts presented in Gilbert's declaration.  No evidence presented
26   by Hamilton shows misconduct by the prosecution, or any

1  constitutional error.

2      Gilbert's plea agreement required he testify truthfully.
3  The prosecutor's warning to Gilbert not to deviate from his prior
4  statement was no more than an attempt to ascertain that Gilbert
5  had given the full truth in his statement, and to communicate the
6  expectation that Gilbert must also tell the full truth at trial.
7  The assertion the prosecutor was angry Lilly Bardsley identified
8  Gilbert does not establish that the subsequent rebuttal witnesses
9  presented false, manufactured testimony.  The rebuttal witnesses'
10 testimony was in fact consistent with Gilbert's testimony on
11 direct examination, given long before Lilly Bardsley identified
12 him, that he had taken his child trick-or-treating prior to going
13 to Carolyn's house on Halloween.  RT 8:1978.

14     Similarly, Vicki's testimony, consistent with her
15 declaration, that Detective Salazar talked to the District
16 Attorney to get a misdemeanor disposition on her felony check
17 charges, does not establish sufficient basis under *Brady* for
18 failing to disclose benefits regarding her bad check charges.
19 *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Vicki's declaration
20 does not say that those benefits were received prior to her
21 testimony at trial.  *See* Ex. 22.  Even assuming the benefits were
22 given before trial, in light of the benefits which Vicki did
23 disclose to the jury, that she and Stephen received money to fly
24 from Texas to California and for seven months of living expenses,
25 it is unlikely the non-disclosure of any benefit regarding the
26 bad check charges was material to the jury's evaluation of her

credibility.  The record fairly supports the California Supreme

Court's summary denial of this claim.  Claim 8 is denied on the

merits.

        c.    CLAIM 11:   ACCOMPLICE TESTIMONY

        Hamilton asserts (1) the trial court erred by refusing to

instruct the jury that Vicki was an accomplice as a matter of

law, (2) that in light of Lilly Bardsley's identification of

Sharon Burns, the jury should have been instructed to determine

whether Sharon also was an accomplice, and (3) that without these

errors, the case against him would lack corroboration.[14]

        The California Supreme Court addressed this claim on direct

review, holding the uncontradicted evidence did not show Vicki

was an accomplice to murder as a matter of law.  Vicki's

participation was limited to two conversations with Carolyn.  An

aider and abettor as a matter of law must "act with knowledge of

the criminal purpose of the perpetrator and with an intent or

purpose either of committing, or of encouraging or facilitating

commission of, the offense."  *People v. Beeman*, 35 Cal. 3d 547,

560 (1984).  The state court found the evidence regarding Vicki's

intent ambiguous since she stated she would participate in the

---

[14]    The jury was instructed, pursuant to Cal. Penal Code
§ 1111, that "a defendant cannot be found guilty based on the
testimony of an accomplice unless such testimony is corroborated by
other evidence which tends to connect such defendant with the
commission of the offense;" that accomplice testimony was to be
viewed with distrust; and that "an accomplice is one who is subject
to prosecution for the identical offense charged against the
defendant on trial."  The court instructed that Carolyn Hamilton
and Gilbert Garay were to be considered accomplices as a matter of
law, and the jury should determine whether Victoria Hamilton and
Brenda Burns were accomplices.  *Hamilton*, 48 Cal. 3d at 1168-69.

1   murder, suggested the appropriate weapon, but shortly after her

2   statements moved to Texas and did not participate in the murder.

3   Because her actions are subject to a variety of interpretations

4   her accomplice status was properly left for the jury to

5   determine.  *Hamilton*, 48 Cal. 3d at 1169-70.

6       The California court did find that whether Sharon Burns was

7   an accomplice should have been submitted to the jury, but found

8   the error was harmless.  There was no evidence Sharon intended

9   the killing.  The jury could not find Sharon was an accomplice

10  without rejecting her testimony and finding that she did buy the

11  gun.  Since an accomplice finding could not be made without

12  rejecting Sharon's credibility, a subsequent instruction to view

13  her testimony with caution would have little effect.  Lastly,

14  even if all Sharon's testimony was viewed with caution, the

15  prosecution's case would not have been affected.  Sharon

16  testified that Hamilton told her he was unhappy with his sex life

17  with Gwen and wanted a divorce, but considerable other evidence

18  supports that testimony.  Sharon's discovery of the shotgun

19  shells in Brenda's apartment was not significant in the case.

20  And even if the jury concluded that Sharon purchased the gun

21  instead of Brenda, that conclusion would do little to detract

22  from the evidence that Hamilton used the gun to kill his wife.

23  *Hamilton*, 48 Cal. 3d at  1170-71.

24      Hamilton contends that the evidence shows Vicki agreed to

25  join the plan to kill Gwen, suggested the weapon to use, and was

26  to have been the person to do the actual shooting, and that even

1  after her move to Texas she still stated her intent to
2  participate in the murder.  Hamilton asserts this evidence makes
3  Vicki equally liable as a co-conspirator, so her testimony was
4  required to be viewed with distrust.  Hamilton argues the
5  numerous benefits Vicki received in exchange for her testimony
6  suggest she was an accomplice.  Hamilton concludes that had the
7  court instructed Vicki was an accomplice as a matter of law the
8  case against him would have lacked corroboration.

9       Hamilton further alleges the failure to include Sharon Burns
10 in the accomplice instructions implied that Lilly Bardsley's
11 identification of her as the purchaser of the gun was not to be
12 believed.  Hamilton contends he was prejudiced by this error
13 since the rebuttal identification of Sharon as the gun purchaser
14 cast doubt on the entire version of events given by the
15 prosecution's witnesses.  This notion was rejected because Brenda
16 testified she purchased the gun for Hamilton, Sharon denied
17 purchasing the gun, Brenda's name was on the gun purchase form,
18 and a handwriting expert confirmed Brenda signed the gun purchase
19 form.

20      The State asserts the trial court was correct to instruct
21 the jury to determine whether Vicki was an accomplice, since the
22 uncontradicted evidence reveals she was not an accomplice as a
23 matter of law, and that no accomplice instruction regarding
24 Sharon was proper since there was no evidence she knew of
25 Hamilton's criminal purpose.  The State urges that even if the
26 instructions were erroneous, the error was unquestionably

1  harmless since Brenda Burns testified as to Hamilton's motive,

2  purchase of the gun, and later consciousness of guilt; and the

3  prosecution's case remained almost unaffected without Sharon's

4  testimony.

5      It is undisputed law in California that whether a person is

6  an accomplice is a question of fact for the jury, unless there is

7  no dispute as to either the facts or the inferences to be drawn

8  regarding accomplice status.  *People v. Tewksbury*, 15 Cal. 3d

9  953, 960 (1976).  Generally, federal habeas relief is not

10 available for errors of state law, unless the error amounts to a

11 deprivation of constitutional rights.  *Estelle v. McGuire*, 502

12 U.S. 62, 67-69 (1991).  The denial or misapplication of state

13 procedures implicates a federally recognized liberty interest

14 only if it results in the deprivation of a substantive right.

15 *Olim v. Wakinekona*, 461 U.S. 238, 250-51 (1983).

16     Hamilton's contention, that if Vicki had been included in

17 the accomplice as a matter of law instruction and Sharon included

18 in the accomplice instructions, the result of his trial would

19 have been different, lacks support.  The evidence presented at

20 trial of Hamilton's affair with Brenda; his financial troubles;

21 the life insurance on Gwen; Brenda's testimony of her purchase of

22 the shotgun for Hamilton and his later attempt to conceal that

23 fact; Jackie Piper's testimony about his unusual visits to

24 Porterville three days in a row; the inconsistencies in his

25 statements to police and his prevarication about a Canadian

26 suspect were independent evidence and sufficient to corroborate

1  the testimony of Carolyn, Gilbert, and Vicki.  Nothing in this

2  claim shows that Hamilton was deprived of a constitutional right.

3      Based on this evidence, defense counsel was not ineffective

4  for failing to further object to the failure to instruct that

5  Vicki was an accomplice as a matter of law or to seek Sharon's

6  inclusion in the accomplice instructions.  The record fairly

7  supports the California Supreme Court's denial of this claim.

8  Claim 11 is denied on the merits.

9      d.   CLAIMS 2a & u: INEFFECTIVE ASSISTANCE OF COUNSEL

10     Hamilton first asserts that defense counsel was ineffective

11 because he failed to investigate and present evidence that others

12 planned and committed the murder.  Hamilton contends there was a

13 conspiracy between Carolyn, Vicki, Jackie and Sam Piper to kill

14 Gwen and then coerce Hamilton into sharing with or loaning them a

15 portion of the insurance proceeds.  Hamilton alleges that Jackie,

16 believing she would be repaid by the insurance, funded Vicki's

17 travel to Texas so Vicki could talk Stephen into shooting Gwen.

18 Hamilton asserts that Carolyn convinced Hamilton to buy the

19 shotgun for another purpose, that when Vicki and Stephen did not

20 return from Texas, Carolyn convinced Gilbert to act as the

21 shooter, and that Vicki contacted the police because Carolyn

22 attempted to exclude her and Stephen from sharing in the

23 insurance.  Hamilton states that Patti Ketchum saw Gilbert

24 "anxiously brush past her" upon returning after the murder,

25 shower and carry away his soiled clothes, Ex. 27, ¶ 17; Ex. 16,

26 ¶ 5 (declaration of Ron Stafford), and that Vicki confirmed

1  Gilbert was the one who shot Gwen.  RT 9:2050, 2079.  Hamilton

2  asserts counsel failed to subpoena phone records of Jackie,

3  Brenda, Hamilton's residence, and the phone booth to impeach the

4  witnesses' claims, failed to hire a ballistics expert to show the

5  absence of gun powder residue and blood on his clothes and hands

6  pointed to someone else as the shooter, and failed to locate

7  witnesses to show Hamilton was looking forward to the birth of

8  his fifth child with Gwen and was not in terrible financial

9  straits.

10     As stated below in Claim 2, in order to establish an

11  ineffective assistance of counsel claim, a petitioner must show:

12  that counsel's performance was deficient and that the deficiency

13  prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668,

14  687 (1984).

15     Gilbert's actions as related by Patti Ketchum (brushing past

16  her and showering) also can be consistent with just witnessing

17  (instead of performing) a murder.  Gilbert taking his clothes

18  away does not conclusively imply that gunpowder/blood was on

19  them, but could be seen as reasonable since he was not living

20  with Patti at that time.  Vicki's statement that Carolyn said

21  Gilbert did the shooting was introduced at trial and fully argued

22  by the defense in closing.  RT 9:2279-81, 2292.  Expert testimony

23  presented the opinion that the lack of gun powder residue and/or

24  blood on Hamilton did not exclude him as the one who shot Gwen.

25  *Id.* at 2034-35.  The absence of gun powder residue or blood tying

26  Hamilton to the shooting also was argued by the defense in

1  closing.  RT 10:2286.  Testimony regarding Hamilton's history of
2  paying his debts even when money was tight was presented at trial
3  and also argued in closing.  *Id.* at 2284, 2287, 2296-97.

4       Hamilton has presented no evidence supporting the allegation
5  that his mother and step-father, Jackie and Sam Piper, were
6  involved in any way in the conspiracy.  As observed by the State,
7  Hamilton has failed to come forward with phone records or
8  witnesses to his happiness about Gwen's latest pregnancy to show
9  prejudice from counsel's failure to investigate and present this
10 evidence.  Even if expert testimony was now presented stating the
11 lack of blood and/or gunpowder residue exculpates Hamilton, this
12 would only cumulate the expert testimony and argument presented
13 to the jury at trial.  In light of the damaging testimony by
14 Vicki, Carolyn and Gilbert, the blood spatter and gunpowder
15 residue evidence were not so consequential as to change the
16 outcome.  That Carolyn planned the murder and carried it out with
17 Gilbert's assistance was the main defense Hamilton presented at
18 trial.  It was defense counsel's main argument in closing and was
19 rejected by the jury.  The record fairly supports the California
20 Supreme Court's summary denial of this claim.  Claim 2a is denied
21 on the merits.

22      Second, Hamilton alleges that defense counsel was
23 ineffective because he failed to make motions in limine regarding
24 damaging, inadmissible evidence, the tape of the phone call
25 between Vicki and Carolyn, photos and testimony about the crime
26 scene and victims, and Hamilton's statements.  See Claims 4a and

ORePetnHam                        59

1  4b below and Claims 14 and 15 above.  As discussed separately,

2  all this evidence was properly admitted.  Counsel cannot be

3  ineffective for failing to seek exclusion of this admissible

4  evidence.  The record fairly supports the California Supreme

5  Court's summary denial of this claim.  Claim 2u is denied on the

6  merits.

7      e.   CLAIMS 3a(6), (11) & (14): IMPROPER ARGUMENT BY

8           PROSECUTOR

9      Hamilton alleges the prosecutor misstated the law during

10  argument to the jury by expressing his opinion that as a matter

11  of law Vicki could not be prosecuted as an accomplice.  Hamilton

12  also alleges the prosecutor improperly argued that Carolyn's

13  hearsay statement was admitted as a prior consistent statement

14  and could be considered to prove the truth of the matter, when it

15  was admitted only for limited purposes.  Lastly, Hamilton alleges

16  the prosecutor misstated witness testimony, e.g., that Carolyn

17  testified Hamilton committed the murder for financial gain, when

18  she gave no such testimony.  See Claim 2g below.

19      A prosecutor's improper argument does not justify federal

20  habeas relief unless it so infects the trial with unfairness as

21  to make the resulting conviction a denial of due process.

22  "Improper argument does not, per se, violate a defendant's

23  constitutional rights."  *Thompson*, 74 F.3d at 1576 (citing *Darden*

24  *v. Wainwright*, 477 U.S. 168, 181 (1986)).  Moreover,

25  prosecutorial comments to which a defendant fails to object are

26  reviewed for plain error.  *Jeffries*, 5 F.3d at 1191.

First, the prosecutor's statement that Vicki was not an accomplice as a matter of law was not misconduct as the trial judge made that specific legal ruling in submitting the issue of Vicki's accomplice status to the jury for decision.  The record fairly supports the California Supreme Court's denial of this claim.  Claim 3a(6) is denied on the merits.

Second, defense counsel, during cross-examination of Carolyn, asked whether she told Vicki that Gilbert did the shooting.  RT 8:1910.  Carolyn denied making such a statement. *Id.*  Gilbert also denied being the actual killer.  *Id.* at 2022. Later Vicki testified she had "assumed" Gilbert was the killer because she was to have been the shooter and Gilbert took her place in the plot.  RT 9:2050.  The prosecution then introduced over objection a tape recording of a November 27, 1981 telephone conversation between Vicki and Carolyn, where Carolyn said that Hamilton, not Gilbert, shot Gwen.  *Id.* at 2061-63.  The conversation was admitted as a prior consistent statement under an exception to the hearsay rule.  *Id.* at 2062, 2101-02.

Defense counsel's objection impliedly asserted that Carolyn's testimony, stating Hamilton and not Gilbert did the shooting, was a recent fabrication made to minimize her and Gilbert's role in the murder.  *Hamilton,* 48 Cal. 3d at 1168.  The issue is whether the admitted conversation took place "before the bias, motive for fabrication, or other improper motive is alleged to have arisen."  *Id.*  The California Supreme Court, addressing this claim on direct appeal, found that at the time Carolyn made

1  the taped statement she had consistently denied all involvement
2  in the crime, but Hamilton was under arrest so she might have
3  already anticipated arrest and reasoned that her involvement in
4  the murder would appear less if Hamilton instead of Gilbert were
5  the triggerman (although this was unlikely).  *Id.*  The state
6  supreme court observed the testimony did not explore Carolyn's
7  state of mind at the time of the conversation, so arguably, the
8  prosecution failed to show that the statement was made before the
9  motive for fabrication arose, however, any error was found
10  harmless.  *Id.*

11      Hamilton contends the prosecutor improperly urged the taped
12  conversation could be considered to establish the truth of
13  Carolyn's assertion that Hamilton shot Gwen when in fact it was
14  admitted on a limited basis.  The record, however, does not
15  reflect that any limiting instruction was given as to the taped
16  telephone conversation, but in fact the court's instructions told
17  the jury that prior consistent statements could be considered for
18  the truth of the facts as stated.  RT 10:2313.  Even assuming,
19  arguendo, this instruction and therefore the argument by the
20  prosecutor were erroneous, Hamilton cannot show prejudice since
21  the taped conversation duplicates testimony given by Carolyn and
22  Gilbert at trial.  The record fairly supports the California
23  Supreme Court's denial of this claim.  Claim 3a(11) is denied on
24  the merits.

25      Third, the California Supreme Court concluded the
26  prosecutor's misstatement, attributing the statement to live

1  testimony instead of the tape which was played for the jury, did
2  not prejudicially affect the outcome of the trial because it was
3  clear that Carolyn said Hamilton wanted to kill Gwen for money.
4  *Hamilton,* 48 Cal. 3d at 1178.  The record fairly supports the
5  California Supreme Court's denial of this claim.  Claim 3a(14) is
6  denied on the merits.

7      f.   CLAIMS 3b(1), (2) & (4): KNOWING USE OF PERJURED
8           TESTIMONY

9      Hamilton asserts the prosecution presented perjured
10 testimony by failing to disclose consideration given to Vicki and
11 Carolyn, and by insisting that Gilbert not deviate from his prior
12 statement.

13     Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the
14 suppression by the prosecution of evidence favorable to an
15 accused [*Brady* evidence] violates due process where the evidence
16 is material either to guilt or to punishment."  There are two
17 general types of *Brady* evidence: knowing use of perjured
18 testimony, and failure to disclose exculpatory evidence.  *United*
19 *States v. Agurs*, 427 U.S. 97 (1976); *United States v. Bagley*, 473
20 U.S. 667, 678 (1985).

21     Presentation of false evidence violates due process and
22 requires a new trial.  *Mooney v. Holohan*, 294 U.S. 103, 112
23 (1935).  This is so even where the prosecution does not solicit
24 the false information but only allows it to go uncorrected, *Napue*
25 *v. Illinois*, 360 U.S. 264, 269 (1959), irrespective of the good
26 or bad faith of the prosecution.  *Brady*, 373 U.S. at 87.  "The

1   principal [underlying *Brady*] is not punishment of society for

2   misdeeds of a prosecutor but avoidance of an unfair trial to the

3   accused.   Society wins not only when the guilty are convicted,

4   but when criminal trials are fair; our system of the

5   administration of justice suffers when any accused is treated

6   unfairly."   *Id.*

7          The knowing use of perjured testimony is material "if there

8   is any reasonable likelihood that the false testimony could have

9   affected the judgment of the jury."  *Brady*, 373 U.S. at 87;

10  *Agurs*, 427 U.S. at 103.   This is equivalent to the *Chapman v.*

11  *California*, 386 U.S. 18, 24 (1967) harmless error standard.

12  *Bagley*, 473 U.S. at 679-80 n.9.   *See also Napue*, 360 U.S. at 267

13  n.2 and 271-72 (finding the primary witness testified falsely,

14  the prosecutor knew he did so, and in light of the record showing

15  insufficient evidence without the witness's testimony, a new

16  trial was required).

17         Hamilton alleges the prosecution failed to disclose

18  consideration given to Vicki in exchange for her testimony,

19  specifically that she would not be prosecuted for conspiracy to

20  commit capital murder; that she received a favorable disposition

21  of insufficient fund check charges pending against her (i.e., her

22  warrants were cleared, and a misdemeanor disposition was secured

23  on felony charges); that Stephen was not deported; and that she

24  was protected from loss and/or prosecution for an accident while

25  driving a police vehicle.   Ex. 22.  As discussed in Claim 8

26  above, it is unclear that the favorable disposition of the bad

1  check charges occurred before her testimony, and even if it did,
2  in light of the benefits of airfare from Texas to California and
3  seven months of living expenses she received which were
4  disclosed, it is unlikely the additional disclosure would have
5  been material.  Similarly, Vicki's statement in her declaration
6  that the prosecutor agreed not to deport Stephen is cumulative of
7  impeachment evidence which was disclosed, and not material to her
8  credibility.  Lastly, that Vicki was not held responsible for the
9  alleged accident in Detective Salazar's vehicle is not material
10 to her credibility.  It is not reasonably likely that any of the
11 alleged undisclosed benefits, individually or collectively, even
12 if they had been disclosed to the jury, would have affected the
13 judgment.  The record fairly supports the California Supreme
14 Court's summary denial on state habeas of this claim.  Claim
15 3b(1) is denied on the merits.

16      Hamilton asserts consideration was given to Carolyn in the
17 form of favorable treatment while she was in custody and special
18 treatment for her and her son J.R. which was not disclosed.
19 Ex. 25.  Hamilton contends the undisclosed benefits were that
20 Carolyn's son was allowed to visit her in jail and a picture of
21 them together was taken; that Carolyn was allowed to wait in a
22 jury room prior to a hearing where Gilbert's family brought them
23 food; and that Carolyn was allowed out of her cell more than
24 other people charged with murder before the trial.

25      Even assuming these alleged benefits were bestowed to
26 Carolyn, in light of the damaging disclosures she made about her

1   involvement in the murder, it is unlikely the disclosure of these
2   minor benefits were material to her credibility or would have
3   affected the judgment of the jury.  The record fairly supports
4   the California Supreme Court's summary denial on state habeas of
5   this claim.  Claim 3b(2) is denied on the merits.

6       Hamilton contends the prosecution made it a condition of
7   Gilbert's plea bargain that he not deviate in his testimony from
8   the prior statement given to the police, which allegedly
9   precluded the defense from discovering Gilbert's ability to
10  describe the shooting in vivid detail, to impeach his trial
11  testimony.  Ex. 23.  As discussed in Claim 8 above, the
12  prosecutor's requirement that Gilbert not deviate from his prior
13  statement was not misconduct.  For a prosecutor to condition
14  immunity on the witness testifying truthfully and not committing
15  perjury is not prohibited.  No limit was placed by the court on
16  the type of cross-examination of Gilbert at trial.  The record
17  fairly supports the California Supreme Court's summary denial on
18  state habeas of this claim.  Claim 3b(4) is denied on the merits.

19      g.   CLAIMS 3c(8) & (9): *BRADY* VIOLATION

20      Hamilton asserts the prosecutor's failure to disclose the
21  requirement that Gilbert adhere to his prior statement, as well
22  as the additional benefits granted to Vicki violated *Brady*.  As
23  discussed in Claims 3b(2), 3b(4) and 8 above, even assuming the
24  prosecutor should have disclosed the disputed evidence, it was
25  not material and its lack of disclosure did not violate due
26  process in light of the extent of the benefits which were

1  disclosed to the jury.  Defense counsel was free to inquire
2  whether any limits had been placed on Gilbert's testimony.  The
3  record fairly supports the California Supreme Court's summary
4  denial on state habeas of this claim.  Claims 3c(8) and (9) are
5  denied on the merits.

6        h.   CLAIM 3e: PATTERN OF PROSECUTORIAL MISCONDUCT

7        Hamilton contends the prosecutor engaged in a pattern of
8  misconduct, in order to shift the blame for Gwen's murder from
9  Gilbert to Hamilton, by requiring that Gilbert not deviate from
10 his prior statement, see Claim 8 above, and by coercing Brenda
11 Burns to make a statement consistent with the prosecution theory
12 and to testify in accordance with that statement although it did
13 not reflect her recollection.  See Claim 3b(3) below.  As
14 discussed above, a requirement that Gilbert not deviate from his
15 statement does not provide the basis for constitutional error.
16 As discussed below, the record does not support the allegation
17 that Brenda's testimony was coerced.  The record fairly supports
18 the California Supreme Court's summary denial on state habeas of
19 this claim.  Claim 3e is denied on the merits.

20        i.   CLAIM 4a: ADMISSION OF HEARSAY

21        Hamilton argues the taped conversation between Vicki and
22 Carolyn was admitted in violation of California law.  Hamilton
23 asserts admission of a hearsay statement under the prior
24 consistent statement exception requires either that there was an
25 intervening inconsistent statement admitted to attack
26 credibility, or that a charge of recent fabrication or bias has

1  been made and the statement was made before any motive to

2  fabricate arose.  Hamilton contends the phone call between Vicki

3  and Carolyn that was played for the jury failed to meet either of

4  these requirements.

5       Federal courts have no authority to review claims that a

6  state's evidentiary rules were violated, but can only determine

7  if the admission of evidence rendered the trial so fundamentally

8  unfair as to violate due process.  *McGuire*, 502 U.S. at 72;

9  *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998).  Even if

10 evidence was admitted in violation of a state rule of evidence,

11 due process is not violated unless the evidence is "of such

12 quality as necessarily prevents a fair trial."  *Id.* at 1103

13 (citing *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir.

14 1986)).  However, a state court finding that an evidentiary

15 admission was harmless error is a question of law or a mixed

16 question of law and fact, not a factual finding entitled to a

17 presumption of correctness.  *Dickson v. Sullivan*, 849 F.2d 403,

18 405 (9th Cir. 1988).

19      The California Supreme Court addressed this claim on direct

20 appeal, finding that although the evidence showed defense counsel

21 implied Carolyn's statement from the taped phone call, that

22 Hamilton not Gilbert did the shooting, was a recent fabrication

23 the prosecution arguably failed to show the statement was made

24 before the motive for fabrication arose by not exploring

25 Carolyn's state of mind.  The state high court found that any

26 error, however, was harmless.  The California Supreme Court found

1  although Carolyn's statement rebutted Hamilton's theory that

2  Gilbert fired the fatal shots, the admission of the taped

3  conversation was not significant due to the absence of any

4  evidence to support Hamilton's theory.  Even if the taped

5  conversation had been excluded, the jury would still have heard

6  the testimony of Carolyn and Gilbert that Hamilton was the actual

7  killer, their unequivocal denial that Gilbert was the killer, and

8  no contrary testimony or evidence whatever.  *Hamilton*, 48 Cal. 3d

9  at 1166-68.

10      The State contends the taped conversation was properly

11  admitted to counter the defense's charge of recent fabrication,

12  since any motive to fabricate did not arise until Carolyn was

13  confronted with her involvement in the murder when she was

14  arrested.  The State asserts even if the taped conversation was

15  admitted in error, it was harmless since there was no evidence

16  that Gilbert shot Gwen and the evidence against Hamilton was

17  strong.

18      From a temporal and logical perspective, Carolyn had no

19  incentive to falsely accuse Hamilton shortly after the murder.

20  The exact time of Carolyn's prior statement, and whether it was

21  made before any motive to fabricate arose, was not precisely

22  established.  Even if the statement was not made before a motive

23  to fabricate arose, the admission of the taped conversation did

24  not render Hamilton's trial fundamentally unfair.  Both Carolyn

25  and Gilbert testified at trial to the same matters discussed in

26  the taped conversation, that Hamilton was the one who actually

1    shot Gwen.  Even assuming the taped conversation was erroneously

2    admitted, it does not justify habeas relief.  The record fairly

3    supports the California Supreme Court's denial of this claim.

4    Claim 4a is denied on the merits.

5    2.   CLAIM 2:   INEFFECTIVE ASSISTANCE OF COUNSEL AT GUILT PHASE

6         A petitioner must satisfy two components to establish an

7    ineffective assistance of counsel claim:  that counsel's

8    performance was deficient and that the deficiency prejudiced the

9    defense.  *Strickland*, 466 U.S. at 687; *Wiggins v. Smith*, 539 U.S.

10   510, 521 (2003).  The deficient performance prong requires a

11   showing that counsel's errors were so serious that he was "not

12   functioning as the 'counsel' guaranteed the defendant by the

13   Sixth Amendment."  *Strickland*, 466 U.S. at 687.  The question is

14   whether "counsel's representation fell below an objective

15   standard of reasonableness."  *Id.* at 688.  There is a "strong

16   presumption that counsel's performance falls within the 'wide

17   range of reasonable professional assistance.'"  *Kimmelman v.*

18   *Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S.

19   at 689).  Every effort must be made to "eliminate the distorting

20   effects of hindsight, to reconstruct the circumstances of

21   counsel's challenged conduct, and to evaluate the conduct from

22   counsel's perspective at the time." *Strickland*, 466 U.S. at 689;

23   *Bonin v. Calderon,* 59 F.3d 815, 833 (9th Cir. 1995).

24        In order for counsel's inadequate performance to constitute

25   a Sixth Amendment violation, a petitioner must show counsel's

26   failures prejudiced his defense.  *Wiggins*, 539 U.S. at 534

1   (citing *Strickland,* 466 U.S. at 692).   The prejudice prong

2   requires a showing of reasonable probability that without

3   counsel's unprofessional errors the "result of the proceeding

4   would have been different.   A reasonable probability is a

5   probability sufficient to undermine confidence in the outcome."

6   *Strickland*, 466 U.S. at 694.

7        Hamilton presents the following instances which he claims

8   resulted in ineffective assistance of counsel:

9   a.   failure to investigate and present evidence that others
         planned and committed the murder,
10  b.   failure to investigate and present mitigation
         (psychological disorders, physical/sexual abuse,
11       addiction),
12  c.   failure to investigate and present issues from Claims
         5-7, 10-15, 20-21 (impartial jury, juror misconduct,
         unreliable penalty, factual innocence,[15] accomplice
13       testimony, state interference with trial, illegal
         arrest, coerced statements, *Miranda* violations,
14       improper aggravation, incompetence),
    d.   failure to object to admission of hearsay evidence
15       regarding financial gain special circumstance,
    e.   failure to object to instruction on financial gain
16       special circumstance and accomplice corroboration,
    f.   failure to object to instruction regarding motive,
17  g.   failure to object to prosecutor's misstatement of
         evidence regarding financial gain,
18  h.   failure to object to prosecutor's misleading argument
         that no mitigation equals aggravation,
19  i.   failure to object to prosecutor's argument in favor of
         the death penalty based on mathematical weighing,
20  j.   submission of erroneous instructions regarding
         financial gain special circumstance and accomplice
21       corroboration,
    k.   failure to investigate and present guilt/penalty
22       issues,
    l.   failure to research and demonstrate the death penalty
23       is excessive based on inter-proportionality,
    m.   failure to research and demonstrate the death penalty
24       is excessive based on intra-proportionality,
    n.   failure to prepare defense to aggravation,
25  o.   failure to investigate and present evidence of deal

26   ─────────────────

     [15] This portion duplicates the issue presented in subclaim a.

with prosecution witness,

p.   failure to adequately cross-examine accomplice
     witnesses,[16]

q.   failure to investigate and present forensic evidence of
     Hamilton's innocence in the shooting,[17]

r.   failure to investigate and present evidence of unequal
     treatment of accomplices,

s.   failure to impeach and exclude witness testimony,

t.   failure to object to jury composition,

u.   failure to make motions in limine regarding damaging,
     inadmissible evidence (tape of phone calls, crime scene
     and victim photos and testimony, Hamilton's statements,
     evidence seized in violation of Fourth Amendment),

v.   failure to obtain discovery,

w.   failure to object to prosecutor's and judge's
     misstatements during voir dire,

x.   failure to investigate constitutionality of means to
     prepare jury roll,

y.   failure to prevent continuation of conduct in section
     XIII,[18]

z.   failure to raise incompetence,[19]

aa.  failure to procure psychological/neurological exam,
     research and present evidence of sanity, incompetence
     or diminished capacity,[20]

ab.  failure to prosecute writs regarding denial of change
     of venue,

ac.  failure to cross-examine regarding gun powder residue
     tests,[21]

ad.  failure to adequately prepare for closing argument,

ai.[22] failure to object to admission of damaging,
     inadmissible evidence (knife, disc removed from body,
     shotgun and shells),

aj.  failure to object to admission of excluded news reports
     and their use in closing argument,

ak.  failure to object to prosecutor's argument in closing
     of facts not in evidence and of excluded evidence, in

---

[16] This subclaim refers to conduct presented in Claim 11, and duplicates subclaim c.

[17] This subclaim duplicates issues presented subclaim a.

[18] It is not clear what conduct is referred to here, as the petition does not contain a "section XIII." If the reference is to Claim 13, this subclaim duplicates subclaim c.

[19] This subclaim duplicates subclaim c, as the issue of Hamilton's incompetence is contained in Claim 21.

[20] This subclaim duplicates subclaim b.

[21] This subclaim raises issues presented in Claim 10, and duplicates subclaim c.

[22] Subclaims ae, af, ag and ah duplicate subclaims d, g, h, and w respectively.

ORePetnHam

1                  effect "testifying" as a criminal law expert,

al.   unreasonable stipulation to use of Carolyn's taped
2                  statement, the only statement that Hamilton wanted his
                  wife killed for the insurance money,
3      am.   unreasonable stipulation to use of prior testimony at
                  penalty instead of recalling witnesses to point out
4                  inconsistencies in testimony,
      an.   failure to object at penalty to evidence regarding
5                  Hamilton's prior crime,
      ao.   lack of competence -- no assistance, conflicting
6                  caseload, and first capital trial,
      ap.   appellate counsel's failure to raise federal grounds,
7                  instead relying on state grounds,
      aq.   failure to interview known witnesses,
8      ar.   inadequate knowledge of relevant law,
      as.   failure to object to prosecutor's inaccurate and out of
9                  context statements,
      at.   failure to investigate to support tactical decision for
10                 any alleged error.

11

12      The State urges that all but seven subclaims should be

13  dismissed because they are conclusory and fail to state a prima

14  facie case.[23]  Hamilton's points and authorities address the

15  failure of counsel to properly investigate his background and

16  mental state (subclaim b: failure to investigate and present

17  mitigation, i.e., psychological disorders, physical/sexual abuse,

18  addiction and subclaim aq: failure to interview known family and

19  other mitigation witnesses), his incompetence (subclaim c: Claim

20  21- failure to raise incompetence), and his mental state at the

21  time of the murder (subclaim b: failure to investigate and

22  present mitigation).  Subclaims a, b, o and aq are argued in the

23  petition.  See pages 7-12, 12-15, and 16-17.  Sufficient

24  reference is made in the petition and/or the state record to

25

26       [23] The State contends that only subclaims a, b, k, n, z, aa and
aq are addressed in Hamilton's points and authorities.

1  determine the bases for subclaims c, g, h, i, l, m, p, u, y, ab,
2  ac, ad, ai, aj, al, and ao.

3       Subclaims d, e, f, j, k, n, r, s, t, v, w, x, ak, am, an,
4  ap, ar, as, and at, to the extent that they present allegations
5  not discussed in other claims, are denied on the merits as they
6  fail to state a prima facie claim upon which relief may be
7  granted.   Subclaims a and u are discussed above with the claims
8  involving Hamilton's co-conspirators.   Subclaim c is discussed in
9  Claims 5-7, 10-15, 20 and 21.   Subclaim ab is discussed above in
10  the analysis of Claim 1.   Subclaims p, q, y, z, aa, ac, ae, af,
11  ag, and ah are denied on the merits as they present claims which
12  are included in other subclaims of Claim 2.

13       g.   **FAILURE TO OBJECT TO PROSECUTOR's MISSTATEMENT OF**
14            **EVIDENCE REGARDING FINANCIAL GAIN**

15       In his closing argument during the guilt phase, the
16  prosecutor stated Carolyn Hamilton "testified on the stand" that
17  the killing was for money and that she "told Vicki that
18  [Hamilton] was going to kill Gwendolyn for the insurance money."
19  RT 10:2256.   Hamilton alleges defense counsel's failure to object
20  to this misstatement constitutes ineffective assistance of
21  counsel.

22       The California Supreme Court addressed this claim on direct
23  appeal, finding that defense counsel's failure to object to the
24  prosecutor's misstatement of financial gain evidence during
25  closing argument did not constitute ineffective assistance of
26  counsel since it did not result in the withdrawal of a

1  potentially meritorious defense.  *Hamilton*, 48 Cal. 3d at 1177.
2  The state court found, in spite of the fact that Carolyn made
3  this statement to a police detective instead of to her sister and
4  that it came before the jury through a taped confession instead
5  of direct testimony, that it was clear she stated that Hamilton
6  stated he wanted to kill his wife for the money, so the
7  credibility of the statement was not significantly affected.  *Id.*
8  at 1178.  The state court concluded that the prosecutor's
9  misstatement, and defense counsel's failure to object to it, did
10 not prejudicially affect the outcome of the trial.  *Id.*

11      Hamilton does not present any offer of proof or other
12 showing which indicates defense counsel's failure to object
13 resulted in ineffective assistance of counsel, nor that in any
14 other way refutes the state court's analysis of the record.  The
15 record fairly supports the California Supreme Court's summary
16 denial of this claim.  Claim 2g is denied on the merits.

17      o.   FAILURE TO INVESTIGATE AND PRESENT BENEFITS GIVEN TO
18           PROSECUTION WITNESS

19      Hamilton alleges defense counsel's failure to uncover
20 evidence of the prosecution's undisclosed consideration to Vicki
21 in exchange for her testimony resulted in ineffective assistance
22 of counsel.  See Claims 3b(1) and (8) above.  As discussed above,
23 there was no prosecutorial misconduct, so defense counsel cannot
24 have provided ineffective assistance by failing to uncover the
25 alleged additional benefits.

26      Hamilton does not present any offer of proof or showing

ORePetnHam                        75

1  which indicates defense counsel's actions resulted in ineffective
2  assistance of counsel.   The record fairly supports the California
3  Supreme Court's summary denial of this claim.   Claim 2o is denied
4  on the merits.

5       ad.   FAILURE TO ADEQUATELY PREPARE FOR CLOSING ARGUMENT
6       Hamilton argues that defense counsel's failure to prepare
7  for closing argument resulted in a rambling, nearly incoherent
8  presentation which left major inconsistencies and arguments
9  unaddressed.   Review of defense counsel's closing argument
10 reveals not a "rambling, nearly incoherent presentation," but
11 repeated attacks on inconsistencies in the testimony of Carolyn,
12 Gilbert and Vicki, bolstering the theory that they planned and
13 carried out Gwen's murder and then framed Hamilton.

14      Hamilton does not present any offer of proof or showing
15 which indicates defense counsel's actions resulted in ineffective
16 assistance of counsel.   The record fairly supports the California
17 Supreme Court's summary denial of this claim.   Claim 2ad is
18 denied on the merits.

19      ai.   FAILURE TO OBJECT TO ADMISSION OF DAMAGING,
20            INADMISSIBLE EVIDENCE

21      Hamilton contends defense counsel's failure to object to the
22 admission of damaging, inadmissible evidence, including a knife,
23 shot cups removed from Gwen's body, the shotgun pieces, and
24 shotgun shells, was unreasonable and resulted in ineffective
25 assistance of counsel.   Hamilton asserts testimony established
26 the knife had no connection to the case, the shot cups were not

1  identified and had no foundational chain of custody, and the

2  shotgun and shells were not shown to have been used in the

3  murder.

4      The knife, People's Exhibit No. 29, was taken from

5  Hamilton at the crime scene, tested by criminologist Steven

6  O'Clair and determined not to have made the hole in the tire of

7  Hamilton's pickup truck.  RT 8:1769; RT 9:2029-30.  The shot cups

8  (which are the part of shotgun shells that hold the pellets

9  together until they leave the barrel of the gun, RT 8:1771) were

10 removed from Gwen's neck and chest during the autopsy, tested by

11 O'Clair and determined they could have come from a 12-gauge

12 shotgun with number 8 shot.  RT 8:1770-71, RT 9:2031-33.  The

13 shotgun parts were found where Gilbert said he disposed of them,

14 RT 7:1966, RT 8:2008-09.  The serial number on the recovered

15 shotgun part matched the serial number on the ATF form of the

16 sale to Brenda Burns on October 31, 1981.  RT 8:1777-78; 1788.

17 Hamilton does not present any offer of proof or showing

18 which indicates any undue prejudice from admission of this

19 evidence, or that defense counsel's failure to object resulted in

20 ineffective assistance of counsel.  Further, Hamilton does not

21 present any basis for the allegation that any of this evidence

22 was inadmissible.  See Claim 4e and f below.  The record fairly

23 supports the California Supreme Court's summary denial of this

24 claim.  Claim 2ai is denied on the merits.

25 /////

26

ORePetnHam                        77

1        aj.   FAILURE TO OBJECT TO ADMISSION OF EXCLUDED NEWS

2              REPORTS, USE IN CLOSING ARGUMENT[24]

3        Hamilton contends defense counsel failed to object when a

4   properly excluded news release was put into evidence, and again

5   failed to object when the prosecutor referred to that evidence in

6   closing argument.

7        Review of the record reveals defense counsel did object to

8   the admission of the news release into evidence, and the trial

9   court ruled it was not admitted.   RT 9:2100.   Review of the

10  prosecutor's arguments to the jury reveals that although

11  reference was made to the news release, the argument was based on

12  the testimony of Lt. Byrd, who related Hamilton's statement that

13  he knew Gwen was shot with a shotgun because he saw a news

14  release, and indicating the news release stated Gwen was shot,

15  but did not reveal the type or caliber of weapon.   RT 10:2263,

16  RT 7:1700-01.   These references to a news release were invited by

17  Hamilton's post-arrest statement to Lt. Byrd which made reference

18  to the news release as bearing on whether such a news release

19  existed as related to the credibility of Hamilton's post-arrest

20  statement.   The record fairly supports the California Supreme

21  Court's summary denial of this claim.   Claim 2aj is denied on the

22  merits.

23  /////

24

25

26        [24] This claim is amended from the denial on November 12, 2002,
    due to additional review of the record.

1      al.   UNREASONABLE STIPULATION TO USE CAROLYN'S TAPED
2            STATEMENT

3      Hamilton contends that the tape of Carolyn's November 27,
4 1981 confession to Detective Salazar included the only statement
5 that Hamilton wanted to kill his wife for the insurance money,
6 and that defense counsel's stipulation to playing the tape for
7 the jury resulted in ineffective assistance of counsel.   RT
8 8:1960.

9      The California Supreme Court addressed the underlying
10 admission claim on direct appeal and held that since Carolyn's
11 statement was admissible, it was not necessary to consider
12 whether counsel's failure to object to its admission denied
13 Hamilton constitutionally effective assistance of counsel.
14 *Hamilton*, 48 Cal. 3d at 1175, n.21.

15     Carolyn testified at trial that Hamilton said he wanted his
16 wife killed because he had a girlfriend and he wanted his kids.
17 Similarly, in her taped confession Carolyn stated that Hamilton
18 wanted to kill Gwen for the insurance money and because he had a
19 girlfriend.   Even assuming the taped confession was improperly
20 admitted, and that defense counsel erred in not objecting to its
21 admission, there was no prejudice because the implication that
22 Hamilton wanted the life insurance money was presented by
23 Carolyn's in-court testimony that Hamilton offered her $20,000
24 from the insurance proceeds if she assisted him with the murder.
25 Hamilton cannot show that defense counsel's failure to object
26 resulted in ineffective assistance of counsel.   The record fairly

1  supports the California Supreme Court's denial of this claim.

2  Claim 2al is denied on the merits.

3       ao.  LACK OF PROFESSIONAL EXPERIENCE IN CAPITAL CASE TRIALS

4       Hamilton contends that defense counsel provided him

5  constitutionally ineffective assistance of counsel since this was

6  his first capital trial, he had no assistance, and he was

7  attempting to defend other capital murder trials and major felony

8  cases during Hamilton's trial.

9       Hamilton does not present any offer of proof or other

10  showing which indicates defense counsel was not competent to

11  represent a capital defendant.  The record fairly supports the

12  California Supreme Court's summary denial of this claim.  *See*

13  *also* analysis below of Claim 2b.  Claim 2ao is denied on the

14  merits.

15       aq.  FAILURE TO INTERVIEW KNOWN WITNESSES

16       Hamilton asserts that defense counsel was ineffective for

17  failing to interview known witnesses.  However, Hamilton does not

18  specify in the petition or supportive briefing which witnesses

19  counsel knew of and did not interview, or what their testimony

20  would establish, nor does he present any offer of proof or other

21  showing how defense counsel's actions resulted in ineffective

22  assistance of counsel.  The record fairly supports the California

23  Supreme Court's summary denial of this claim.  Claim 2aq is

24  denied on the merits.

25  /////

26

3.    CLAIM 3:   PROSECUTORIAL MISCONDUCT

     a.   IMPROPER ARGUMENT

     Hamilton asserts the prosecutor made improper statements during argument which undermined the basic fairness of his trial. This claim asserts the prosecutor: (1) made graphic, prejudicial, inflammatory remarks; (2) misstated the law on fetus viability; (3) misstated evidence regarding the behavior of alleged accomplices; (4) argued fetal murder by a preponderance of the evidence; (5) inaccurately argued Hamilton made admissions; (7) gave improper opinion that Sharon's boyfriend Don Van Eck's testimony connected Hamilton to the crime; (8) improperly stated that Hamilton had a motive for murder; (9) improperly stated the elements of murder; (10) argued Hamilton originally intended to carry out the murder in front of his children; (12) inaccurately argued the defense presented no evidence on key points; (13) misstated the nature of the financial gain special circumstance, its necessary proof, and argued irrelevant facts; and (15) improperly usurped the jury's role and "testified" as a criminal law expert.[25]

     "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson*, 74 F.3d at 1576.  A prosecutor's argument, even though improper and universally condemned, does not justify federal habeas relief unless it so infected the trial with unfairness as to make the resulting

_____

     [25] Subsections (6), (11) and (14) are discussed above in Part V.1(e).

ORePetnHam                         81

1   conviction a denial of due process. *Darden*, 477 U.S. at 181.

2   Moreover, prosecutorial comments to which a defendant fails to

3   object are reviewed for plain error. *Jeffries*, 5 F.3d at 1191.

4       Subsections (1) and (12), that the prosecutor made graphic,

5   prejudicial, inflammatory remarks, and inaccurately argued no

6   evidence was presented on key defense points, are not supported

7   by specific allegations or citations to the record. Review of

8   the record does not reveal that the prosecutor's argument was

9   improper, or inconsistent with the evidence presented at trial.

10  These claims are denied on the merits as they fail to state a

11  prima facie claim upon which relief may be granted and are

12  unsupported by record references.

13      Subsections (2), (5) and (9), that the prosecutor misstated

14  the law on fetus viability, inaccurately argued Hamilton made

15  admissions, and improperly stated the elements of murder, lack

16  specific allegations or citations to the record. Review of the

17  state record reveals that the language used by the prosecutor

18  mirrors the language of California's jury instructions.

19  RT 10:2245 and 2322; *id.* at 2243 and 2322, 2324. Subsections

20  (2), (5) and (9) are denied on the merits.

21      Subsections (3), (4), (8) and (13), that the prosecutor

22  misstated evidence regarding the behavior of the alleged

23  accomplices, argued fetal murder by a preponderance of the

24  evidence, stated Hamilton had a motive for murder, and misstated

25  the necessary proof for the financial gain special circumstance

26  and argued irrelevant facts, are not supported by specific

ORePetnHam                    **82**

1  citations to the record.  Review of the state record reveals that

2  the argument by the prosecutor regarding the accomplices,

3  Hamilton's motive, and the financial gain special circumstance

4  was consistent with the evidence presented at trial.  RT 10:2265-

5  71 and 2254-56.  The prosecutor's argument about fetal viability

6  told the jury they "must find *beyond a reasonable doubt* that the

7  fetus was viable."  *Id.* at 2241 (emphasis added).  There is no

8  error.  Subsections (3), (4), (8) and (13) are denied on the

9  merits.

10       Subsections (7) and (10), that the prosecutor stated his

11  opinion that Van Eck's testimony connected Hamilton to the crime,

12  and argued Hamilton originally intended to carry out the murder

13  in front of his kids, are both confirmed by the record.  RT

14  10:2265 and 2050-51.  Hamilton alleges these statements by the

15  prosecutor were improper, intended only to inflame the jury, and

16  infected the trial with unfairness.  Defense counsel's objection

17  to Van Eck's testimony, that on November 3, 1981, he saw Hamilton

18  with an "older" woman in a white pickup, *id.* at 1751-52,[26] was

19  overruled.  RT 7:1756.  Although the testimony by Van Eck may not

20  have "overwhelmingly" connected Hamilton to the crime, it did

21  provide a connection and as such the prosecutor's argument did

22  not render the entire trial unfair.  The argument of intent to

23  carry out the murder in front of the children was consistent with

24  and did not misrepresent the evidence presented at trial.  The

25

26       [26] Don Van Eck was 21 at the time of Hamilton's trial in
October 1982; Gwen was 26 at the time of her death and the mother
of 4 children ages 6 and younger.  RT 7:1752; 1737, 1725.

1  trial judge twice warned the jury, once prior to counsels'

2  closing arguments and once during the instructions, that

3  statements of counsel were not evidence.  RT 10:2238-39, 2308.

4  Subsections (7) and (10) are denied on the merits.

5       Subsection (15), that the prosecutor argued at both guilt

6  and penalty that it was hard to conceive of a more cold-blooded,

7  calculated murder, is confirmed by the record and the

8  circumstances of the killing.  RT 10:2304 and 2388.  Defense

9  counsel did not object to this argument during the guilt phase,

10 but did object at the penalty phase.  The trial court sustained

11 the objection, but indicated the prosecutor's comment was proper

12 if submitted as argument instead of personal belief.  *Id.* at

13 2388.  The prosecutor indicated that he was submitting the

14 statement as argument only.  *Id.*  Hamilton alleges the argument

15 effectively allowed the prosecutor to give his personal opinion

16 about the evidence, which allowed him to "testify" as a criminal

17 law expert on the ultimate issue of guilt, thus improperly

18 usurping the jury's role and infecting the trial with unfairness.

19      The prosecutor's argument is premised on a reasonable

20 inference that the murder was carried out for Hamilton's selfish

21 pecuniary gain after two aborted attempts.  Even assuming this

22 statement was an improper comment on the weight of the evidence

23 against Hamilton, any error was later cured by the instructions

24 to the jury that they alone were to determine the facts based on

25 the evidence presented at trial, RT 10:2306, and that the

26 statements and argument of counsel were not evidence.  *Id.* at

1  2238-39, 2308.  The trial court's instructions were sufficient to
2  focus the jury's attention on the proper issues.  *United States*
3  *v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986).  Subsection (15)
4  is denied on the merits.

5      The record fairly supports the California Supreme Court's
6  summary denial of this claim.  Claim 3a is denied on the merits.

7      b.    KNOWING USE OF PERJURED TESTIMONY

8          (3)   BRENDA BURNS' COERCED/REHEARSED TESTIMONY AND
9                CONSIDERATION

10     Hamilton asserts Brenda Burns was permitted to give
11 testimony which the prosecutor knew to be false, misleading and
12 unreliable because it had been coerced and repeatedly rehearsed
13 without regard for whether it reflected her independent memory of
14 events.  Hamilton also alleges Brenda's testimony misleadingly
15 failed to disclose that she was testifying in exchange for
16 explicit and implicit promises that she would not be charged for
17 capital murder and that county authorities would not take custody
18 of her children.

19     Hamilton presents a supporting declaration by Brenda Burns,
20 asserting she was questioned by detectives for hours until she
21 gave the answers she thought they wanted, that she was given a
22 lie detector test which she was told she failed, that she was
23 instructed to memorize her statement before she testified, and
24 that when she testified to something not in her statement she was
25 shown her statement so she could change her answer.  Ex. 28.
26     To justify a new trial under *Brady v. Maryland* for knowing

1    use of perjured testimony, the false evidence must be material,

2    i.e., reasonably likely to affect the judgment of the jury.   373

3    U.S. at 87.

4        Hamilton's allegation of coercion is not supported by the

5    record.   Contrary to her declaration, Brenda Burns' testimony at

6    trial contains three instances where she was asked to examine the

7    statement she gave to the police in order to refresh her

8    recollection, however only one instance resulted in her

9    correction of an incorrect answer.   RT 8:1821-27 (correcting

10   response that she did not call Carolyn at Hamilton's request).

11   The other two instances where she was asked to review her

12   statement to police, was to refresh her recollection following

13   her answers that she "did not recall."   *Id.* at 1818-19 and 1833-

14   36.

15       The record fairly supports the California Supreme Court's

16   summary denial of this claim.   Claim 3b is denied on the merits.

17       c.   FAILURE TO DISCLOSE EXCULPATORY EVIDENCE

18       Hamilton alleges the prosecutor failed to: 1) disclose names

19   and addresses of all witnesses who might have been called to

20   testify or who gave statements to the police, including consulted

21   experts; 2) provide access to all physical evidence obtained and

22   information, including felony conviction records, regarding

23   prosecution witnesses (i.e., whether they were on probation/

24   parole, had any pending charges, were given money, immunity or

25   other promises, had prior false charges or statements); 3)

26   disclose the existence of taped conversations made for the Tulare

1  County Sheriff between Patti and Vicki; and 4) disclose Brenda's
2  failed polygraph exam with evidence of extensive coaching and
3  threats.

4       The failure to disclose exculpatory and impeachment evidence
5  favorable to the defense is material if there is a "reasonable
6  probability" that had the evidence been disclosed to the defense
7  "the result of the proceeding would have been different."
8  *Strickland*, 466 U.S. at 668.  A "reasonable probability" is "a
9  probability sufficient to undermine confidence in the outcome."
10 *Bagley*, 473 U.S. at 682.  *Bagley* materiality is not a sufficiency
11 of the evidence test.  *Kyles v. Whitley*, 514 U.S. 419, 435
12 (1995).  "The question is not whether the defendant would more
13 likely than not have received a different verdict with the
14 evidence, but whether in its absence he received a fair trial,
15 understood as a trial resulting in a verdict worthy of
16 confidence."  *Id.* at 434.

17      Hamilton fails to show any witness information which is
18 material, that had it been disclosed the result of the trial
19 would have been different.  Further, there is no indication that
20 the reports, records, or other physical evidence Hamilton
21 challenges ever existed.  Assuming such information existed,
22 there is no evidence any of it was exculpatory evidence mandating
23 disclosure to the defense.  Hamilton has failed to make any
24 showing that any physical evidence to which he refers existed
25 which should have been disclosed.  More importantly, Hamilton has
26 not shown that any undisclosed evidence was material or that the

1  result was an unfair trial.

2      The record fairly supports the California Supreme Court's
3  summary denial of this claim.  Claim 3c is denied on the merits.

4      d.   WITHHOLDING, MISREPRESENTING, AND FAILING TO PRESERVE
5           EVIDENCE

6      Hamilton contends the prosecution withheld, misrepresented,
7  and failed to preserve potentially exculpatory evidence,
8  including blood and gun powder residue, test results of Hamilton
9  and his clothing, the tires of Hamilton's station wagon and
10 truck, and the polygraph tests administered to Hamilton and other
11 witnesses.  None of this alleged evidence, however, has been
12 identified as having been in the possession of law enforcement or
13 located during this proceeding, or in any other case which has
14 reviewed Hamilton's conviction.  Repeated requests of habeas
15 counsel and continual investigation have not revealed such
16 evidence.

17     Due process is not violated by the mere failure to preserve
18 evidence which could have been subjected to tests which might
19 have exonerated the defendant.  *United States v. Hernandez*, 109
20 F.3d 1450, 1455 (9th Cir. 1997); *Arizona v. Youngblood*, 488 U.S.
21 51, 56 (1988).  The failure to preserve evidence which is only
22 potentially exculpatory violates due process only if the
23 evidence's exculpatory value was apparent before it was
24 destroyed, the defendant would be unable to obtain comparable
25 evidence by other reasonably available means, and the police
26 acted in bad faith in failing to preserve the potentially useful

1   evidence.   *Hernandez*, 109 F.3d at 1455; *California v. Trombetta*,
2   467 U.S. 479, 489 (1984); *Youngblood*, 488 U.S. at 58.

3       Hamilton has shown no facts which would support an
4   allegation that the prosecution, or law enforcement, acted in bad
5   faith by failing to preserve evidence or that evidence he seeks
6   existed or is in existence.   Further, Hamilton has not shown that
7   any of the evidence or tests he describes possessed any
8   exculpatory value.   The record fairly supports the California
9   Supreme Court's summary denial of this claim.   Claim 3d is denied
10  on the merits.

11  4.   CLAIMS 4b, c, d, e, & f:   ADMISSION OF EVIDENCE ERRORS

12      Hamilton claims inadmissible, prejudicial evidence was
13  admitted which infected the trial with fundamental unfairness.
14  Hamilton challenges the admission of graphic photographs of Gwen
15  and the fetus, as well as their autopsies; the unduly graphic
16  testimony of officers which related the discovery of Gwen's body
17  and detailed the scene; and the knife taken from him at the
18  scene, the shotgun and the shells, since evidence showed the
19  knife could not have been used in the commission of the crime and
20  the shotgun and shells were never connected with the crime.
21  Hamilton contends all this evidence was irrelevant and more
22  prejudicial than probative.

23      Hamilton also raises a challenge to evidence for which he
24  provides no factual identification, explanation, specification,
25  or argument: that "unreliable, false or irrelevant evidence of
26  prior bad acts or crimes" was admitted.   Claim 4c is denied on

1  the merits as it fails to state a prima facie claim for relief.

2      As noted above in Claim 4a, an evidentiary admission only

3  justifies federal habeas relief if the admission renders the

4  proceedings fundamentally unfair. *McGuire*, 502 U.S. at 72;

5  *Windham*, 163 F.3d at 1103.  Evidence which is probative of an

6  element of the crime may be introduced whether or not that

7  element is specifically contested by the defense. *McGuire*, 502

8  U.S. at 69-70.  The trial court has broad discretion to admit

9  photos of the murder victim. *People v. Price*, 1 Cal. 4th 324,

10  441 (1991).  The prosecution is not obligated to rely solely on

11  testimony or accept an antiseptic stipulation. *Kealohapauole*,

12  800 F.2d at 1466 (finding no denial of due process from admission

13  of a videotape of autopsy procedure).  Photographs which disclose

14  the manner in which a victim was wounded or killed are properly

15  admitted on the issue of malice. *United States v. Goseyun*, 789

16  F.2d 1386, 1387 (9th Cir. 1986).

17      Hamilton has presented no evidence showing that the trial

18  judge abused his discretion in allowing admission of the

19  challenged evidence, or that the admissions made his trial

20  unfair.  Claims 4b, d, e, and f are denied on the merits.

21  5.  CLAIM 6:  JUROR MISCONDUCT AT GUILT PHASE

22      a.  EXTRANEOUS INFORMATION RE: FETAL VIABILITY

23      Hamilton contends that the jury, in determining the multiple

24  murder special circumstance, relied on extraneous information

25  which was irrelevant and unreliable to resolve the issue of fetal

26  viability.  Hamilton asserts consideration of this information

1  failed to provide him the opportunity to refute it and created an
2  impermissible risk of conviction based on materially false and
3  misleading evidence.

4      Hamilton presents the declarations of two jurors, Allen
5  Peoples and Mabel Heguigaray, saying that they personally knew of
6  babies born at seven months who survived and that some
7  unidentified women on the jury related knowledge of similar
8  experiences.  Ex. 31, ¶ 5 and Ex. 32, ¶ 3.

9      Jurors bring to their deliberations knowledge and beliefs
10  about general matters of law and fact that find their source in
11  everyday life and experience.  *United States v. Navarro-Garcia*,
12  926 F.2d 818, 821 (9th Cir. 1991); *People v. Marshall*, 50 Cal. 3d
13  907, 950 (1990).  When jurors receive information from extraneous
14  sources, the effect of such receipt is judged by a review of the
15  entire record, and may be found not prejudicial.  *In re*
16  *Carpenter*, 9 Cal. 4th 634, 647 (1995).  A petitioner is entitled
17  to habeas relief only if the extrinsic evidence had a substantial
18  and injurious effect or influence on the verdict.  *Lawson v.*
19  *Borg*, 60 F.3d 608, 612 (9th Cir. 1995).

20      The extraneous information Hamilton complains of was based
21  upon past, pre-trial, personal experiences of the jurors, and was
22  not the subject of outside, independent research or from an
23  authoritative extrinsic source.  Further, it duplicated
24  information which was testified to at trial, and did not have a
25  substantial and injurious effect or influence on the verdict.
26      Based on this evidence, defense counsel was not ineffective

1  for failing to investigate and present evidence of juror

2  misconduct.   The record fairly supports the California Supreme

3  Court's summary denial of this claim.   Claim 6a is denied on the

4  merits.

5          c.    FAILURE TO INFORM COURT OF JUROR CONVERSATION WITH

6                DETECTIVE SALAZAR

7          Hamilton asserts that Juror Peoples violated the trial

8  court's admonition not to discuss the case with anyone or to

9  speak to witnesses when he initiated a conversation with

10 Detective Salazar outside the courtroom.   Hamilton presents the

11 declaration of Juror Peoples in support of this claim, where

12 Peoples admits being acquainted with Detective Salazar, that on

13 the day the jury was sworn Peoples called out to Salazar saying

14 he recently found an old newspaper photo of him, to which Salazar

15 laughed and they went their separate ways.   Ex. 31, ¶ 3.   Juror

16 Peoples also declares he assumed that the trial judge lectured

17 the jury not to talk to witnesses the next day because of this

18 incident.   *Id.*

19         The state record reveals that the "lecture" by the trial

20 judge was the standard admonition given on the same day the jury

21 was sworn in.   RT 7:1595-99.   If Juror Peoples is mistaken about

22 when the incident occurred and he talked to Detective Salazar the

23 day before the "lecture," that was prior to any admonition given

24 by the judge.   Even if the incident occurred after the jury was

25 admonished, the conversation related by Juror Peoples is

26 innocuous, did not concern the trial or any issue in it, and

1  could not have had a substantial and injurious effect or

2  influence on the verdict.

3       Based on this evidence, defense counsel was not ineffective

4  for failing to investigate and present evidence of juror

5  misconduct.   The record fairly supports the California Supreme

6  Court's summary denial of this claim.   Claims 6c is denied on the

7  merits.

8  <u>VI.   TRIAL CLAIMS - PENALTY PHASE</u>

9  1.   CLAIM 2:   INEFFECTIVE ASSISTANCE OF COUNSEL AT PENALTY PHASE

10      b.   FAILURE TO INVESTIGATE AND PRESENT MITIGATION

11      Hamilton asserts defense counsel failed to investigate and

12  present evidence from his background, including evidence of

13  multi-generational sexual abuse and symptoms of psychiatric

14  disorders, suicide and alcohol/drug addiction, his father's

15  physical and psychological abuse of the entire family, his early

16  and continuing symptoms of psychic trauma, dissociative behavior,

17  extreme anxiety and depression which went untreated, his parents'

18  arrests for sexual exploitation of Carolyn and his subsequent

19  foster care placement, his attempted suicide prior to trial, and

20  the probability he suffers from organic trauma.   Specifically,

21  Hamilton contends defense counsel was ineffective since he did

22  not consult any mental health specialists or present any expert

23  testimony of his psychiatric history, and failed to locate his

24  childhood evaluations of psychological trauma and schizophrenic

25  paranoid disturbances.   Exs. 50 and 40.

26      Counsel has a duty to make reasonable investigations or to

ORePetnHam                      **93**

1 make a reasonable decision that makes particular investigations

2 unnecessary. *Strickland*, 466 U.S. at 690-91.  In assessing

3 whether counsel's investigation was reasonable, an objective

4 review must be conducted of their performance "under prevailing

5 professional norms." *Wiggins*, 539 U.S. at 523.  "The

6 reasonableness of counsel's actions may be determined or

7 substantially influenced by the defendant's own statements or

8 actions. . . . [W]hen a defendant has given counsel reason to

9 believe that pursuing certain investigations would be fruitless

10 or even harmful, counsel's failure to pursue those investigations

11 may not later be challenged as unreasonable." *Strickland*, 466

12 U.S. at 691.

13 <u>Deficient Performance</u>

14      Hamilton presents in support of this claim eighteen

15 declarations by family members and friends detailing the chaotic

16 and abusive environment in which he grew up, as well as records

17 documenting his early mental health evaluations.  Exs. 2-5, 7-10,

18 12-14, 17-20, 22, 24-25.  He also presents a social history

19 prepared by Shirley A. Reece, M.S.W., who interviewed Hamilton

20 and members of his family in 1993 and 1994, and reviewed numerous

21 documents.  Ms. Reece states that Hamilton was raised in an

22 environment of inter-generational alcoholism, child abuse and

23 domestic violence, that much of the adult behavior he was exposed

24 to was and is proscribed by law, and that there was seemingly a

25 total lack of familial or social supports.  Ms. Reece observes

26 there is abundant evidence that all the children were severely

1   deprived in every sense and lacked the normal affectional bonds

2   and guidance which foster healthy development and prosocial

3   behavior, that the ongoing stress far exceeded Hamilton's coping

4   capabilities and he literally had nowhere to turn for help.  Ms.

5   Reece states that Hamilton was repeatedly subjected to gross

6   maltreatment and incredible psychological abuse, and that his

7   parents' behavior was by all reasonable standards both deviant

8   and depraved.  Ms. Reece concludes that without a doubt Hamilton

9   is the product of an extraordinarily dysfunctional and

10  pathological family, which contributed substantially to his

11  behavior and to his functioning as an adult.  Ex. 47.

12      Hamilton also presents the opinion of Dr. Woods, who

13  interviewed Hamilton and reviewed numerous documents.  Dr. Woods

14  states that Hamilton has had serious psychiatric disorders which

15  substantially altered his ability to understand and function,

16  that both sides of Hamilton's family have histories of

17  genetically transmitted disorders which expressed themselves

18  early in Hamilton's life, and that any ability Hamilton had to

19  function normally was destroyed by a constant barrage of life-

20  threatening and degrading treatment at the hands of his parents.

21  Dr. Woods states Hamilton's mental health was severely damaged by

22  repeated physical and psychological abuse directed at Hamilton

23  and others, and his sense of hopelessness, learned helplessness,

24  and chronic anxiety have their roots in times he was forced to

25  witness sadistic attacks against family members and was unable to

26  help them.  Dr. Woods opines that Hamilton is incapable of

1   meaningfully engaging others and must either retreat into
2   isolation or surrender to the influence of people around him.
3   Dr. Woods concludes that as a result of environmental,
4   developmental and traumagenic factors beyond his control,
5   Hamilton has been burdened throughout his life with extreme
6   mental and emotional impairments which compromised his ability to
7   fully appreciate the nature and consequences of his acts or to
8   conform his conduct to the requirements of the law.  Ex. 48.
9        Hamilton asserts trial counsel failed to interview family,
10  friends, and others with whom he had contact, about his
11  background or family history of psychiatric disorders and alcohol
12  and drug dependency, failed to obtain evidence about his
13  childhood and any psychologically traumatic events, and failed to
14  obtain a psychiatric or psychological exam or any psychiatric
15  records.  Hamilton maintains trial counsel's performance fell
16  below an objective standard of reasonableness and violated the
17  duty to obtain mental health exams and to investigate his
18  background.
19       Hamilton argues the standards for effective capital counsel
20  were no different in 1982 than they are now.  Hamilton asserts
21  that both the Ninth Circuit and the United States Supreme Court
22  have rejected the notion that a different standard applied to
23  capital counsel in the early 1980s, both acknowledging the
24  importance of developing the defendant's background and character
25  in order to make an individualized assessment of the appropriate
26  penalty.  *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *Ainsworth*

1  *v. Woodford*, 268 F.3d 868, 876-77 (9th Cir. 2001);  *Bean v.*

2  *Calderon*, 163 F.3d 1073 (9th Cir. 1998);  *Karis v. Calderon*, 283

3  F.3d 1117 (9th Cir. 2002) (citing *Williams (Terry) v. Taylor*, 529

4  U.S. 362 (2000) applying the 1980 American Bar Association

5  ("ABA") Standards in evaluating counsel's duty to investigate

6  mitigation).  Hamilton asserts the mitigation evidence in his

7  case is similar to that in *Wiggins v. Smith*, 539 U.S. at 534

8  (severe privation and abuse by alcoholic, absentee mother,

9  physical torment, molestation and rape in foster care, diminished

10 mental capacities, homelessness), which the Supreme Court found

11 to be relevant to assessing moral culpability.

12      The State agrees that counsel must thoroughly investigate a

13 defendant's background to prepare for the penalty phase, but

14 contends the performance inquiry must determine whether counsel's

15 actions were reasonable in light of all the circumstances.

16 *Strickland*, 466 U.S. at 688.  The State argues the circumstances

17 include the defendant's cooperation as well as the prevailing

18 norms of practice.  The State observes the standards of the ABA

19 should only be viewed as guides, *id.*, and that the prevailing

20 norms may be determined from the standard practices at the

21 particular time and place of trial, *Wiggins*, 539 U.S. at 522, but

22 that no set of rules can account for the variety of circumstances

23 counsel faces and should not restrict counsel's constitutional

24 independence and wide latitude to make tactical decisions.

25 *Strickland*, 466 U.S. at 688-89.  Further, the State notes that

26 the purpose of the ABA Standards is to improve the quality of

1   legal representation, while the purpose of the Sixth Amendment

2   right to effective assistance of counsel is to ensure that

3   criminal defendants receive a fair trial.  *Id.* at 689.

4        The State argues the evidence establishes that despite trial

5   counsel's urging to the contrary and warnings about the

6   consequences, Hamilton insisted no mitigating evidence of his

7   background or character be presented; Hamilton refused to

8   entertain a mental defense or to undergo mental health testing

9   and evaluation; insisted on an "all or nothing" defense of

10  innocence at the guilt phase; and adamantly contended that if

11  convicted he wanted to receive the death penalty.  This was

12  confirmed by the testimony of his trial counsel at the

13  evidentiary hearing held in these federal habeas proceedings.

14       The State contends trial counsel persevered in his duty to

15  investigate penalty phase mitigation despite the lack of

16  cooperation by Hamilton and his friends and family, but the

17  investigation produced little positive information.  Trial

18  counsel's investigation was not only hampered by Hamilton's

19  refusal to discuss mitigation, but also by difficulty in

20  obtaining information from other witnesses, whom trial counsel

21  either could not speak to; did not provide any useful

22  information; or provided negative information.  The State argues

23  that nothing in counsel's dealings with Hamilton suggested the

24  need to consult a mental health professional.  The State observes

25  that records and reports provided after the evidentiary hearing

26  show that defense counsel obtained Hamilton's juvenile record,

1   his prior convictions, and his school records, and that inquiry

2   was made about his foster care but no records were produced from

3   providers.

4       The State asserts trial counsel made a tactical decision not

5   to present evidence which had been gathered, including "character

6   disorder" type evidence, in light of the circumstances;

7   particularly Hamilton's strong objections to "mental" evidence;

8   the absence of a history of serious mental pathology; and an

9   offense which involved aggravated, pre-meditated, and purposeful

10  activity.  The State asserts that in light of the results of

11  trial counsel's investigation, it was reasonable to seek to

12  present evidence of Hamilton's childhood through his mother.

13      The State argues that Hamilton's categorical denial of

14  complicity in the murders during the guilt and penalty phases

15  made his refusal to seek mitigation an understandable and

16  consistent trial strategy.  The State concludes that under the

17  norms of practice in Tulare County in 1981 and 1982, trial

18  counsel was not so deficient that he was not functioning as

19  counsel guaranteed under the Sixth Amendment, especially where

20  the psycho-social history evidence which has ultimately been

21  discovered is weak and not particularly helpful to Hamilton.

22      The State observes that at the federal evidentiary hearing

23  Hamilton conceded his consistent focus has been on the guilt

24  phase of his trial and absence of complicity for the crime as he

25  denied being the perpetrator.  Both trial counsel and defense

26  investigator Wells confirmed Hamilton's attitude was if he was

1   found guilty he would rather receive the death penalty than spend

2   the rest of his life in prison, which prompted Hamilton to refuse

3   their repeated requests to provide background information.   The

4   State asserts Hamilton's motivation to forego a penalty phase

5   defense was based on his assertion that if he was convicted,

6   trial counsel had failed to do his job, and a sentence of death

7   would entitle him to an automatic appeal to the California

8   Supreme Court.  *See* the State's Exhibit 5; December 2003

9   Evidentiary Hearing transcript ("EH") at 249-50.[27]

10  The State contends the record corroborates trial counsel's

11  recollection over Hamilton's current assertion that he did supply

12  all the requested information for the penalty phase and never

13  said he did not want to present a penalty phase case.  *See* the

14  State's Exhibits 5 and 7; EH at 2379.

15  Hamilton contends there was ample evidence available to

16  trial counsel which called for additional investigation which

17  would have led to mitigating information, and that a rudimentary

18  investigation would have alerted counsel to records revealing his

19  mental health problems, the myriad of medications he was

20  prescribed, and his bizarre behavior.  Hamilton maintains the

21  available evidence of his alleged suicide attempt, his problems

22  at the jail, and his questions about his medication, should have

23  prompted counsel to hire a mental health expert.

24

25      [27]  However, Hamilton was equivocal when asked at the
    evidentiary hearing if that was his strategy, replying "Not
26  entirely," but conceding, "I can't deny that the [my] words are
    there."  EH at 249-50, 252.

ORePetnHam                              100

1    Hamilton argues a capital counsel's failure to investigate
2  and present mitigating evidence is not justified by a lack of
3  cooperation from his client.  *Silva v. Woodford*, 279 F.3d 825,
4  847 (9th Cir. 2002) (if a client forecloses certain avenues of
5  investigation, it is an obligation, especially on capital
6  counsel, to seek alternative sources); *Douglas v. Woodford*, 316
7  F.3d 1079, 1087 (9th Cir. 2003) (counsel's obligation to obtain
8  mitigating evidence is not excused by a client's lack of
9  cooperation).  Hamilton refers to Exhibits 133, 134 and 140,
10 which include Kern County court records obtained in October of
11 1982, and a letter he wrote to trial counsel in September of
12 1982, that were discovered in counsel's files and submitted <u>after</u>
13 the December, 2003 evidentiary hearing.  Hamilton asserts these
14 documents reveal mitigating evidence from his childhood which
15 could have been used at trial and contradict trial counsel's
16 assertion that Hamilton refused to provide useable information
17 about his background.

18   The evidentiary hearing was re-opened at the State's request
19 in order to allow testimony by Hamilton, trial counsel,
20 investigator Wells, and federal habeas counsel about the recently
21 produced letter in Hamilton's handwriting, dated September 20,
22 1982, which provided details about his background.  *See* Ex. 133D.
23 Hamilton testified he provided this letter to trial counsel, but
24 does not recall if it was mailed or given to counsel in person.
25 September 2004 Reopened Evidentiary Hearing transcript ("REH") at
26 53.

ORePetnHam                        101

1       Hamilton argues that even if trial counsel did not review,

2   or even receive, Exhibit 133D, investigator Wells obtained

3   records which would have led to the same mitigating evidence, had

4   counsel only investigated the information they contained.

5   Hamilton observes that the records included references to his

6   parents' arrests for sexual abuse of his sister, his placement in

7   various foster homes, the name of his social worker, and a report

8   by the probation officer who interviewed him following his

9   father's arrest.  Hamilton asserts that in light of the

10  information in these records, trial counsel had sufficient

11  information to investigate mitigation even if Hamilton was

12  uncooperative.

13      Hamilton asserts that even assuming trial counsel never

14  received Exhibit 133D and that he had been as uncooperative as

15  trial counsel characterized him, trial counsel still failed in

16  his duty to investigate all avenues of mitigating evidence.

17  Hamilton contends a defendant's insistence that penalty phase

18  witnesses not be called does not eliminate trial counsel's duty

19  to investigate mitigation, or to advise about the potential

20  consequences of failing to present mitigating evidence.  Hamilton

21  argues that trial counsel's decision to call only Hamilton's

22  mother was not a strategic decision made after full investigation

23  of mitigation, but was a decision made because trial counsel had

24  abdicated his responsibility to conduct a full investigation and

25  failed to interview probation officers, foster parents, and

26  mental health experts.

ORePetnHam                        102

The State contends the September, 1982 letter (Ex. 133D) is completely contrary to an October, 1982 letter Hamilton wrote to his defense counsel in which Hamilton eschewed a penalty phase defense, and is also contradicted by statements Hamilton made at the time of trial in 1982. *See* Respondent's Ex. 4 (Hamilton's statement to the jury), Ex. 7 (Hamilton's statement at sentencing), and Ex. 8 (Hamilton's statement to probation officer). The State observes Hamilton did not mention preparing a written history during the December, 2003 evidentiary hearing, but testified instead that trial counsel took notes when Hamilton told him about his background. *See* EH at 205-06. Trial counsel testified he has no recollection of having ever seen the letter or having received it from Hamilton. REH at 26. The State urges that Exhibit 133D is unreliable, inferring it is a fabrication and should not be entitled to any weight.

Grave doubts about whether trial counsel ever received Exhibit 133D, and about Hamilton's credibility in 2003 as to the 1982 letters, do not have to be resolved because there is sufficient evidence to show that investigator Wells obtained records in October 1982 which contained sufficient information about Hamilton's background that would have led to similar mitigating evidence. *See* Exs. 133, 134 and 140.

The State asserts that reports of Hamilton's mental health problems in 1965 were only contained in his father's military records, and nothing alerted trial counsel of the need to obtain Hamilton's father's employment records. The State observes even

1   Hamilton's *Strickland* expert Phillip Cherney hesitated to say a

2   capital defense counsel must obtain a defendant's parents'

3   employment records without any basis to do so.  EH at 176-77.

4   The State disputes that trial counsel should have been put on

5   notice of the need for a mental health evaluation by Hamilton's

6   pre-trial alleged suicide attempt and use of antidepressant

7   medication.  The State asserts defense counsel was entitled to

8   believe Hamilton's denial of an actual suicide attempt, and that

9   Hamilton's understanding and interaction with trial counsel in

10  the preparation for trial contradicted any suggestion that he was

11  mentally impaired.  EH at 278-80.

12      Hamilton concludes there was no strategic reason for trial

13  counsel's failure to investigate and present substantial

14  mitigating evidence of his father's depraved and sadistic

15  behavior, his mother's complicity in the incest of his sister,

16  his succession of stays in foster homes, his childhood behavioral

17  and thought disturbances, and his attempted suicide while in

18  jail.  Hamilton contends the presentation of mitigation at his

19  penalty trial was constitutionally deficient and he should be

20  granted a new penalty trial.

21      The State observes trial counsel still believes Hamilton's

22  mother was the best, and indeed only, way to present evidence of

23  the family abuse and incest to the jury.  EH, Thomas Transcript,

24  at 20; State's Exhibit 2 at 25.  When Mrs. Piper refused to

25  discuss the abuse on the stand, trial counsel had no alternative

26  way to present the evidence.  State's Exhibit 1 at 2.  The State

asserts, however, that defense counsel had other strategies for the penalty phase, such as observing that the disposition of Carolyn's and Gilbert's cases could let them out of prison in as little as ten years when they were just as guilty of the murder, and arguing that Hamilton's life had value by reminding the jury of guilt phase testimony mentioning positive impressions about Hamilton, including that he was a good father.

Mr. Cherney testified at the evidentiary hearing that trial counsel should have developed a "theme," obtained a mental health evaluation, prepared a social history, and possibly obtained Hamilton's father's military records. EH at 72, 81, 104, 90. The State contends there is no established practice requiring capital counsel to develop a "theme," but asserts trial counsel did focus on a theme throughout the trial: that Carolyn Hamilton instigated the murder conspiracy and that Gilbert Garay shot Gwen. Trial counsel returned to this theme in his penalty phase argument when he contrasted the sentences of Carolyn and Gilbert with the sentence Hamilton was facing. The State observes trial counsel testified at the evidentiary hearing that preparing a social history and hiring a mental health expert was not done as a matter of course in 1981, and Mr. Cherney, Hamilton's *Strickland* expert, did not disagree.

That appellate cases decided twenty years later, when social history and mental health mitigation preparation is the standard of practice in death penalty trials, does not change the reality of capital defense practice in 1981 and 1982. Nor does it

1  resolve defense counsel's testimony that he partially undertook

2  social history and mental health analysis but Hamilton refused to

3  permit him to present a mitigation defense.

4      The State admits the duty to make a reasonable investigation

5  into potential mitigating evidence has never changed, but

6  contends that the norms of practice which define "reasonableness"

7  and the extent of mitigation evidence have evolved with

8  experience and study.  Trial counsel testified he would prepare

9  for Hamilton's penalty phase differently today, but at the time

10  he did the best he could in light of Hamilton's strong opposition

11  and lack of cooperation.  The State questions the validity of Mr.

12  Cherney's opinion that trial counsel's investigation into

13  mitigation was inadequate, because Mr. Cherney does not know

14  about the communications between trial counsel and Hamilton and

15  because Mr. Cherney has no first-hand knowledge of the prevailing

16  norms in Tulare County in 1981 and 1982.  The State asserts both

17  are critical to any assessment of trial counsel's performance,

18  arguing conversations between counsel and defendant are

19  particularly important when an uncooperative defendant later

20  alleges ineffective representation at the penalty phase.

21      The State asserts Mr. Cherney is not an authority in the

22  prevailing norms of practice in Tulare County in 1981 and 1982.

23  Mr. Cherney was in private practice until 1987, and did not try a

24  capital case to a jury until 1989 and 1990.  Conversely,

25  Hamilton's trial counsel began work for the Tulare County Public

26  Defender's Office in 1979, has been appointed to twelve capital

ORePetnHam

**106**

1  cases, tried six of those to a jury (of which Hamilton was the

2  only one to receive the death penalty), and has been promoted to

3  supervising attorney in the Public Defender's Office.

4      Trial counsel testified that the norms of practice in

5  capital litigation have evolved since 1981.  EH, Thomas

6  transcript at 10-11, 24-25.  He did not think there was a death

7  penalty seminar before his appointment to Hamilton's case, but if

8  there was it only lasted about two hours, where now the seminars

9  occur annually and last three to four days.  EH at 291.  Trial

10  counsel testified that attorneys in his office now assigned to

11  capital cases hire an investigator and an outside consultant or

12  mitigation specialist to investigate every aspect of a

13  defendant's life.  EH at 303, Thomas transcript at 11, 25, 28-29,

14  40-41.  In 1981 this was not done, and trial counsel did not

15  believe that a mitigation specialist even existed then.  EH,

16  Thomas transcript at 29.  At the time of Hamilton's trial, trial

17  counsel's office did not hire a psychologist or psychiatrist as a

18  matter of course in every capital case and did not prepare a

19  psychosocial history, as they do today.  EH at 133, 142, 282-83,

20  303, Thomas transcript at 10, 24-25, 40.  In short, trial counsel

21  testified that the techniques and practices of capital defense in

22  Tulare County today are very different from 1981.

23      The State argues this case is like *Jeffries v. Blodgett*, 5

24  F.3d 1180, 1197-98 (9th Cir. 1993)[28], which recognized the

25  ―――――――――――――――

26      [28] The State also cited *Hayes v. Woodford*, 301 F.3d 1054, 1067
    (9th Cir. 2002) for this argument, however that opinion was
    substituted after the State's brief was filed by *Hayes v. Brown*,

1  principle from *Strickland* that the reasonableness of counsel's

2  actions may be determined or substantially influenced by the

3  defendant's own statements and desires about how the trial be

4  conducted.  466 U.S. at 691.  The State contends Hamilton's

5  letter to trial counsel, and the statement he wished to read to

6  the jury, unequivocally expressed his wish not to present

7  mitigation evidence, entitling his trial counsel's decisions to

8  additional deference.  The State observes that a law review

9  article relied on by Mr. Cherney discusses the effect of an

10 uncooperative defendant, stating it may be impossible to

11 construct a substantial mitigation case without the defendant's

12 active assistance.  *See* Gary Goodpaster, *The Trial for Life:*

13 *Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.

14 L.Review 299, 321-22 (1983).

15     The State concludes that trial counsel properly sought

16 Hamilton's assistance to prepare for the penalty phase early in

17 his representation, but Hamilton refused to cooperate, insisted

18 he did not want mitigation evidence presented, and made it clear

19 he did not want counsel to investigate or present evidence of his

20 family background, including the incest, by refusing to provide

21 information or names of relatives.  The State contends Hamilton's

22 lack of cooperation prevented trial counsel from obtaining all

23 the details of the abuse and problems in Hamilton's family, but

24 that nevertheless trial counsel did investigate, interviewed

25

26 399 F.3d 972 (9th Cir. 2005) (granting habeas relief for
   presentation of false evidence).

1  witnesses and searched for records, trying to persuade Hamilton

2  to cooperate, and making sure Hamilton understood the

3  consequences of his failure to do so.  The State argues trial

4  counsel made a tactical decision to call Hamilton's mother to

5  testify about his childhood because she had firsthand knowledge

6  of the abuse.  Counsel expected her to generate sympathy, and she

7  had additional credibility due to her testimony for the

8  prosecution at the guilt phase.  Trial defense counsel reminded

9  the jury of positive comments about Hamilton made by guilt phase

10 witnesses and emphasized the relatively lenient sentences

11 received by Hamilton's co-defendants as a result of their

12 agreements with the prosecution.  The State concludes Hamilton

13 received reasonably effective assistance of counsel under the

14 circumstances and the prevailing professional norms, and that

15 Hamilton's failure to cooperate in his defense, which sabotaged

16 counsel's efforts, cannot be used to obtain a reversal of his

17 sentence.

18 <u>Analysis</u>

19     Standard practice in death penalty defense in Tulare County

20 in 1982, the time of Hamilton's trial, was different from today.

21 The law review article by Goodpaster, which Hamilton's *Strickland*

22 expert relied on, was published in 1983.  *Strickland* was not

23 decided until 1984.  Although the ABA Standards published in 1980

24 stated capital counsel was required to thoroughly investigate a

25 defendant's background, it is unclear what constituted a

26 "thorough background investigation" at the time of Hamilton's

1  trial.  Trial counsel's testimony at the evidentiary hearing,

2  that using a mitigation expert and obtaining a social history

3  were not standard practices in 1982, was not contradicted by

4  Hamilton's *Strickland* expert nor any other evidence.  The Supreme

5  Court in *Strickland* noted that prevailing norms of practice, as

6  reflected in the ABA Standards, were only guidelines for

7  determining reasonableness and could not take account of the

8  variety of circumstances defense counsel faces or the range of

9  legitimate decisions about representation.  *Strickland*, 466 U.S.

10  at 688-89.

11     Three of the cases Hamilton cites, in support of his

12  assertion that the standards regarding investigation in capital

13  cases have not changed from the early 1980s to the present,

14  confirm that in the early 1980s capital counsel had an obligation

15  to conduct an investigation of a capital defendant's

16  background.[29]  In *Bean v. Calderon*, 163 F.3d 1073, 1078-79 (9th

17  Cir. 1998), counsel was found ineffective in a 1981 trial for

18  failing to obtain testing of an accused which had been

19  recommended by mental health experts and for not furnishing

20  necessary information to testifying experts, which would have

21  resulted in the presentation of evidence of mental retardation,

---

[29] The fourth case Hamilton cites, *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), was tried in 1980, but the issue addressed by the Supreme Court involved jury instructions.  The fifth case, *Williams (Terry) v. Taylor*, 529 U.S. 362, 396 (2000) (finding ineffective assistance of counsel for failure to investigate and present evidence of abusive and neglectful childhood, history of foster care, borderline retardation, and positive conduct in prison), was tried in 1986.

ORePetnHam                          110

post-traumatic stress disorder, brain damage, and the inability
to form intent.  In *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir.
2001), counsel was found ineffective in a 1980 trial because he
could not provide a tactical reason for failing to investigate
mitigation, failing to interview one witness until ten minutes
before she was scheduled to testify, obtaining records but not
examining them, failing to obtain evidence of a troubled
childhood, drug use in the military and a 20 year addiction to
drugs and alcohol which were documented in the probation report,
and failing to present evidence of positive adjustment to prison.
*Karis v. Calderon*, 283 F.3d 1117, 1135 (9th Cir. 2002), held that
counsel in a 1982 trial had a duty to investigate a capital
defendant's background for possible mitigation, citing *Penry v.
Lynaugh*, 492 U.S. at 319, that the sentencer must be able to
consider relevant evidence from the defendant's background and
character.  However, *Karis* also held that in 1982 capital counsel
was not constitutionally compelled to perform the extent of
family history research which is now often presented on appeal.
*See* 283 F.3d at 1133-34.

     In addressing what constituted a reasonable background
investigation at the time of Hamilton's trial, in light of the
circumstances of his case, trial counsel knew about Hamilton's
troubled childhood and did investigate, but could not find
witnesses who were available or willing to present that evidence.
Trial counsel did obtain and reviewed the records which were
available, and investigated Hamilton's background to the extent

possible.  No recommendation for further examination or testing
was made by mental health experts.  Trial counsel testified at
the evidentiary hearing that Hamilton appeared to fully
understand the proceedings, was active in preparing for the guilt
phase, and that his refusal to assist with the penalty phase was
not due to a lack of understanding or competence.  EH at 280,
Thomas transcript at 16, 43.

Trial counsel testified at the evidentiary hearing that the
standard capital practice in the Tulare County Public Defender's
Office at the time of Hamilton's trial did not include preparing
a social history.  EH, Thomas transcript at 28.  This testimony
distinguishes Hamilton's case from the facts in *Wiggins*.  In
*Wiggins*, trial counsel acknowledged that standard practice in
capital cases at the time of trial in 1988 included the
preparation of a social history report, but that he chose not to
commission such a report despite the fact that funds were
available.  *Wiggins*, 539 U.S. at 524.

Considering the available evidence and the evidence
presented at the evidentiary hearings, in light of the
circumstances of the crime, trial counsel's investigation and
presentation of mitigation was not deficient.  Regardless of
whether the allegations of Hamilton's lack of cooperation are
true or not, either trial counsel or investigator Wells did
interview the available witnesses, and no better, available
witness about Hamilton's background and social history other than
his mother was uncovered.  Trial counsel could not talk to

1  Carolyn and Gilbert because they were adverse parties represented

2  by counsel.  Counsel did obtain background information from Vicki

3  and Uncle Marvin, the brother of Hamilton's father, but their

4  testimony would have included information detrimental to

5  Hamilton, and Gwen's family and other friends were either

6  unwilling to talk to defense counsel or their testimony would

7  have been more detrimental than helpful to Hamilton.  The mental

8  condition evidence known to defense counsel and his interactions

9  with Hamilton, who did not want a "mental" defense, support

10  counsel's lack of further pursuit of such evidence.

11  <u>Prejudice</u>

12      Even assuming arguendo, that trial counsel did render

13  deficient performance by failing to sufficiently investigate and

14  present Hamilton's background and mental history in mitigation,

15  Hamilton must also establish prejudice in order to prevail.  In

16  assessing prejudice, the evidence in aggravation is reweighed

17  against the totality of available mitigating evidence.  *Wiggins*,

18  539 U.S. at 534.  Persons who commit crimes attributable to

19  mental or emotional problems or a disadvantaged background may be

20  less culpable than those with no excuse.  *Boyde v. California*,

21  494 U.S. 370, 382 (1990).

22      The mitigation presented in these proceedings which is most

23  favorable to Hamilton is: childhood physical abuse by his father

24  against him, his sisters, and mother; his father's sexual abuse,

25  with his mother's assistance, of his sister Carolyn; the breakup

26  of the family, twice; the first time when the extended family

1  discovered the sexual abuse perpetrated against Carolyn and

2  brought the children from Washington State to stay with relatives

3  in California, followed by the family's reunion and a resumption

4  of the sexual abuse (the time at which Hamilton learned about

5  it), and the second time when both parents were arrested on

6  sexual abuse charges; his transient foster care for three years

7  during high school; and that he was prescribed medication for

8  depression prior to trial.[30]

9      In aggravation, Hamilton's crime was premeditated and

10 extremely cold-blooded.  Hamilton attempted three days in a row

11 to murder Gwen by shooting her with a shotgun.  The first two

12 attempts were to have her murdered by another in the presence of

13 their children.  He finally shot her himself.  Jury deliberation

14 was short at both guilt and penalty phases.  RT 10:2334-46 (two

15 hours for guilt); 2417-18 (about four hours for penalty,

16 including lunch).  The California Supreme Court commented on the

17 characteristics of the crime in relation to the background

18 evidence which Hamilton presented at trial:

19     In addition, though other aggravating evidence was not
       overwhelming, the capital crimes themselves were
20     exceptionally brutal. [Hamilton] planned the shotgun
       murder of his pregnant wife for reasons of personal
21     convenience and financial gain.  With cold-blooded
       determination, he personally executed his homicidal
22     scheme, at point-blank range, after confederates failed

23

24     [30] Although Hamilton asserts trial counsel should have
       discovered evidence that he experienced mental health difficulties,
25     as discussed in Claim 21, *supra*, there is no credible evidence
       supporting these claims.  Hamilton's conduct and demeanor at the
26     federal evidentiary hearings, and his communications with, and
       motions to the Court, totally contradict these claims that he
       suffered from any mental impairments.

1    to make good on earlier attempts to assassinate the
     victim. [Hamilton] knew his wife's death would also
2    kill their unborn fetus and would render their four
     young children motherless.  Though mitigating evidence
3    that [Hamilton] suffered a difficult childhood was
     cause for sympathy, it was unlikely to carry persuasive
4    weight against such a callous and calculated murder.

5  *Hamilton*, 48 Cal. 3d at 1185.

6        The cases cited by Hamilton, *Silva v. Woodford*, 279 F.3d 825

7  (9th Cir. 2002) and *Karis v. Calderon*, 283 F.3d 1117 (9th Cir.

8  2002), are distinguishable.  The murders in *Silva* and *Karis* were

9  crimes of opportunity, by contrast the murder here was

10 "exceptionally brutal" and deliberately calculated.  The

11 circumstances of Hamilton's crime are not the type mitigated by a

12 possible lack of control or an inability to foresee the

13 consequences of actions.  Cases where counsel's failure to

14 investigate and present mitigation have been found prejudicial

15 involve either less aggravating evidence, including the

16 circumstances of the crime, or more significant mitigating

17 evidence, or both.

18        The facts of the murder in *Wiggins* were less aggravating

19 than the facts here:  Wiggins was observed talking to the victim

20 the last time she was seen alive and later that evening was in

21 possession of the victim's car and credit cards.  However, no

22 other evidence tied him to the murder, and the victim's time of

23 death could not be definitely established.  *Wiggins v. State*, 352

24 Md. 580, 724 A.2d 1 (1999).  There, the mitigating evidence was

25 more compelling: Wiggins experienced severe privation and abuse

26 in the first six years of his life while in the custody of his

1  alcoholic, absentee mother, suffered physical torment, sexual

2  molestation, and repeated rape during his subsequent years in

3  foster care, spent time homeless, and had diminished mental

4  capacities.  *Wiggins*, 539 U.S. at 535.

5       In *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003), the

6  jury heard about Douglas's aversion to the sight of blood and to

7  his non-violent nature, and were given a very generalized

8  sociological history, but did not hear about his abandonment as a

9  child, having an abusive alcoholic foster father who locked him

10 in the closet for hours at a time, having to scavenge for food,

11 being beaten and gang-raped as a young man in a Florida jail, and

12 did not hear expert testimony of possible significant mental

13 illness and dysfunction.  The *Douglas* expert could also have

14 explained how the effects of inhaling solvents and an automobile

15 accident may have exacerbated Douglas's pre-existing neurological

16 deficit.  In spite of the gruesome nature of the killing[31] for

17 which Douglas was convicted, the jury did not hear a substantial

18 amount of Douglas's social history and heard none of the evidence

19 regarding his mental problems, which undermined confidence in the

20 outcome of the penalty phase verdict.

21      Similarly, in *Silva v. Woodford*, 279 F.3d 825 (9th Cir.

22 2002), where the defendant was convicted of abduction, robbery,

23 and murder, trial counsel's failure to present significant

24 evidence regarding the defendant's abusive childhood, mental

25 _____

26      [31] Douglas lured two young women to the desert with promises
of a photo shoot, then raped and brutally murdered them.  316 F.3d
at 1091.

ORePetnHam                          116

1   illnesses, organic brain disorders, and substance abuse "was

2   profoundly prejudicial."  *Id.* at 847.  Trial counsel's "failure

3   to investigate Silva's background and to prepare evidence

4   relating to his family history, mental health, and substance

5   abuse problems resulted in an egregious failure to uncover and

6   present a raft of potentially compelling mitigating evidence."

7   *Id.* at 850.

8        In *Mayfield v. Woodford,* 270 F.3d 915 (9th Cir. 2001) (en

9   banc),  humanizing mitigation evidence was determined to have

10  unique significance.  Mayfield killed a woman and her son who had

11  filed an auto theft complaint against him, and then killed

12  another man who witnessed the murders.  *Id.* at 918-19.  Although

13  "[t]he aggravating evidence against Mayfield was strong," and

14  counsel had already solicited testimony from a psychiatrist about

15  Mayfield's childhood diabetes, drug use, and psychological and

16  social problems, counsel's failure to present the additional

17  available mitigation evidence was prejudicial.  *Id.* at 929-32.

18  Counsel's failure to present experts in endocrinology and

19  toxicology to explain the chemical impact of Mayfield's illness

20  and drug abuse contributed to the finding of ineffective

21  assistance.  *Id.* at 932.  Much of the potential mitigating

22  testimony would have emphasized that Mayfield was a good,

23  protective brother and generous nephew; not a violent person;

24  that friends and family loved Mayfield and wished the jury to

25  spare his life; and that friends and siblings understood

26  Mayfield's years of drug and alcohol abuse and his poorly

1    controlled diabetes had changed him.  *Id.* at 931-32.

2         In *Landrigan v. Schriro*, 441 F.3d 638 (9th Cir. 2006)

3    (en banc), *cert. granted ___* S. Ct. ___, 2006 WL 1591780 (Sept.

4    26, 2006), a colorable claim was presented that counsel was

5    ineffective for failing to present mitigating evidence, although

6    Landrigan told his counsel that he did not want family members to

7    testify who had been subpoenaed to testify.  Landrigan actively

8    sought to defeat counsel's efforts to present mitigation evidence

9    by making statements that made matters even worse every time

10   counsel attempted to place mitigating factors before the court.

11   There, it was reasonably probable that, had counsel developed

12   other mitigating evidence from different sources, the result

13   might have differed.  The murder in *Landrigan* involved stabbing

14   and strangulation of an acquaintance in Arizona after escaping

15   from prison in Oklahoma where he was incarcerated for murder.

16   The state court pointed out, Landrigan himself was exceptional

17   (unscrupulous, lacking in regard for others, and lacking in

18   morals), *see State v. Landrigan*, 176 Ariz. 1, 859 P.2d 111, 117

19   (1993), but the available mitigating evidence of an alcoholic

20   mother, an alcoholic adoptive mother, and a predisposition to

21   violence, could have provided an explanation of his actions.

22        Conversely, in *Woodford v. Visciotti*, 537 U.S. 19, 25-26

23   (2002), the aggravating evidence of the circumstances of the

24   crime (a cold-blooded execution-style killing of one victim and

25   attempted execution-style killing of another, both during the

26   course of a preplanned armed robbery) and the prior offenses (the

1  knifing of one man, and the stabbing of a pregnant woman as she
2  lay in bed trying to protect her unborn baby) were so severe that
3  counsel's failure to present evidence of Visciotti's troubled
4  family background and possible seizure disorder was not
5  prejudicial.  *Id.* at 26.

6      In *Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005), *cert.*
7  *denied sub nom.*, *Allen v. Brown*, ___ U. S. ___, 126 S. Ct. 134
8  (2005), counsel's failure to present potential humanizing, non-
9  exculpatory mitigating evidence that Allen could be pleasant at
10 times did not prejudice him because, even if counsel had
11 presented the evidence, there was no reasonable probability that
12 the jury would have weighed the evidence in favor of life rather
13 than death, when Allen was convicted of murdering three people
14 and conspiring to murder four others while already serving a life
15 sentence for yet another murder, and he had a long history of
16 orchestrating and committing violent robberies and burglaries.
17 *Id.* at 1002-10.  "None of the testimony portrays a person whose
18 moral sense was warped by abuse, drugs, mental incapacity, or
19 disease or who acted out of passion, anger or other motive
20 unlikely to reoccur."  *Id.* at 1007.

21     In the over fourteen years between Hamilton's removal from
22 his parents' house in March of 1967 until Gwen's murder in
23 November of 1981, Hamilton was frequently in trouble with the
24 law, but generally for non-violent crimes such as theft.  *See*
25 Exs. 133C, E, F, G & I.  While Hamilton's record does show
26 instability (such as his failure to stay employed for any

1   significant length of time), there is no evidence that the

2   experiences of his childhood caused him to be violent or unable

3   to control his impulses.  Instead, the evidence shows that

4   Hamilton cold-bloodedly planned to murder his wife, intending to

5   share the life insurance proceeds with a killer Hamilton

6   solicited, and that Hamilton eventually carried out the murder

7   himself, and did this at the expense of his unborn child's life

8   to obtain the life insurance money and to clear the way for him

9   to be with his mistress.

10       Like *Allen*, none of the evidence here portrays Hamilton as

11  "a person whose moral sense was warped by abuse, drugs, mental

12  incapacity, or disease or who acted out of passion, anger or

13  other motive unlikely to reoccur."  395 F.3d at 1007.  The murder

14  took three days in execution under circumstances arguably

15  analogous to lying in wait.  Even if evidence of Hamilton's

16  complete background had been presented to the jury, the

17  circumstances of the crime are such that confidence in the

18  outcome is not undermined.  "Evidence about the defendant's

19  background and character is relevant because of the belief, long

20  held by this society, that defendants who commit *criminal acts*

21  *that are attributable* to a disadvantaged background or to

22  emotional or mental problems, may be less culpable than

23  defendants who have no such excuse."  *Boyde v. California,* 494

24  U.S. at 382 (emphasis added).  Hamilton's deliberately

25  premeditated criminal act is not the type attributable to a

26  disadvantaged background or to emotional or mental problems.  It

1   is not reasonably probable that had all the available mitigating

2   evidence been presented that the result of the proceeding would

3   have been different in light of the very extensive evidence of

4   ruthless premeditation.  Trial counsel's performance was not

5   prejudicial.  The record fairly supports the California Supreme

6   Court's summary denial of this claim.  Claim 2b is denied on the

7   merits.

8         h.     FAILURE TO OBJECT TO PROSECUTOR'S MISLEADING ARGUMENT

9               THAT NO MITIGATION EQUALS AGGRAVATION

10       Hamilton asserts that defense counsel unreasonably failed to

11   object to the prosecutor's argument that the absence of a

12   mitigating factor was aggravating.

13       The California Supreme Court addressed the underlying claim

14   on direct appeal, finding that the jury was adequately informed

15   of its sentencing responsibility and the pertinent sentencing

16   factors, was given the standard admonition to consider only

17   "applicable" factors, and that defense counsel vigorously

18   disputed the prosecutor's version of the aggravation-mitigation

19   balance, urged the factors on which no evidence had been

20   presented should be "ignored" or were "not an issue," reminded

21   the jurors they alone decided the weight of each factor, and that

22   any one mitigating factor could justify a life sentence "no

23   matter how many other factors point the other way."  *Hamilton*, 48

24   Cal. 3d at 1185.  The California Supreme Court held there was

25   only a minimal chance the jury was misled by the prosecutor's

26   argument and found there was no reasonable possibility the

ORePetnHam

**121**

1  prosecutor's improper argument affected the life-death
2  determination since the mitigating evidence of a difficult
3  childhood was unlikely to carry persuasive weight against such a
4  callous and calculated murder.   *Id.*

5      As found in Claim 7a below, the prosecutor's erroneous
6  argument, that the lack of mitigating evidence was aggravating,
7  was not prejudicial as the jury was adequately informed of its
8  discretion and admonished to consider only applicable factors.
9  Further, defense counsel vigorously disputed the prosecutor's
10  version of the aggravation-mitigation balance and reminded jurors
11  they had the sole power to decide the weight of each factor and
12  that any single factor could justify a life sentence.

13      Hamilton does not present any offer of proof or other
14  allegation which indicates defense counsel's failure to object to
15  the prosecutor's argument resulted in ineffective assistance of
16  counsel.   The record fairly supports the California Supreme
17  Court's denial of this claim.   Claim 2h is denied on the merits.

18      *i.*   FAILURE TO OBJECT TO PROSECUTOR'S ARGUMENT IN FAVOR OF
19          THE DEATH PENALTY BASED ON MATHEMATICAL WEIGHING

20      Hamilton asserts that defense counsel unreasonably failed to
21  object to the prosecutor's argument that the death penalty should
22  be imposed on the basis of a mathematical balance of mitigating
23  and aggravating factors.

24      The California Supreme Court addressed the underlying claim
25  on direct appeal, holding that although the prosecutor stressed
26  during argument the existence of at least "nine" factors in

1  aggravation and a maximum of "two" in mitigation, there was no

2  reasonable possibility his comment would have led jurors to

3  refrain from weighing the aggravating and mitigating evidence to

4  decide which penalty was appropriate.  *Hamilton*, 48 Cal. 3d at

5  1181-82.

6          As found in Claim 7a below, the prosecutor's argument

7  referring to a numerical count of aggravating and mitigating

8  factors was not prejudicial as the jurors were not mislead

9  regarding their discretion and responsibility.  Defense counsel

10  reminded the jurors they needed to weigh the sentencing factors

11  and that any single factor could justify a life sentence.

12          Hamilton does not make any offer of proof or other showing

13  that defense counsel's failure to object to the prosecutor's

14  argument resulted in prejudicial ineffective assistance of

15  counsel.  The record fairly supports the California Supreme

16  Court's summary denial of this claim.  Claim 2*i* is denied on the

17  merits.

18          l. & m.   INTER-CASE AND INTRA-CASE PROPORTIONALITY

19          Hamilton asserts defense counsel's failure to research and

20  demonstrate that the death penalty was excessive based on inter-

21  case and intra-case proportionality, compared to sentences in

22  similar cases and compared to his alleged accomplices, resulted

23  in ineffective assistance of counsel.  Hamilton does not make any

24  offer of proof or showing which indicates defense counsel's

25  failure to research this issue resulted in ineffective assistance

26  of counsel.  This claim is foreclosed by *Pulley v. Harris*, 465

1  U.S. 37, 53 (1983) (holding the jury's finding of a special

2  circumstance with automatic review by the trial judge and the

3  California Supreme Court, sufficiently limits the risk of

4  arbitrariness and capriciousness without comparative

5  proportionality review).  The record fairly supports the

6  California Supreme Court's summary denial of this claim.  Claims

7  21 and m are denied on the merits.

8       ao.  LACK OF PROFESSIONAL EXPERIENCE IN CAPITAL CASE TRIALS

9       Hamilton contends that defense counsel provided him

10 constitutionally ineffective assistance of counsel since this was

11 his first capital trial, he had no assistance, and he was

12 attempting to defend other capital murder trials and major felony

13 cases during Hamilton's trial.  *See* same claim (2ao) in guilt

14 phase above.  As above, Hamilton does not make any offer of proof

15 or other showing that defense counsel was not competent to defend

16 a capital defendant.  At the time of his appointment to represent

17 Hamilton, defense counsel had been a lawyer for six years, had

18 been employed by the Tulare County Public Defender's Office for

19 over two years, had specialized in criminal defense, and had

20 tried a murder case before a jury.  EH at 280-81, Thomas

21 transcript at 8.  The record fairly supports the California

22 Supreme Court's summary denial of this claim.  Claim 2ao is

23 denied on the merits.

24      aq.  FAILURE TO INTERVIEW KNOWN WITNESSES

25      Hamilton asserts that defense counsel was ineffective for

26 failing to interview known witnesses.  *See* same claim (2aq) in

1   guilt phase above.  Hamilton does not specify in the petition or

2   identify in briefing which witnesses counsel knew of and did not

3   interview, or what testimony they would provide.  Nor does he

4   present any offer of proof or evidence which demonstrates defense

5   counsel's actions resulted in ineffective assistance of counsel.

6   The record fairly supports the California Supreme Court's summary

7   denial of this claim.  Claim 2aq is denied on the merits.

8   2.   CLAIM 5:   IMPAIRED RIGHT TO TRIAL BY JURY

9        g.   IMPROPER PENALTY DETERMINATION

10       Hamilton asserts that from 1967 until the time of his trial

11  in 1982 there had been only five executions nationwide, and none

12  in California, so the jurors at his trial did not reasonably

13  believe a death sentence would be carried out.

14       California's death penalty statute requires juries to find a

15  special circumstance based on the facts of the crime and/or on

16  the defendant's history, distinguishing those defendants

17  convicted of first degree murder who are selected for death from

18  those who are not.  *Brown v. Sanders*, 546 U.S. 212, 126 S. Ct.

19  884, 892, 894 (2006); *Tuileapa v. California*, 512 U.S. 967, 972

20  (1994); *Furman v. Georgia*, 408 U.S. 238 (1972).  The federal

21  constitution requires that sentence selection be made after "a

22  broad inquiry into all relevant mitigating evidence to allow an

23  individualized determination."  *Buchanan v. Angelone*, 522 U.S.

24  269, 276 (1998); *Tuilaepa,* 512 U.S. at 971-73; *Zant v. Stephens*,

25  462 U.S. 862, 878-79 (1983).  The consideration of aggravating

26  and mitigating factors at the penalty phase, including the

defendant's character and background and the circumstances of the
crime, allows for an individualized determination of sentence,
thereby directing and limiting the sentencer's discretion to
avoid arbitrary and capricious action.  *Lockett v. Ohio*, 438 U.S.
586, 604-05 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303-
04 (1976).  The jury "need not be instructed how to weigh any
particular fact in the capital sentencing decision," but is
permitted unbridled discretion in determining the appropriate
sentence.  *Tuilaepa,* 512 U.S. at 979; *Buchanan,* 522 U.S. at 276;
*Stephens*, 462 U.S. at 875.  Finally, California's statute
requires that the defendant either killed, intended to kill, or
acted with reckless indifference to human life, so the death
penalty is proportionate to the crime committed.  *Edmund v.
Florida,* 458 U.S. 782, 787 (1982); *Tison v. Arizona*, 481 U.S.
137, 157-58 (1987).

　　　　Hamilton presents no evidence in support of this claim.  The
history of a state's application of its laws is not relevant to a
reliable determination of penalty.  In arriving at a verdict for
the penalty phase, Hamilton's jury properly considered the
circumstances of the crime, all evidence presented in mitigation
including Hamilton's character and background, and whether
Hamilton killed, intended to kill or acted with reckless
indifference to human life.  Based on this evidence, defense
counsel was not ineffective.  The record fairly supports the
California Supreme Court's summary denial of this claim.  Claim
5g is denied on the merits.

3.    CLAIM 6:    JUROR MISCONDUCT AT PENALTY

As reflected in the guilt phase analysis of this claim, jurors bring to their deliberations knowledge and beliefs about general matters of law and the facts that find their source in everyday life and experience.  The effect of information received from extraneous sources is judged by a review of the entire record, and the determination of whether the extraneous information is nonprejudicial or is sufficient to justify habeas relief turns on whether there was a substantial and injurious effect or influence on the verdict.  *Navarro-Garcia*, 926 F.2d at 821; *In re Carpenter*, 9 Cal. 4th at 647; *Lawson*, 60 F.3d at 612.

b. & f.    EXTRANEOUS INFORMATION REGARDING POSSIBILITY OF RELEASE AND PRISON CONDITIONS

Hamilton asserts that the jurors discussed, considered and relied on extraneous information that if they chose a sentence of life without possibility of parole, Hamilton would still be paroled within seven to twenty years.  Hamilton presents the declarations of Irene Perkins, Allen Peoples, Mabel Heguigaray, Wendell Webb, and Geneva Gholston in support of this claim.  Ex. 30 ¶ 5, Ex. 31 ¶ 6, Ex. 32 ¶ 5, Ex. 33 ¶ 7, and Ex. 34 ¶ 13.

Hamilton also asserts an unnamed juror, who had a brother in prison, observed that if Hamilton were sentenced to life he would probably be killed by other inmates because of the nature of the crimes, so they would probably be extending his life by sentencing him to death.  Ex. 33 ¶ 7.  Hamilton contends this extraneous information was prejudicial and improperly aggravated

1  the offense by implying that the crime was reprehensible even by

2  prison standards.

3      Federal Rule of Evidence 606(b) governs the admissibility of

4  a statement by a juror to impeach the verdict.[32]  Under Rule

5  606(b), a juror may not testify as to any matter or statement

6  occurring during deliberations, or the effect of anything upon

7  any juror's mind, emotions, or mental processes as influencing

8  the verdict.  An exception under Rule 606(b) allows juror

9  testimony about whether extraneous prejudicial information was

10 brought to the jury's attention or whether any improper outside

11 influence was brought to bear.

12     The starting point is the rule that jurors' statements

13 cannot be considered unless they concern the receipt of

14 extraneous prejudicial information or the presence of outside

15 influence.  The declarations submitted in support of this claim

16 deal with personal opinions of certain jurors expressed during

17 deliberations.  This is not a case involving extrinsic

18 information imparted by a third party or obtained through an

19 outside reference.  *See Parker v. Gladden*, 385 U.S. 363, 363-65

20 (1966) (misconduct for bailiff to tell the deliberating jury that

21 defendant was a "wicked fellow" who was guilty and to tell

22 another juror the Supreme Court would correct any improper guilty

23 verdict); *Marino v. Vasquez*, 812 F.2d 499, 502-03, 505 (9th Cir.

24 1987) (misconduct for juror to consult a dictionary for the

25 _____

26 [32] Pursuant to Federal Rule of Evidence 1101(e), the Federal
   Rules of Evidence apply to habeas corpus cases brought under 28
   U.S.C. § 2254.

ORePetnHam                    **128**

definition of "malice"); *Bayramoglu v. Estelle*, 806 F.2d 880, 882-84, 887-88 (9th Cir. 1986) (misconduct for juror to call a law librarian to inquire about the differences, including penalties, between first and second degree murder); *Gibson v. Clanon*, 633 F.2d 851, 852-55 (9th Cir. 1980) (misconduct occurred when one juror consulted an encyclopedia and another juror looked at a medical dictionary and both jurors shared the information during deliberations).

A careful review of the submitted juror declarations reveals no evidence of any extraneous information provided to the jury or any outside influence exerted on the jury.  None of the allegations or declarations raise anything other than intra-jury matters.  Rule 606(b) and related case law prohibit the court from considering the type of information upon which Hamilton bases his claims.  Based on this evidence, defense counsel was not ineffective for failing to investigate and present evidence of juror misconduct.  The record fairly supports the California Supreme Court's summary denial of this claim.  Claims 6b and f are denied on the merits.

e.   CONSULTATION OF THE BIBLE AT PENALTY PHASE

Hamilton contends that Juror Lahoma Kuehl consulted the Bible to guide her decision to impose death, denying him the opportunity to refute or correct her interpretation of the scriptures and impermissibly interjecting religion as a guiding influence into the deliberations.

Hamilton submits the declaration of Juror Kuehl which states

1   that when the trial became too stressful she handed her worries

2   to God and she repeatedly read the Bible's teachings that the

3   death penalty is an appropriate punishment which gave her

4   guidance.   Ex. 29 ¶ 4.   Juror Kuehl also testified at the state

5   evidentiary hearing, where she contended she was not a religious

6   fanatic as the declaration made her appear, and that she did not

7   specifically consult the Bible regarding the death penalty.   *In

8   re Hamilton*, 20 Cal. 4th at 291.   Juror Kuehl admitted at the

9   evidentiary hearing that she did study the Bible daily during the

10  trial.   *Id*. at 292.

11       No clearly established federal rule governs the consultation

12  of the Bible during a capital sentencing jury deliberation.

13  *Robinson v. Polk,* 444 F.3d 225 (4th Cir. 2006) (Wilkinson, J.,

14  concurring in denial of rehearing en banc).   Juror Kuehl made no

15  mention, either in her declaration or at the state evidentiary

16  hearing, that she discussed biblical passages and/or beliefs with

17  other jurors.   Hamilton has made no allegation that a Bible was

18  present in the jury room during deliberations, or that Juror

19  Kuehl's actions had any impact on the jury's decision.   There is

20  no suggestion the jury disregarded the law or the court's

21  instructions, and instead referred to or applied biblical law.

22       Based on this evidence, defense counsel was not ineffective

23  for failing to investigate and present evidence of juror

24  misconduct.   The record fairly supports the California Supreme

25  Court's summary denial of this claim.   Claim 6e is denied on the

26  merits.

4.    CLAIM 7: PROSECUTORIAL MISCONDUCT - IMPROPER ARGUMENT AT
      PENALTY; LACK OF MITIGATION IS AGGRAVATING

      a.    MATHEMATICAL COMPARISON OF MITIGATION AND AGGRAVATION
            ENCOURAGED

Hamilton asserts the jury was led to believe by
instructions, voir dire questioning and prosecutorial argument
that they were to determine the applicability of the death
penalty based on a mathematical comparison of aggravating and
mitigating circumstances.  The California Supreme Court rejected
this claim on direct appeal, holding that prosecutorial argument
which simply restates the statutory language that death shall be
imposed if aggravation outweighs mitigation is insufficient to
mislead the jury or to misstate the law.  *Hamilton*, 48 Cal. 3d at
1181.  The state court found the prosecutor did not suggest the
jury merely count factors, but told them to "weigh" the factors
and to "balance them."  *Id.* at 1182.  Although observing that it
might have been better for the prosecutor not to have emphasized
the numerical count, the state supreme court saw no reasonable
possibility his comment led jurors to refrain from weighing the
aggravating and mitigating evidence to decide which penalty was
appropriate.  *Id.*

Hamilton further alleges, as he did on his state direct
appeal, that the prosecutor's argument was erroneous as he argued
the absence of evidence as to mitigating factors constituted
aggravation.  See Claim 19e below.  The California Supreme Court
rejected this claim despite finding error in the prosecutor's

1  argument (that the absence of evidence on factors (d), (e), (f),
2  (g), (h), and (j) of California Penal Code section 190.3
3  ("§ 190.3") was aggravating), because the jury was adequately
4  informed of its responsibility and the pertinent factors, the
5  jury was admonished to consider only "applicable" factors, and
6  defense counsel vigorously disputed the prosecutor's version of
7  the aggravation-mitigation balance and reminded the jurors they
8  had the sole power to decide the weight of each factor and any
9  one mitigating factor could justify a life sentence.  *Hamilton*,
10 48 Cal. 3d at 1184-85.  The California Supreme Court concluded
11 that any chance the jury was misled by the prosecutor's argument
12 was minimal, especially in light of the exceptionally brutal
13 character of the crimes.  *Id.* at 1185.

14     A prosecutor may properly argue that the jury can consider
15 the lack of evidence as to mitigating factors.  *Tuilaepa*, 512
16 U.S. at  975-81.  Under California law it is error for a
17 prosecutor to argue that such a lack of evidence of mitigating
18 factors constitutes an aggravating factor.  *People v. Davenport*,
19 41 Cal. 3d 247, 289-90 (1985).

20     Here, the prosecutor stated in closing argument there were
21 two factors in mitigation and nine factors in aggravation, but
22 then immediately told the jury, "Your duty as judges at this time
23 I would submit to you is to weigh the factors in aggravation with
24 the factors in mitigation," RT 10:2395, implying that more than
25 mechanical counting was required.  Defense counsel also told the
26 jury that they alone would decide the weight and importance of

1  each factor, and that any single factor could justify a life
2  sentence.  *Id.* at 2403.

3      Review of the state record reveals that the California
4  Supreme Court was correct in finding no prejudice from the
5  prosecutor's erroneous argument.  The jurors were not misled
6  about their discretion and responsibility to determine the
7  appropriate penalty under all the evidence.  Since both the
8  prosecutor and defense counsel reminded the jurors they needed to
9  find that aggravation outweighed mitigation, the prosecutor's
10 statement did not render the proceedings so unfair "as to make
11 the resulting conviction a denial of due process."  *Darden*, 477
12 U.S. at 181.

13     Based on this evidence, defense counsel was not ineffective
14 for failing to object to the instruction, voir dire questioning,
15 or argument.  The record fairly supports the California Supreme
16 Court's denial of this claim.  Claim 7a is denied on the merits.

17     b.   DEATH MANDATORY IF AGGRAVATION OUTWEIGHED MITIGATION

18     Hamilton contends the court instructed, and the prosecutor
19 argued, that if the jury found aggravating factors outweighed
20 mitigating factors it was *mandatory* they impose a death sentence.
21 Although Hamilton concedes this claim is foreclosed by *Boyde v.*
22 *California*, 494 U.S. at 374-77, he asserts in this case the
23 mandatory instruction was unconstitutional because the argument
24 of the prosecutor reinforced the notion that the jury had no
25 discretion once a mathematical counting had taken place and they
26 were not told they had the ultimate sentencing discretion.

1  Hamilton contends the "shall impose" instruction is only

2  permissible if the jury is informed of the requirement of an

3  individualized sentencing determination.

4      As found above, the prosecutor's statement about the

5  numerical count of the § 190.3 factors did not mislead the jury

6  as to its duty to weigh the evidence.  The purported "mandatory"

7  instruction was not rendered unconstitutional.  Based on this

8  evidence, defense counsel was not ineffective for failing to

9  object to the instruction or argument.  The record fairly

10  supports the California Supreme Court's summary denial of this

11  claim.  Claim 7b is denied on the merits.

12      c.   IMPLICATION JURY WASN'T RESPONSIBLE FOR IMPOSING DEATH

13           PENALTY

14      Hamilton contends jury instructions and argument led the

15  jurors to believe their role was limited strictly to finding the

16  facts as to aggravation and mitigation, and that the law required

17  the death penalty if more aggravation existed than mitigation.

18      Hamilton points to nothing other than the prosecutor's

19  statement, reviewed in Claim 7a above, to support his argument

20  that the jury's duty was lessened.  The instructions as a whole

21  and the arguments of counsel adequately informed the jury of its

22  responsibility.

23      Based on the record, defense counsel was not ineffective for

24  failing to object to the instruction or argument.  The record

25  fairly supports the California Supreme Court's summary denial of

26  this claim.  Claim 7c is denied on the merits.

1    d.    INDICATION HUNG JURY WAS IMPROPER

2        Hamilton asserts that voir dire questioning and statements

3  of the court led the jurors to believe it would be improper to

4  have a hung jury, and that repeated instructions that the jurors

5  work together exacerbated this misunderstanding.

6        Hamilton does not identify what questions, statements and/or

7  instructions allegedly misled the jury about the failure to reach

8  unanimity.  A review of the record does not reveal any statement

9  by either counsel or the judge which impaired the jury's

10  understanding of their responsibility.

11        Based on this evidence, defense counsel was not ineffective

12  for failing to object to the voir dire questioning or court

13  statements.  The record fairly supports the California Supreme

14  Court's summary denial of this claim.  Claim 7d is denied on the

15  merits.

16  5.  DEATH PENALTY ISSUES

17    a.    CLAIM 16:   CALIFORNIA DEATH PENALTY UNCONSTITUTIONAL AS

18          ADMINISTERED

19        (1)   SUBCLAIM a: UNBRIDLED PROSECUTORIAL DISCRETION

20        Hamilton asserts California's death penalty statute is

21  unconstitutional because prosecutors' unbridled discretion

22  whether to seek the death penalty renders the result arbitrary

23  and capricious.  He further contends that discretion is

24  improperly influenced by a prosecutor's professional and

25  political aspirations which benefit by compiling a record of

26  capital convictions, especially as here in cases occurring during

1 an election year.

2        This argument has been explicitly rejected by the Supreme

3 Court.   *Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (plurality of

4 Stewart, Powell, and Stevens, JJ.).   The Court stated the

5 presence of discretionary stages does not render a death sentence

6 unconstitutional and in fact indicated the opposite, that the

7 absence of discretion would be unconstitutional.   *Id*. at n.50.

8 "Absent facts to the contrary, it cannot be assumed that

9 prosecutors will be motivated in their charging decisions by

10 factors other than the strength of their case and the likelihood

11 that a jury would impose the death penalty if it convicts."   *Id*.

12 at 225 (White, J. concurring).

13        The record fairly supports the California Supreme Court's

14 summary denial of this claim.   Claim 16a is denied on the merits.

15            (2)   SUBCLAIM b: CONFINEMENT ON DEATH ROW IS CRUEL AND

16                  UNUSUAL

17        Hamilton asserts California's death penalty statute is

18 unconstitutional as the severe conditions of and psychological

19 strain from confinement on death row inflicts unnecessary

20 physical and psychological pain, resulting in cruel and unusual

21 punishment.

22        If Hamilton's claim is that the conditions of his

23 confinement on death row make his sentence cruel and unusual, he

24 has not alleged sufficient facts to state a prima facie case.

25 Generally a challenge to conditions of confinement is not

26 cognizable on habeas corpus.   *Beardslee v. Woodford*, 395 F.3d

1   1064, 1068-69 (9th Cir. 2005) (citing *Badea v. Cox*, 931 F.2d 573,

2   574 (9th Cir. 1991)) (habeas corpus proceedings are proper

3   mechanism to challenge legality or duration of confinement and

4   civil rights action the proper method to challenge conditions of

5   confinement).  However, an Eighth Amendment claim may be stated

6   if the conditions of confinement result in a denial of "the

7   minimal civilized measure of life's necessities," *Rhodes v.*

8   *Chapman,* 452 U.S. 337, 347 (1981), through the "deliberate

9   indifference" by prison personnel or officers.  *Wilson v. Seiter,*

10  501 U.S. 294, 302-03 (1991).  The evaluation of claims of cruel

11  and unusual punishment under the Eighth Amendment has both

12  objective and subjective components, so reviewing courts must ask

13  both if "the officials act[ed] with a sufficiently culpable state

14  of mind" and if the alleged wrongdoing was objectively "harmful

15  enough" to establish a constitutional violation.  *Id.* at 298,

16  303; *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996).

17  Hamilton has not alleged any facts showing a denial of "the

18  minimal civilized measure of life's necessities," or that

19  "deliberate indifference" by prison personnel or officers caused

20  such deprivation.

21      If Hamilton is alleging psychological strain results from

22  *extended* confinement on death row, that claim is foreclosed by

23  Ninth Circuit precedent.  Lengthy incarceration on death row

24  during the pendency of capital appeals does not violate the

25  Constitution's prohibition against cruel and unusual punishment.

26  *McKenzie v. Day*, 57 F.3d 1493, 1494 (9th Cir. 1995) (en banc).

1  Although this claim is raised in Hamilton's first federal

2  petition, unlike McKenzie's claim which was raised in a

3  subsequent petition along with a request for a stay of execution,

4  the reasons for rejecting the claim remain the same.  "A

5  defendant must not be penalized for pursuing his constitutional

6  rights, but he also should not be able to benefit from the

7  ultimately unsuccessful pursuit of those rights."  *McKenzie v.*

8  *Day*, 57 F.3d 1461, 1466 (9th Cir. 1995) (panel opinion).

9       The record fairly supports the California Supreme Court's

10  summary denial of this claim.  Claim 16b is denied on the merits.

11           (3)  SUBCLAIM c: DISCRIMINATORILY IMPOSED DEATH PENALTY

12       Hamilton asserts California's death penalty statute is

13  unconstitutional since it has been discriminatorily imposed

14  against poor males with white victims.[33]  The same argument,

15  proffered by Justice Blackmun, was rejected by the Supreme Court

16  during review of the constitutionality of § 190.3(a), the

17  circumstances of the crime sentencing factor.  *Tuilaepa v.*

18  *California*, 512 U.S. at 978-79, 991-93.  Hamilton's claim is

19  foreclosed.

20       The record fairly supports the California Supreme Court's

21  summary denial of this claim.  Claim 16c is denied on the merits.

22       b.   CLAIM 17:  DISPROPORTIONATE AND EXCESSIVE PENALTY

23       Hamilton asserts that his death sentence is unconstitutional

24  because, as applied, it is disproportionate and excessive as

25  compared to his co-defendants and alleged co-conspirators and

26  _____

        [33] Hamilton is white.

1    also as compared to others who commit similar crimes.

2        The California Supreme Court reviewed this claim on direct

3    appeal, finding that the federal Constitution did not require

4    either intra-case nor inter-case proportionality review.

5    *Hamilton*, 48 Cal. 3d at 1187.  Although the California

6    Constitution prohibits punishment which is disproportionate to

7    culpability, the state court determined that in view of the

8    circumstances of the crime Hamilton's sentence was not

9    disproportionate.   *Id.*

10       The Eighth Amendment does not require comparative

11   proportionality review.  *Harris*, 465 U.S. at 50-51.  California's

12   statute provides sufficient protection against arbitrariness

13   through procedures which require a special circumstance finding,

14   the consideration of relevant aggravating and mitigating factors,

15   an automatic motion for new trial, and an automatic appeal.  *Id.*

16   at 51-53.[34]  Further, the jury here found that Hamilton was the

17   one who actually shot Gwen and did so in order to obtain the

18   insurance proceeds on her life.

19       The record fairly supports the California Supreme Court's

20   summary denial of this claim.  Claim 17 is denied on the merits.

21       c.   CLAIM 18:  VAGUE AND OVERBROAD AGGRAVATING FACTORS

22       The Eighth Amendment requires that a jury's capital

23   sentencing decision involve an individualized determination, that

24

25       [34] Although Harris was sentenced under the 1977 statute, the
     procedures which the United States Supreme Court found sufficient
26   to protect against arbitrariness are all present in the 1978
     statute as well.

ORePetnHam                         **139**

1  is, consideration of relevant mitigating evidence including the

2  character and record of the defendant and the circumstances of

3  the crime, but does not require instruction on how to weigh any

4  particular fact. *Tuilaepa*, 512 U.S. at 972, 979; *Buchanan*, 522

5  U.S. at 276. "Once the jury finds that the defendant falls

6  within the legislatively defined category of persons eligible for

7  the death penalty," the jury's consideration of a myriad of

8  factors and exercise of "unbridled discretion" in determining

9  whether death is the appropriate punishment, is not arbitrary and

10 capricious. *California v. Ramos,* 463 U.S. 992, 1008-09 (1983).

11        (1)   SUBCLAIM a: FACTOR (a)

12        Hamilton asserts that § 190.3(a) incorporates several vague

13 and overbroad special circumstances from the list of special

14 circumstances in California Penal Code section 190.2 ("§ 190.2")

15 as aggravating factors: *i.e.*, the uncertainty that the multiple

16 murder special circumstance applies to one act which results in

17 the murders of a mother and a fetus; the vagueness and overbroad

18 nature of the financial gain special circumstance.

19        This claim is foreclosed by *Tuilaepa v. California*, which

20 upheld the constitutionality of § 190.3(a), the actual

21 circumstances of the murder as an aggravating factor; and *Brown*

22 *v. Sanders*, 546 U.S. 212, 126 S. Ct. at 894, holding the impact

23 of the inclusion of any true special circumstance applying factor

24 (a) was inconsequential and could not fairly be regarded as a

25 constitutional defect in the sentencing process. The Court in

26 *Tuilaepa* found factor (a) to be a "constitutionally indispensable

1  part of the process" in capital cases, 512 U.S. at 976, and its
2  open-ended subject matter an appropriate part of the jury's broad
3  discretion in determining the sentence.  *Id.* at 978-79.

4       The application of factor (a) here does not give rise to
5  federal constitutional error since the totality of the
6  instructions and both counsels' arguments made clear the jury's
7  duty.  *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) (finding no
8  constitutional error in capital sentencing scheme which permits
9  the jury to consider in sentence selection an element of the
10 underlying crime); *People v. Holt*, 15 Cal. 4th 619, 699-700
11 (1997).  Although the prosecutor here gave a numerical count of
12 the § 190.3 factors, he in substance also told the jury more than
13 mechanical counting was required, and defense counsel told the
14 jury they alone could decide the weight and importance of each
15 factor and any single factor could justify a life sentence.  See
16 Claim 7a above.

17      The record fairly supports the California Supreme Court's
18 summary denial of this claim.  Claim 18a is denied on the merits.

19               (2)   SUBCLAIM b: FACTOR (b)

20      Hamilton contends § 190.3(b), prior criminal activity which
21 used or threatened violence, is vague and overbroad since it can
22 be interpreted either to only apply to prior acts or to include
23 the subject murder.  This argument, that the jury should have
24 been instructed the violent criminal activity referred to in (b)
25 excludes the circumstance of the subject crime, thus preventing
26 double counting of the guilt phase offense in both (a) and (b),

1   is foreclosed by *Tuilaepa*, 512 U.S. at 976-77 (holding factor (b)

2   is not unconstitutionally vague).  *See Bonin*, 59 F.3d at 848.

3       The record fairly supports the California Supreme Court's

4   summary denial of this claim.  Claim 18b is denied on the merits.

5           (3)   SUBCLAIM c: FACTOR (j)

6       Hamilton asserts that § 190.3(j), whether the defendant was

7   an accomplice or minor participant in the murder, is vague and

8   overbroad since it can be interpreted, as he alleges it was in

9   his case, to constitute an aggravating factor which would

10  automatically apply to every murder.  The California Supreme

11  Court has indicated in numerous cases that factor (j) is only

12  mitigating and inapplicable unless the defendant was an

13  accomplice whose participation was relatively minor.  *People v.*

14  *Proctor*, 4 Cal. 4th 499, 553 (1992).  That the state court has

15  approved the treatment of factor (j) as an aggravating factor

16  where a defendant was the sole participant, *id.*, does not

17  transform it into an automatic aggravating factor for every

18  murder.  The jury properly determined Hamilton's role in the

19  offense.

20      The record fairly supports the California Supreme Court's

21  summary denial of this claim.  Claim 18c is denied on the merits.

22          (4)   SUBCLAIM d: FACTOR (k)

23      Hamilton alleges § 190.3(k), any other circumstance, even

24  though not a legal excuse, that extenuates the gravity of the

25  crime, is vague as it does not clearly instruct jurors they can

26  consider anything offered in mitigation, including a defendant's

1  background and character.

2      The California Supreme Court rejected this claim on direct
3  appeal.  *Hamilton*, 48 Cal. 3d at 1182.  Because this case was
4  tried before *People v. Easley*, 34 Cal. 3d 858, 878, n.10 (1983),
5  Hamilton's jury was not instructed that factor (k) includes not
6  only circumstances which extenuate the gravity of the crime, but
7  also any other aspect of the defendant's character or background
8  that he offers as a basis for a life sentence.  *Hamilton*, 48 Cal.
9  3d at 1182.  The state court's review of Hamilton's sentence
10 considered whether, because such an instruction was not given,
11 the jury may have been led to fail to consider Hamilton's
12 mitigating character and background evidence.  *Id.*  The state
13 court found, based on the arguments of the prosecutor and defense
14 counsel, that the jury was not misled into believing it could not
15 consider Hamilton's mitigating background and character evidence.
16 *Id.* at 1182-83.

17     The United States Supreme Court has held that an instruction
18 based on the "unadorned" version of factor (k) is not erroneous.
19 *Boyde*, 494 U.S. at 380.  The Court found it was not reasonably
20 likely a jury would think the instruction was limited to evidence
21 related to the crime or that it prevented the consideration of
22 background and character.  *Id.* at 381-82.

23     The record fairly supports the California Supreme Court's
24 denial of this claim.  Claim 18d is denied on the merits.
25 */////*

26

1       **(5)  SUBCLAIM e: FACTORS NOT IDENTIFIED AS AGGRAVATING**

2       **OR MITIGATING**

3    **Hamilton asserts that § 190.3 is unconstitutionally vague**

4  **because it fails to identify which factors are to be considered**

5  **aggravating and which are to be considered mitigating.**

6    **This claim is foreclosed by** *Tuilaepa v. California.* **"A**

7  **capital sentencer need not be instructed how to weigh any**

8  **particular fact in the capital sentencing decision. . . . [but]**

9  **is free to consider a myriad of factors . . . [and] given**

10  **unbridled discretion in determining whether the death penalty**

11  **should be imposed."  512 U.S. at 979-80.**

12    **The record fairly supports the California Supreme Court's**

13  **summary denial of this claim.  Claim 18e is denied on the merits.**

14    **d.   CLAIM 19:   INFLATED AGGRAVATION/UNCONSTITUTIONAL**

15       **STATUTE**

16     **(1)  SUBCLAIM a: DOUBLE/TRIPLE COUNTING**

17    **Hamilton asserts certain acts were counted more than once,**

18  **as elements of the crime, and/or special circumstances, and in**

19  **aggravation, violating double jeopardy.** *See* **Claim 18b above.**

20  **Hamilton contends this double-counting resulted in "automatic**

21  **aggravating circumstances," making California's death penalty**

22  **statute in effect mandatory, especially when combined with:**

23  **(i) the mandatory language of the statute,** *see* **Claim 7b above;**

24  **(ii) the erroneous double counting of multiple murder special**

25  **circumstance; (iii) the erroneous instruction and argument that**

26  **the absence of mitigation was aggravating,** *see* **Claim 7a above;**

1  and (iv) the invitation by statute, the court, prosecutor and

2  defense counsel to determine the sentence based on mathematical

3  comparison of aggravation and mitigation.  *See* Claim 7a above.

4       Hamilton's claim that the charging of two separate multiple-

5  murder special circumstances requires reversal, was rejected by

6  the California Supreme Court on direct appeal.  The Court found

7  the duplicate charging erroneous, but found no basis to reverse

8  the penalty as there appeared no reasonable possibility the jury

9  gave significant independent aggravating weight to the fact that

10  two multiple-murder special circumstances, rather than one, had

11  been charged and found.  *Hamilton,* 48 Cal. 3d at 1180-81.

12  Hamilton asserts the error of charging two multiple-murder

13  special circumstances requires reversal because California's

14  statute calls for weighing and the California Supreme Court did

15  not re-weigh the aggravating and mitigating factors, as required

16  by *Stringer v. Black*, 503 U.S. 222, 229-30 (1992).

17       The United States Supreme Court recently held California is

18  a non-weighing state.  *Sanders*, 546 U.S. 212, 126 S. Ct. at 893.

19  However, the Supreme Court found the weighing/non-weighing scheme

20  needlessly complex and incapable of providing for the full range

21  of variations, and so imposed the following rule: "An invalidated

22  sentencing factor (whether an eligibility factor or not) will

23  render the sentence unconstitutional by reason of its adding an

24  improper element to the aggravation scale in the weighing process

25  *unless* one of the other sentencing factors enables the sentencer

26  to give aggravating weight to the same facts and circumstances."

1   *Id.* 546 U.S. 212, 126 S. Ct. at 891-892.

2       California's eligibility factors, the special circumstances

3   of § 190.2, are designed to satisfy the narrowing requirement of

4   *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam).   *See*

5   *Sanders*, 546 U.S. 212, 126 S. Ct. at 892.   If the jury finds one

6   charged special circumstances true, a penalty trial follows at

7   which the jury must "take into account" the *separate* list of

8   sentencing factors from § 190.3 which include the "circumstances

9   of the crime."   *Id.* 546 U.S. 212, 126 S. Ct at 892-93.   Even if

10  the direction in § 190.3(a) to consider "the existence of any

11  special circumstances found to be true" placed special emphasis

12  upon the facts and circumstances relevant to an invalid factor,

13  that impact "cannot fairly be regarded as a constitutional defect

14  in the sentencing process."   *See Sanders*, 546 U.S. 212, 126

15  S. Ct. at 894;   *Zant v. Stephens*, 462 U.S. 862, 889 (1983).

16      Applying *Sanders*' analysis to the special circumstances

17  Hamilton's jury found true, the California Supreme Court

18  invalidated one of the multiple murder special circumstances;

19  but each of the remaining two special circumstances, one of

20  multiple murder and one of murder for financial gain, is

21  independently sufficient to uphold Hamilton's death sentence.

22  The facts and circumstances considered by the jury in support of

23  the valid special circumstances, properly admitted under the

24  "circumstances of the crime" sentencing factor, were the same

25  facts and circumstances supporting the invalid special

26  circumstance.   *See Sanders*, 546 U.S. 212, 126 S. Ct. at 893-94.

1    The remaining allegations underlying this claim have been

2  rejected above in Claims 7 and 18.   The federal constitution

3  requires that sentence selection be made after "a broad inquiry

4  into all relevant mitigating evidence to allow an individualized

5  determination."  *Buchanan*, 522 U.S. at 276; *Tuilaepa,* 512 U.S. at

6  971-73; *Stephens*, 462 U.S. at 878-79.   The sentencer may not be

7  prevented from considering, nor refuse to consider, any such

8  mitigating evidence.  *Buchanan,* 522 U.S. at 276; *Eddings v.*

9  *Oklahoma*, 455 U.S. 104, 114-15 (1982).   The jury "need not be

10  instructed how to weigh any particular fact in the capital

11  sentencing decision," but is permitted unbridled discretion in

12  determining the appropriate sentence.   *Tuilaepa,* 512 U.S. at 979;

13  *Buchanan,* 522 U.S. at 276; *Stephens*, 462 U.S. at 875.   Hamilton

14  provides no evidence, nor does review of the record indicate,

15  that the jury's consideration of mitigating evidence was

16  impacted.   The record fairly supports the California Supreme

17  Court's summary denial of this claim.   Claim 19a is denied on the

18  merits.[35]

19

20    [35] Hamilton raised three other challenges to the death penalty
statute for which he provides no factual basis or argument:

21  subclaim (b) that no instruction identifying the mitigating factors
which were supported by some evidence was given; subclaim (c) that

22  improper classifications differentiate between acts and mental
state which may be considered in aggravation or mitigation from

23  those that may not bear a significant relationship to the
retributive and deterrent justifications of the death penalty; and

24  subclaim (d) that a death sentence may be imposed on the basis of
a "personal characteristic" which is not a rational or legitimate

25  basis and lacks sufficient justification for imposing death.   No
explanation is given which defines the challenged classifications

26  under subclaim (c) or the challenged personal characteristic under
subclaim (d).   Subclaims (b), (c) and (d) are denied on the merits
as they fail to state a prima facie claim for relief.

1        (2)  SUBCLAIM e: ARGUING THAT ABSENCE OF MITIGATION WAS
2        AGGRAVATING

3     Hamilton contends his death sentence is unreliable since the
4 prosecutor was allowed to argue that the absence of evidence on a
5 mitigating factor constitutes aggravation.  See Claim 7a above.
6 Hamilton asserts this error created an unconstitutional
7 presumption of the appropriateness of death and the existence of
8 aggravation, falsely inflated the number of aggravating
9 circumstances, confused the jurors, thwarted the requirement of
10 carefully channeling their sentencing discretion, and created
11 aggravating circumstances which bore no rational relationship to
12 the question of whether a man should live or die.

13     As discussed in Claim 7a above, the *Davenport* error in the
14 prosecutor's argument was harmless.  The record reveals the
15 jurors were not misled about either their discretion or their
16 responsibility to determine the appropriate penalty under all the
17 evidence.  In light of the entire record, the prosecutor's
18 erroneous argument did not render the proceedings unfair.  The
19 record fairly supports the California Supreme Court's summary
20 denial of this claim.  Claim 19e is denied on the merits.

21     e.  CLAIM 20:  IMPROPER AGGRAVATION

22     Hamilton asserts his death sentence was improperly imposed
23 because unconstitutional prior convictions were relied on to
24 prove aggravating factors, and evidence of aggravation not
25 enumerated in § 190.3 was considered.

26     The prosecutor admitted into evidence during the penalty

ORePetnHam

148

1 phase one of Hamilton's prior conviction for grand theft.   RT

2 10:2373.   California Penal Code section 190.3(c) lists prior

3 convictions as a valid sentencing factor.   Hamilton does not

4 specify in the petition or his briefing how his prior grand theft

5 conviction was unconstitutional, or what aggravating evidence not

6 enumerated in § 190.3 was considered.   Based on these

7 allegations, defense counsel was not ineffective for failing to

8 object to evidence submitted in aggravation.   The record fairly

9 supports the California Supreme Court's summary denial of this

10 claim.   Claim 20 is denied on the merits.

11 6.   CLAIM 22:   CUMULATIVE ERROR

12     Hamilton argues that the cumulative effect of the errors in

13 the guilt and penalty phases of his trial resulted in an

14 unconstitutional death sentence.

15     Where no claim establishes a violation of constitutional

16 law, there is no reason to grant habeas relief based on

17 cumulative error.   *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.

18 1996).   *See also Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir.

19 1997) ("Cumulative-error analysis applies where there are two or

20 more actual errors").   Two errors at the penalty phase exist

21 here, as also found by the California Supreme Court, *see*

22 *Hamilton*, 48 Cal. 3d at 1186, both of which were individually

23 found to be harmless: the prosecutor's argument that lack of

24 mitigation was aggravating (Claim 7a), and the two special

25 circumstances for multiple murder (Claim 19a).   Considering these

26 errors cumulatively, even assuming arguendo, the additional

1   possible error that trial counsel's performance at the penalty

2   phase was deficient for failing to investigate and present more

3   mitigating evidence (Claim 2b), prejudice is not established.

4   The record provides substantial support for both of the jury's

5   conclusions:  that Hamilton with cold-blooded premeditation

6   planned and endeavored three thime over three days to murder his

7   wife and unborn child.  When co-conspirators were twice unable to

8   perpetrate the shotgun killing, Hamilton himself carried out the

9   execution by shooting his wife, killing her and their unborn

10  child.  A jury was justified on the facts finding that death was

11  the appropriate sentence.  Claim 22 is denied on the merits.

12  <u>VII. CONCLUSION</u>

13       Hamilton, who has never accepted responsibility for the

14  murder, continues to maintain that someone else, namely his

15  sister Carolyn and her friend Gilbert Garay killed Gwen without

16  his knowledge or participation.  This defense was fully presented

17  at trial, and it was rejected by the jury.  Hamilton's own

18  statements and other evidence, such as the testimony of his

19  girlfriend, Brenda Burns; the inconsistencies in Hamilton's

20  statements to police and his prevarication about a Canadian

21  suspect; all indicate that Hamilton was involved in the shooting.

22  The testimony of Hamilton's mother and his sister Vicki

23  corroborate Carolyn's and Gilbert's accounts of Hamilton's plan:

24  that for two days in a row Hamilton drove his wife and children

25  on a country road to create the opportunity for Carolyn and

26  Gilbert to shoot Gwen.  When they dod not act, Hamilton, on the

ORePetnHam

**150**

1   next night took over and himself shot and killed Gwen and his

2   unborn child.  No evidence has been presented of any error which

3   shows a "substantial and injurious effect or influence in

4   determining the jury's verdict" or the deprivation of a fair

5   trial in violation of Hamilton's right to due process.  *Brecht*,

6   507 U.S. at 623.

7       Hamilton cold-bloodedly planned to murder his wife; intended

8   to share the life insurance proceeds with the actual killer;

9   eventually carried out the murder himself; and did this at the

10  expense of his unborn child's life to obtain the life insurance

11  money and to clear the way for him to be with his mistress.  In

12  light of the very extensive evidence of ruthless premeditation,

13  it is not reasonably probable, under any scenario, that there was

14  a substantial or injurious effect or injury to the jury's

15  verdict, or a deprivation of a fair trial in violation of the

16  right to due process.  *Brecht*, 507 U.S. at 623.

17  <u>VIII.  CERTIFICATE OF APPEALABILITY</u>

18      Appeal from an order denying habeas relief lies only if

19  leave to appeal is obtained.  The AEDPA amended 28 U.S.C. § 2253

20  to require a "certificate of appealability" ("COA"), which may be

21  granted only upon a "substantial showing of the denial of a

22  constitutional right," and must issue on a claim specific basis.

23  A substantial showing of the denial of a constitutional right

24  includes showing that reasonable jurists could debate whether (or

25  for that matter agree that) the petition should have been

26  resolved in a different manner or that the issues presented

1   deserve encouragement to proceed further.  *Slack v. McDaniel*, 529

2   U.S. 473, 483-84 (2000), (citing *Barefoot v. Estelle,* 462 U.S.

3   880, 893 and n.4 (1983)).

4       *Slack* held the § 2253 certificate of appealability

5   requirement has retroactive effect to petitions filed before the

6   AEDPA's effective date when the appeal commences after the

7   effective date.  *Id.* at 481.  Hamilton is subject to certificate

8   of appealability requirements of the AEDPA.

9       Although there is no showing of the denial of a

10  constitutional right for any claim advanced, there are two issues

11  where jurists of reason may differ.  A certificate of

12  appealability shall issue on Claim 2b, ineffective assistance of

13  counsel for failure to investigate and present mitigation at

14  penalty; and, since the law on this issue is currently unclear in

15  the Ninth Circuit, on Claim 3b(4) and related Claim 8,

16  prosecutorial misconduct as to Gilbert's plea agreement,

17  testimony and subsequent declaration.

18  */////*

19

20

21

22

23

24

25

26

1  <u>IX.   ORDER</u>

2      For the reasons stated above, IT IS ORDERED:

3      1.  Hamilton's petition for writ of habeas corpus is DENIED

4  on the merits on every ground advanced.  All declarations and

5  evidentiary submissions, including testimony and exhibits

6  received at the evidentiary hearing, have been fully considered,

7  including the offers of proof.

8      2. A certificate of appealability shall issue on Claim 2b

9  and Claim 3b(4) and related Claim 8.

10      3. Judgment shall be entered for RESPONDENT, the State, and

11  against PETITIONER, Michael Allen Hamilton.

12

13  **IT IS SO ORDERED.**

14  **Dated:   October 27, 2006         _____ /s/ Oliver W. Wanger_____**
    **b64h1h                          UNITED STATES DISTRICT JUDGE**

15

16

17

18

19

20

21

22

23

24

25

26

ORePetnHam                    **153**